**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BUFFALO GROVE POLICE PENSION FUND, Derivatively on Behalf of Nominal Defendant NAVIENT CORPORATION, )))) | C.A. No. _____ |
| Plaintiff, )) | |
| v. )) | |
| WILLIAM M. DIEFENDERFER, III, JOHN K. ADAMS, ANNA ESCOBEDO CABRAL, DIANE SUITT GILLELAND, KATHERINE A. LEHMAN, LINDA A. MILLS, JOHN (JACK) F. REMONDI, JANE J. THOMPSON, LAURA S. UNGER, BARRY L. WILLIAMS, ANN TORRE BATES, STEVEN L. SHAPIRO, BARRY A. MUNITZ, TIMOTHY J. HYNES, IV, SOMSAK CHIVAVIBAL, JOHN M. KANE, and CHRISTIAN M. LOWN, )))))))))))))))) | |
| Defendants, )) | |
| - and - )) | |
| NAVIENT CORPORATION, )) | |
| Nominal Defendant. )) | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF CLAIMS ........................................................ 1

II.  JURISDICTION AND VENUE ............................................................................... 5

III.  PARTIES ............................................................................................................ 6

  A.  Plaintiff ..................................................................................................... 6

  B.  Nominal Defendant ..................................................................................... 7

  C.  Director Defendants ................................................................................... 8

  D.  Former Director and Executive Defendants ............................................... 10

IV.  THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS ....................... 11

  A.  Duties of All Individual Defendants ........................................................... 11

  B.  Additional Duties of the Audit Committee Defendants ............................... 14

  C.  Additional Duties of the Finance and Operations Committee
      Defendants ............................................................................................... 16

V.  SYSTEMATIC DEFICIENCIES CAUSE NAVIENT TO VIOLATE
    POSITIVE LAW FROM ITS INCEPTION ............................................................ 18

  A.  The Federal Government's Student Loan Programs ................................... 18

  B.  Forbearance Is Intended for Short Term Financial Hardship and Is Not
      Suitable as a Long Term Solution ............................................................. 19

  C.  Navient Systematically Favored Forbearance over IDRs, Even Where
      an IDR Would Guarantee Payment to Navient by the Federal
      Government ............................................................................................... 22

  D.  Navient Provided Borrowers with Inadequate Notice Regarding
      Annual Renewals ...................................................................................... 25

  E.  Navient Failed to Provide Borrowers with Accurate Information
      Relating to Cosigner Release Requirements .............................................. 27

  F.  Pioneer Misinformed Borrowers Regarding the Effects of the Federal
      Loan Rehabilitation Program and Failed to Implement Controls to
      Correct Those Misrepresentations ............................................................ 28

i

G.    Navient Repeatedly Committed Payment Processing Errors and Failed to Implement Internal Controls to Prevent their Reoccurrence ........................... 30

H.    Navient Misreported the Status of Military Accounts ......................................... 31

VI.    NAVIENT SYSTEMATICALLY MAINTAINED DECEPTIVE AND ABUSIVE PRACTICES IN KNOWING VIOLATION OF FEDERAL LAW .............. 32

A.    Navient Failed to Comply with the Law ................................................................ 32

B.    As a Result of Defendants' Breach of Their Fiduciary Duties, the Company Is Sued by the CFPB, ILAG, and WAAG ........................................... 33

VII.    SECURITIES CLASS ACTION LAWSUITS ARE FILED AGAINST THE COMPANY, EXPOSING IT TO FURTHER HARM ...................................... 36

A.    Defendants' Misconduct Has Exposed the Company to a Series of Lawsuits that Injured Its Reputation and Financial Health .................................. 36

B.    The Securities Litigation Alleges that Navient Misled Stockholders Regarding Its: (i) Forbearance Practices, the Credit Quality of Its Loan Portfolio, and Its Financial Results; (ii) Compliance with Legal and Regulatory Requirements; and (iii) Liquidity and Financing Arrangements ....................................................................................................... 37

1.    Navient's Management Misled Stockholders Regarding Its Forbearance Practices ................................................................................... 37

2.    Navient's Management Misled Stockholders Regarding Navient's Compliance with State and Federal Laws and Regulations ....................................................................................................... 40

3.    Navient's Management Misled Stockholders About Its Liquidity and Financing Arrangements ....................................................................... 41

C.    Additional Misleading Statements in Navient's Proxy Statements ..................... 43

D.    The Truth Begins to Emerge About Navient's Forbearance Practices, Its Non-Compliance with Legal and Regulatory Requirements, and Its Liquidity and Financial Arrangements ................................................................ 45

VIII.    DAMAGES TO NAVIENT ...................................................................................... 49

IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ...................................... 50

A.    Demand on Defendant Remondi Is Futile Due to His Position as the Company's President and Chief Executive Officer ............................................. 52

B.     Demand on Defendants Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams Is Futile Due to Their Positions on the Audit Committee ............................................................................ 53

C.     Demand on Defendants Williams, Adams, Cabral, Lehman, Gilleland, Mills, and Thompson Is Futile Due to Their Positions on the Finance and Operations Committee ................................................................. 54

X.     INSIDER TRADING ALLEGATIONS ........................................................ 55

XI.     CAUSES OF ACTION ................................................................................... 57

COUNT I Breach of Fiduciary Duty ............................................................ 57

COUNT II Violations of Section 10(b) of the Exchange Act ....................... 57

COUNT III Violation of Section 14(a) of the Exchange Act ........................ 59

COUNT IV Violation of Section 29(b) of the Exchange Act ........................ 60

COUNT V Breach of Fiduciary Duty for Insider Trading ............................ 61

XII.     PRAYER FOR RELIEF ................................................................................. 62

Plaintiff Buffalo Grove Police Pension Fund ("Plaintiff"), by and through its undersigned counsel, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Navient, Inc. ("Navient" or the "Company") against certain current and former members of Navient's Board of Directors (the "Board") and certain Navient executives for breaching their fiduciary duties.

Plaintiff makes these allegations upon personal knowledge, as to the facts of its ownership of Navient stock, and upon the investigation of counsel, as to all other matters, which included review and analysis of: (a) documents obtained pursuant to 8 *Del. C.* §220 (the "220 Documents"); (b) public filings made by Navient and other parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publically disseminated publications; (d) lawsuits filed by the Consumer Financial Protection Bureau ("CFPB") and the attorneys general of the State of Illinois ("ILAG"), State of Washington ("WAAG"), and Commonwealth of Pennsylvania ("PAAG") (collectively, the "State AGs"); and (e) related federal securities class actions brought against the Company.

## I.      INTRODUCTION AND SUMMARY OF CLAIMS

1.      This stockholder derivative action arises out of the Board's breach of their fiduciary duties in failing to diligently and disinterestedly serve Navient.  Specifically, the Individual Defendants (defined below) knowingly caused Navient to manipulate its student loan servicing and collection practices to mislead borrowers, with regard to their rights, in violation of federal and state law.  Navient caused borrowers to incur millions in additional costs.  As the CFPB and multiple state attorneys general have alleged, Navient: (i) failed to advise borrowers to enter into appropriate income-driven repayment programs ("IDRs"), instead steering them to enter into costly forbearance, when not appropriate, in order to save on costs and create additional future interest; (ii) failed to provide adequate notice to borrowers for submission of the

required annual paperwork to keep lower, income-based payments and/or to allow cosigners to be released from loan obligations; (iii) misinformed borrowers regarding the benefits of loan rehabilitation programs and certain collection costs; (iv) committed repeated payment processing errors and failed to implement internal controls to prevent their re-occurrence, leading to misapplied payments and the false reporting loans as delinquent; and (v) misreported the status of military accounts.  When the Individual Defendants no longer were able to conceal their misconduct under the mounting number of customer complaints that were attracting regulators' scrutiny, Navient's reputation suffered, wiping much of its and stockholders' value. Unsurprisingly, this misconduct resulted in both regulatory and private action against the Company, including two securities class actions, as well as lawsuits by the CFPB and State AGs, causing both financial and reputational harm to the Company.  Certain Individual Defendants also capitalized on Navient's artificially inflated stock price before Navient's conduct was made plain, making over $1.2 million dollars in stock sales.

2.       Navient is a publicly traded company principally engaged in loan management and servicing of private and federal student loans for approximately 12 million customers with $300 billion in outstanding balances, including 6.1 million customers whose accounts are serviced under Navient's contract with the U.S. Department of Education ("DOE").  Navient's 2017 net income was $292 million.

3.       Beginning in at least May 14, 2014, and continuing until at least January 2018 (the "Relevant Period"), Navient engaged in a widespread and systemic practice of regularly steering borrowers experiencing long-term financial hardship into forbearance, instead of counseling them to enroll in IDR plans, which were more appropriate for their situation.  The Navient Board turned a blind eye while the Company violated federal law in order to avoid the

operating costs associated with enrollment in IDR plans, which required extra administrative and time resources.  Indeed, between January 2010 and March 2015, the number of borrowers enrolled in forbearance exceeded the number of borrowers enrolled in IDR plans.  Notably, this practice occurred despite the fact that more than 50% of Navient borrowers, who needed payment relief and were eligible for an IDR plan, qualified for a $0 monthly payment.

4.      Due to a lack of necessary internal controls and compliance measures, Navient's customer service representatives also failed to adequately advise borrowers regarding a number of loan servicing issues.  ***First***, while Navient managed to circulate notices to borrowers, it failed to identify the applicable deadline by which their loan(s) was up for renewal in violation of state and federal law.  Neither did Navient provide adequate language apprising its customers of the severe consequences of submitting an incorrect, incomplete, or untimely renewal form. Furthermore, borrowers who consented to receiving electronic notices only received a boilerplate email with a generic subject line that failed to alert borrowers in an IDR plan of the importance of the email, resulting in over 60% of borrowers failing to timely renew their IDR plan enrollment.  ***Second***, Navient imposed on their borrowers undisclosed hurdles to make cosigner release less attainable.  For example, Navient did not disclose to borrowers that making no payment in response to a $0 balance monthly invoice would count as a failure to make an "on-time payment," delaying the required 12 months of "consecutive, on-time principal and interest payments" in order for a cosigner to be released from payment obligations.  Instead, Navient reset borrowers' progress, thereby delaying their fulfillment of the eligibility criteria for cosigner release.

5.      Furthermore, in a direct violation of state and federal laws and regulations, Navient committed payment processing errors whereby Navient misallocated payments intended

and/or designated for a specific loan.  Navient continued to commit such errors despite being apprised of their occurrence and magnitude and failing to take any meaningful steps to reduce these errors.  This caused borrowers and cosigners to incur improper late fees and increased interest charges, which Navient, in turn, reported inaccurately to consumer credit agencies, negatively impacting borrowers' credit.   Navient applied these sloppy procedures indiscriminately.

6.     As a consequence of the Company's practices in violation of the applicable state and federal laws and regulations, Navient's customers frequently complained, only to be subject to the same error time and again.  As a result of growing negative customer sentiment, many borrowers began to reach out to regulators, such as the CFPB and local agencies, which, in turn, recorded an increased number of complaints sharing the same underlying grievances.

7.     Notwithstanding the nature of Navient's forbearance practices and its failure to adequately service borrowers' loans, the Individual Defendants continued to tout the credit quality of its loan portfolio, financial results, compliance with regulatory requirements, and liquidity and financing arrangements of the Company.  Indeed, Navient's regulatory filings with the SEC – including the proxy statement that accompanied Navient's Spin-Off (defined below) from SLM Corporation ("Sallie Mae") – are replete with managements' assurances of Navient's improved credit quality of its loan portfolio, positive delinquency and charge-off trends, "robust compliance driven culture," and its capacity available under its credit facilities.

8.     The Individual Defendants were well aware of Navient's practices that were violative of the law, and that there were no effective controls to gauge whether further Company practices were compliant.  Yet they failed to take any steps to prevent Navient's illicit practices from continuing.

9.      As a result, Navient's Board has not, and will not, commence litigation against the Individual Defendants named in this Complaint, nor will they vigorously prosecute such claims, because they face a substantial likelihood of liability to Navient for condoning, and failing to stop, the Company from steering borrowers into forbearance and failing to adequately service their customers' loans.  The Navient Board also faces a substantial likelihood of liability because the Board members had actual knowledge that Navient and certain executives made false statements in violation of the federal securities laws.  Additionally, the Individual Defendants face a substantial likelihood of liability to Navient for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred and is certain to continue to occur.

10.      Moreover, while they knew Navient was engaging in the practices described herein, and while the Company's stock traded at artificially inflated prices as a result, Board member Defendants William M. Diefenderfer, III ("Diefenderfer"), Ann Torre Bates ("Bates"), and Diane Suitt Gilleland ("Gilleland") disposed of their personal holdings of Navient stock for a collective total exceeding $1.2 million.  Thus, a pre-suit demand upon the Board is a useless and futile act, and Plaintiff rightfully brings this action on Navient's behalf.

## II.    JURISDICTION AND VENUE

11.      Jurisdiction lies pursuant to Article III, Section 2 of the United States Constitution at 28 U.S.C. §1331.  The claims asserted herein arise under §§10(b), 14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78n(a), 78t(a), and 78cc(b), and Rules 10b-5, 17 C.F.R. §240.10b-5, and 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.  In connection with the wrongdoing complained of herein, Defendants (defined below)

used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.

12.     This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this District, or is an individual who maintains a place of business in this District or has sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

13.     Venue is proper in this jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) Navient is headquartered in, and therefore is a resident of, the State of Delaware; (ii) one or more of the Individual Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Navient and its stockholders, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

III.    **PARTIES**

       **A.    Plaintiff**

14.     Plaintiff Buffalo Grove Police Pension Fund is a current stockholder of Navient, has continuously held Navient stock since at least April 2014, and is committed to retaining Navient shares throughout the pendency of this action to preserve its standing.  Plaintiff will

adequately and fairly represent the interests of Navient and its stockholders in enforcing his rights.

**B.    Nominal Defendant**

15.    Nominal Defendant Navient is a Delaware corporation with its principal executive offices located at 123 Justison Street, Wilmington, Delaware 19801.  Navient came to exist as a result of its separation from Sallie Mae in April 2014 through the distribution of the Company's common stock to the stockholders of Sallie Mae (the "Spin-Off").  Navient is principally engaged in loan management and servicing of private and federal student loans.  The Company services loans for approximately 12 million customers, including 6.1 million customers whose accounts are serviced under Navient's contract with the DOE.  Navient's 2017 net income was $292 million.[1]

16.    Navient underwent a corporate reorganization in 2014.  Navient became the successor to Sallie Mae and Navient, LLC.  In connection with the reorganization, Navient assumed liabilities relating to servicing and collection conducted by Navient, LLC and their subsidiaries, including, Pioneer Credit Recovery, Inc. ("Pioneer").  The liabilities assumed include the servicing and collection practices described in this Complaint.

17.    Navient wholly owns its subsidiary, Pioneer, which is principally engaged in debt collection of outstanding and delinquent student loans.  Pioneer is a "debt collector" within the Consumer Financial Protection Act of 2010 ("FCPA"), 12 U.S.C. §1692a(6).  Navient is the direct or indirect owner of all of the stock of Pioneer.

18.    Pioneer is a wholly owned subsidiary of Navient Corp. and is headquartered in Arcade, New York.  Pioneer is engaged in the debt collection of Navient's outstanding and delinquent student loans.  Pioneer is not named as a Defendant in this action.

---

[1]        *See* Navient Corp., Annual Report at 38 (Form 10-K) (Feb. 26, 2018).

19.     The Navient Code of Conduct[2] applies to "all other direct and indirect subsidiaries of Navient." *Id.* at 5.  In order for a Navient director to be considered independent, according to the policies annunciated in Navient's own Governance Guidelines,[3] the director must be independent of the employees and services of all of Navient's subsidiaries.  *Id.* at 2.  In addition, there is significant overlap in the management of Navient and Pioneer.  For instance, Jack Frazier, a current director and the former President of Pioneer, also serves as Senior Vice President for Navient, and Jeff Mersmann, the current President of Pioneer, also serves as Vice President for Navient.

### C.     Director Defendants

20.     Defendant Remondi has served as the President and CEO of Navient since its Spin-Off from Sallie Mae in April 2014.  He also has served as a director on the Board since the Company's inception in April 2014.  Prior to the Spin-Off, Defendant Remondi served as Sallie Mae's President and Chief Operating Officer ("COO").  Defendant Remondi signed the Sarbanes-Oxley Act of 2002 ("SOX") Certifications on a number of Navient's quarterly and annual regulatory filings in 2014, 2015, and 2016.

21.     Defendant Diefenderfer has served as the Chairman of the Board since the Company's Spin-Off from Sallie Mae in April 2014.  Prior to the Spin-Off, he served as a member of the Sallie Mae Board of Directors.

---

[2]     *Code of Business Conduct*, NAVIENT (Aug. 2017), https://www.navient.com/assets/about/investors/corp-governance/business-code/Navient-CodeOfBusinessConduct.pdf  (the  "Code  of Conduct").

[3]     *Board Governance Guidelines for Navient Corporation*, NAVIENT (Nov. 2017), https://www.navient.com/assets/about/investors/corp-governance/Navient-BoardGuidelines.pdf (the "Governance Guidelines").

22.     Defendant Anna Escobedo Cabral ("Cabral") has served as a director on the Board since December 2014 and served as acting Chair of the Audit Committee on two occasions in 2016.

23.     Defendant Katherine A. Lehman ("Lehman") has served as a director on the Board since December 2014.

24.     Defendant Linda A. Mills ("Mills") has served as a director on the Board since the Company's Spin-Off from Sallie Mae in April 2014.

25.     Defendant Jane J. Thompson ("Thompson") has served as a director on the Board since the Company's Spin-Off from Sallie Mae in April 2014.

26.     Defendant Laura S. Unger ("Unger") has served as a director on the Board and Vice Chairman of the Audit Committee since December 2014.

27.     Defendant Barry L. Williams ("Williams") has served as a director on the Board since the Company's Spin-Off from Sallie Mae in April 2014.  He was previously a member of the Sallie Mae Board of Directors.

28.     Defendants Remondi, Diefenderfer, Cabral, Lehman, Mills, Thompson, Unger, and Williams are referred to herein as the "Director Defendants" and are comprised of 8 of the 10 total members of the current Navient Board, which is a majority of the Board, as of the time of the filing of this Complaint.[4]

29.     Defendants Diefenderfer, Unger, Cabral, Thompson, and Williams are referred to herein as the "Audit Committee Defendants."

30.     Defendants Williams, Cabral, Lehman, Mills, and Thompson are referred to herein as the "Finance and Operations Committee Defendants."

---

[4]     The sole remaining Board member, David L. Yowan, was appointed to the Navient Board on April 4, 2017 and is not named as a Defendant in this action.

**D.      Former Director and Executive Defendants**

31.      Defendant Gilleland has served as a director on the Board since the Company's Spin-Off from Sallie Mae in April 2014.  Prior to the Spin-Off, she served as a member of the Sallie Mae Board of Directors.

32.      Defendant John K. Adams ("Adams") joined the Board in December 2014.

33.      Defendant Bates served as a director on the Board and the Chair of the Audit Committee following the Company's Spin-Off from Sallie Mae in April 2014.  Defendant Bates was a member of the Board and Chair of the Audit Committee until May 25, 2016, at which time she became Chair of the Nominations and Governance Committee.  She continued to serve on the Audit Committee until her resignation from the Board on August 16, 2016.

34.      Defendant Steven L. Shapiro ("Shapiro") served as a director on the Board following the Company's Spin-Off from Sallie Mae in April 2014.  Defendant Shapiro also served on the Compensation and Personnel Committee and the Nominations and Governance Committee during 2016 until his retirement from the Board in May 2016.

35.      Defendant Barry A. Munitz ("Munitz") served as a director on the Board since the Company's Spin-Off from Sallie Mae in April 2014 until his retirement, effective May 25, 2017. Defendant Munitz served on the Nominations and Governance Committee through 2016.  Upon the departure of Defendant Bates in August 2016, the Board appointed Defendant Munitz as Chair of the Nominations and Governance Committee.

36.      Defendant Hynes has been Navient's Executive Vice President of Consumer Lending since June 2017.  Defendant Hynes previously served as the Company's Chief Risk & Compliance Officer from April 2014 to June 2017.  Hynes oversaw credit risk, compliance, and information security at the Company during the Relevant Period.

37.     Defendant Somsak Chivavibul ("Chivavibul") served as the Chief Decision Management Officer and Executive Vice President of Navient from March 27, 2017 to March 2018.  Defendant Chivavibul previously served as the Chief Financial Officer of Navient from April 2014 until March 26, 2017.  Chivavibul joined Sallie Mae in 1992 and worked at various positions there.

38.     Defendant John M. Kane ("Kane") has been Group President of Business Processing Solutions at Navient since June 3, 2015.  Defendant Kane oversaw the corporate transaction creating Navient as a separate entity from Sallie Mae, and served as Navient's COO during its first year, from April 2014 to June 2015.

39.     Defendant Christian M. Lown ("Lown") has been Chief Financial Officer and Executive Vice President of Navient since March 27, 2017.

40.     Defendants Diefenderfer, Adams, Cabral, Gilleland, Lehman, Mills, Remondi, Thompson, Unger, Williams, Bates, Shapiro, Munitz, Hynes, Chivavibul, and Lown are referred to herein as the "Individual Defendants."

41.     Nominal Defendant Navient and the Individual Defendants are referred to herein as the "Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.     Duties of All Individual Defendants

42.     By reason of their positions as present or past officers and/or directors, and by virtue of their ability to control the business and corporate affairs of Navient, each Individual Defendant owed, and owes, Navient and its stockholders fiduciary obligations of loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  The Individual Defendants were,

and are, required to act in furtherance of the best interests of Navient and its stockholders, so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

43.     By virtue of their fiduciary duties of loyalty, good faith, and candor, each Individual Defendant was required to, among other things:

a.      exercise good faith to ensure that Navient's affairs were conducted in an efficient, business-like manner;

b.      exercise good faith to ensure that Navient was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and contractual obligations, including acting only within the scope of its legal authority;

c.      when put on notice of problems with Navient's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

d.      remain informed as to how Navient conducted its operations and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

44.     The Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Navient, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Individual Defendants were, or should have been, aware posed a risk of serious harm to the Company.

45.     Navient's Certificate of Incorporation[5] authorizes the Company to engage only "lawful act or activity."  *Id.* at 1.  Similarly, the Company's Code of Conduct, which is binding on all employees of Navient, including its directors and officers, expressly mandates that "[s]pecific laws and regulations that pertain to all areas of [the Company's] business must be followed."  Code of Conduct at 7.

---

[5]     *Amended and Restated Certificate of Incorporation of Navient Corporation*, NAVIENT.COM  (Mar.  21,  2014),  https://www.navient.com/assets/about/investors/corp-gover nance/Navient-CertificateOfIncorporation.pdf (the "Certificate of Incorporation").

46.     The Code of Conduct expressly recognizes that "accurate books and records are critical[]" and that "[i]naccurate, false, misleading, incomplete or careless record keeping is not acceptable[,]" which principle "applies to every facet of [Navient's] business." *Id.* Navient expressly acknowledges that its customers "***depend on the information they receive from [Navient] and expect it to be accurate***[,]" and that a "[c]ommitment to accuracy enhances our reputation in the business community and ***minimizes potentially costly legal exposure***." *Id.* [emphasis added].

47.     The Code of Conduct also prohibits Navient's employees from taking "unfair advantage of another individual or company through manipulation, concealment, abuse of confidential, proprietary or privileged information or misrepresentation of material facts." *Id.* at 18.

48.     In addition, Navient's Governance Guidelines explicitly require that it oversee and have ultimate responsibility for the Company's risk management:

> The Board and its standing committees oversee the [Company]'s overall risk management framework—including risk management philosophy, risk tolerances and risk parameters—and they periodically review this risk management framework in light of the major risks and issues facing the [Company].

Governance Guidelines at 6.

49.     Navient's 2015, 2016, and 2017 Proxy Statements highlight the following responsibilities of the members of the Board of Directors:

- Review Navient's long-term strategies and set long-term performance metrics;

- ***Review and approve Navient's annual business plan and multi-year strategic plan,*** periodically review performance against such plans and ***ensure alignment between the Company's actions and its longer-term strategic objectives***;

- ***Review risks affecting Navient and its processes for managing those risks, and oversee assignment and performance of various aspects of risk management, compliance and governance***; [and]

\* \* \*

- ***Oversee financial matters, including financial reporting and financial controls***[.][6]

## B.   Additional Duties of the Audit Committee Defendants

50.   According to the Audit Charter[7], the purpose of the Audit Committee is to, among other things:

[A]ssist the board in its oversight of:

(i)   ***the integrity of the Company's financial statements***;

(ii)   ***the Company's systems of internal controls***;

\* \* \*

(iv)   ***the performance of the Company's internal audit function***;

(v)   ***the Company's compliance with legal and regulatory requirements***; [and]

\* \* \*

(vii)   the development, maintenance and governance of the Company's risk profile and risk management policy, standards and program, including the risk appetite statement and enterprise risk management program, all as to be approved by the Board.

*Id.* at 1 [emphasis added].

51.   Additionally, the Audit Committee is charged with the responsibility of "[r]eview[ing] and discuss[ing] with management":

---

[6]   Navient Corp., Schedule 14A at 19 (Form DEF 14A) (Apr. 13, 2017) ("2017 Proxy Statement") [emphasis added]; Navient Corp., Schedule 14A (Form DEF 14A) (Apr. 15, 2016) ("2016 Proxy Statement"); Navient Corp., Schedule 14A (Form DEF 14A) (Apr. 10, 2015) ("2015 Proxy Statement") (collectively, the "Proxy Statements").

[7]   *Audit Committee of the Board of Directors Charter*, NAVIENT.COM (Aug. 2017), https://www.navient.com/assets/Navient-AuditCommittee.pdf (the "Audit Charter").

     (a)     ***major issues regarding critical accounting policies, accounting principles and financial statement presentations***, including (i) any significant changes in the Company's selection or application of accounting principles; (ii) ***significant issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies***, and (iii) any communications between the independent audit team and the independent auditor's national office regarding auditing or accounting issues presented by the engagement;

     (b)     ***analyses and reports prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements***, including analyses of the effects of alternative GAAP methods on the financial statements;

     (c)     ***the effect of regulations and accounting standards on the financial statements of the Company***;

     (d)     ***the Company's periodic financial statements and management's bases for making critical accounting estimates and assumptions contained therein***, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's periodic reports; and

     (e)     ***the Company's earnings press releases and related disclosures of historical and forecasted financial information of the Company, including earnings guidance***.

*Id.* at 2-3 [emphasis added].

     52.     Most importantly, the Audit Committee was also delegated responsibility over "Legal, Regulatory, Compliance, and Risk Oversight" that, amongst other things, includes the responsibility to:

     (17)     ***Review the Company's procedures for the receipt, retention and handling of complaints regarding accounting, internal accounting controls and auditing matters, including procedures for the confidential, anonymous submission of complaints by employees about accounting and auditing matters.***

     (18)     ***Review the Company's compliance programs on a periodic basis***, including (i) compliance risk assessment, (ii) compliance plan, and (iii) significant breaches or violations of compliance policies or the Company's Code of Business Conduct.

* * *

(20)  **Review material pending or potential legal and regulatory matters affecting the Company.**

(21)  At least annually review and recommend to the Board for its approval the Company's risk appetite framework and risk tolerances.

(22)  Periodically review with management and the Chief Risk Officer the framework for assessing and managing the risks of the Company, and the steps management is taking to monitor and control such risk.

(23)  **Periodically review the Company's compliance, performance and governance processes against the risk measures and limits contained in the Company's Board approved risk appetite framework relating to the Company's compliance program, legal risk, governance risk pertaining to the Company's control environment and policies, the Company's internal and external auditors, Code of Business Conduct, SEC rules, and compliance with NASDAQ listing standards**.

(24)  Identify for the Finance and Operations Committee any risk or compliance matter that merits a remediation or action plan.

*Id.* at 5 [emphasis added].

### C.   Additional Duties of the Finance and Operations Committee Defendants

53.    The Finance Charter[8] provides that the Finance and Operations Committee Committee's purpose is to assist the Board with providing oversight with respect to "material corporate finance matters," "business and technology operations[,]" "marketing and product development[,]" and the "oversight, mitigate[ion] and remediat[ion of] operational risk." *Id.* at 1.  To effect that purpose, the Finance and Operations Committee has been delegated the authority, amongst other things, to:

(2)  **Review the credit standing and financial risk profile of the Company**, including, without limitation, **existing liquidity, capital market access, credit, interest rate and currency risks and review with management the steps taken to manage such risks.**

---

[8]    *Finance and Operations Committee of the Board of Directors Charter*, NAVIENT.COM (Aug. 2017), https://www.navient.com/about/investors/corp_governance/board_charters/default.aspx (the "Finance Charter").

> (3)     **Review and approve the Company's investment, asset and liability management** and contingency funding policies.
>
> (4)     **Oversee the Company's capital management policies, liquidity position, capital adequacy equity investments**, proposed issuance of equity or debt by the Company and its affiliates, and plans to return capital to shareholders through dividends and share repurchase activity.
>
> * * *
>
> (6)     Review material commercial banking, investment banking, insurance, and other financial relationships of the Company.
>
> (7)     **Review of the Company's performance against its annual business plan and the performance of each of its investments or acquisition versus plan.**

*Id.* at 2 [emphasis added].

54.     Additionally, with respect to student loan portfolios, the Finance and Operations Committee has the authority and responsibility to:

> (13)     **Review asset quality, administration and management of the Company's private student loan portfolio.**
>
> (14)     **Review the administration and management of the Company's federal family education loan program loan portfolio.**
>
> (15)     **Review asset quality, administration and management of the Company's other loan portfolios, as the case may be.**

*Id.* at 3 [emphasis added].

55.     Finally, the Finance and Operations Committee is also responsible for "**[p]eriodic[] review [of] the Company's compliance and performance against the risk measures and limits contained in the Company's Board approved risk appetite framework relating to credit risk**; market risk; funding & liquidity risk; **operational risk pertaining to key business processes, including loan servicing**, collections, information technology, and vendor management**." *Id.* [emphasis added].

## V.     SYSTEMATIC DEFICIENCIES CAUSE NAVIENT TO VIOLATE POSITIVE LAW FROM ITS INCEPTION

### A.     The Federal Government's Student Loan Programs

56.     The U.S. Department of Education offers prospective students aid to help pay for their education in the form of federal student loans.  Generally, federal student loans come in two main categories: Direct Unsubsidized Loans; and Direct Subsidized Loans.  Direct Unsubsidized Loans are available to undergraduate students without requiring them to demonstrate financial need.[9]  For these loans, all interest that the borrower does not pay while enrolled at school, or during grace periods, deferment, or forbearance periods, accrues and is added to the principal amount of the loan.  *Id.*   On the other hand, Direct Subsidized Loans are available to undergraduate students demonstrating financial need.  *Id.*  The DOE pays interest on Direct Subsidized Loans: (i) while the borrower is enrolled in school at least half-time; (ii) for the first six months after the borrower leaves school; and (iii) during a period of deferment.  *Id.*

57.     Once the borrower begins repayment of the student loan, he or she can choose a repayment plan, or if none is chosen, a standard repayment plan is automatically assigned.[10]  A borrower can switch to a different plan for free at any time during the repayment period to suit his or her own individual needs and goals.  *Id.*

58.     The DOE offers a number of repayment plans.   Since 2009, the federal government started offering IDRs, which calculate the borrower's monthly student loan payments according to the borrower's income and family size.  *Id.*  The DOE offers four types of

---

[9]     Fed. Student Aid, Office of U.S. Dep't of Educ., *Types of Aid: Subsidized and Unsubsidized Loans*, STUDENTAID.ED.GOV (2018), https://studentaid.ed.gov/sa/types/loans/subsidized-unsubsidized.

[10]     Fed. Student Aid, Office of U.S. Dep't of Educ., *How to Repay Your Loans: Forgiveness, Cancellation, and Discharge*, STUDENTAID.ED.GOV (2018), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation.

IDR plans, including the "Revised Pay As You Earn Repayment Plan (REPAY)"; "Pay As You Earn Repayment Plan (PAYE)"; "Income-Based Repayment Plan (IBR)"; and "Income-Contingent Repayment Plan (ICR)." *Id.*  Most federal loans are eligible for at least one of these IDR plans.

59.    There is no required type of employment necessary to enroll in one of the four IDR plans.  Monthly payments under IDR plans are generally calculated as a percentage of discretionary income.  Accordingly, payment under an IDR plan could be as low as $0 per month for low-income borrowers.

60.    In addition to providing more affordable monthly payments, most IDR plans offer several other benefits, especially for borrowers who are experiencing a long-term financial hardship, including:

- Forgiveness of the remaining debt balance after 20 or 25 years of qualifying payments (depending on the type of IDR plan) (*id.*);

- Forgiveness of the remaining debt balance after 10 years of qualifying payments while working full time in public service, under the Public Service Loan Forgiveness ("PSLF") program (*id.*); and

- Forgiveness of unpaid interest on subsidized loans during the first three years of enrollment in an IDR plan.  The borrower will have no obligation to ever repay the three years' worth of interest, because the federal government will pay the interest in full, preventing it from being added to the principal balance of the loan.  *Id.*

**B.    Forbearance Is Intended for Short Term Financial Hardship and Is Not Suitable as a Long Term Solution**

61.    Federal student loans, including both subsidized and unsubsidized loans, are also eligible for forbearance, which is a period during which the borrower's monthly loan payments are temporarily suspended or reduced.  Forbearances are intended for circumstances when the borrower is unable to make payments.  As the DOE makes clear, forbearance is a "good short-term solution[]" for borrowers who "are struggling to repay [their] loans due to a temporary

19

circumstance[.]"[11]  Consistent with this, Navient's website suggests forbearance is intended for borrowers who "have a problem making on-time payments due to a temporary financial difficulty[.]"[12]

62.     During forbearance, principal payments are postponed, but interest continues to accrue and is added to the principal balance of the loan upon the expiration of the forbearance, increasing the total amount the borrower owes.   Additionally, borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance.   Consequently, the risk of accumulation of unpaid interest and its addition to the principal balance of the loan make forbearance unsuitable as a long-term solution.   As the DOE website provides, forbearance is not suitable for borrowers who are "having trouble repaying loans due to circumstances that may continue for an extended period[.]"[13]  Because income-driven repayment plans allow borrowers to avoid or reduce the costs associated with forbearance, for borrowers who experience long-term financial hardship, IDR plans are a significantly better option than forbearance.

63.     The DOE encourages borrowers to consult their servicers before making decisions regarding the repayment of their student loans, including, but not limited to, the following examples:

---

[11]     Fed. Student Aid, Office of U.S. Dep't of Educ., *How to Repay Your Loans: Deferment and Forbearance*, STUDENTAID.ED.GOV (2018), https://studentaid.ed.gov/sa/repay-loans/defer ment-forbearance.

[12]     Navient Solutions, LLC, *Postponing Payments: Deferment and Forbearance*, NAVIENT.COM (2018), https://www.navient.com/loan-customers/postponing-payments/deferment -and-forbearance.

[13]     Fed. Student Aid, Office of U.S. Dep't of Educ., *How to Repay Your Loans: Deferment and Forbearance*, STUDENTAID.ED.GOV (2018), https://studentaid.ed.gov/sa/repay-loans/defer ment-forbearance.

- Always contact your loan servicer immediately if you are having trouble making your student loan payments [(*id.*);]

- Your loan servicer can help you understand which repayment options are available to you[;][14]

- If you are unable to make your scheduled loan payments, contact your loan servicer immediately. Your loan servicer can help you understand your options for keeping your loan in good standing [(*id.*); and]

- The loan servicer will work with you on repayment plans and loan consolidation and will assist you with other tasks related to your federal student loan. It is important to maintain contact with your loan servicer[.][15]

64.     Like the DOE, Navient encouraged borrowers to contact Navient for advice regarding their repayment options and alternatives.  For example, Navient's website included the following statements:

- [I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default. . . . Contact Navient and your other loan servicers. We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-722-1300 and let us help you make the right decision for your situation.[16]

- We understand life sometimes takes unexpected turns, and challenging situations come up when we least expect them. If you're experiencing problems making your loans payments, please contact us. Our

---

[14]     Fed. Student Aid, Office of U.S. Dep't of Educ., *Types of Aid: Subsidized and Unsubsidized Loans*, STUDENTAID.ED.GOV (2018), https://studentaid.ed.gov/sa/types/loans/subsidized-unsubsidized.

[15]     Fed. Student Aid, Office of U.S. Dep't of Educ., *How to Repay Your Loans: Loan Servicers*, STUDENTAID.ED.GOV (2018), https://studentaid.ed.gov/sa/repay-loans/understand/servicers.

[16]     Navient Solutions, LLC, *Postponing Payments: If You're Having Trouble*, NAVIENT.COM (2018), https://www.navient.com/loan-customers/postponing-payments/if-you-are-having-trouble.

representatives can help you by identifying options and solutions, so you can make the right decision for your situation.[17]

- IMPORTANT: Stay in touch with your servicer.[18]

- What should you do if you are having trouble making your monthly loan payments? [Answer:] Call your servicer for help.[19]

65.     Navient's 2017 Proxy Statement highlighted Navient's commitment to counseling

borrowers regarding the appropriate repayment plans, stating, in relevant part:

> At Navient, we use our experience and expertise to assist our customers navigating the complex federal student loan program **by helping them understand their many options so they can choose the solution that best fits their needs. The results are outstanding.**
>
> \* \* \*
>
> We deliver this industry-leading performance by using our expertise and sophisticated data analytics to **better identify customers who need extra support, reach out in ways that result in higher rates of contact, and present repayment options they can select to fit their budget.**

[Emphasis added.]

### C.     Navient Systematically Favored Forbearance over IDRs, Even Where an IDR Would Guarantee Payment to Navient by the Federal Government

66.     Notwithstanding Navient's express commitments and guarantees that it would

help its customers identify optimal repayment options, the Individual Defendants caused Navient

to engage in a pervasive and systemic practice of regularly and indiscriminately steering

borrowers, who were experiencing long-term financial hardship, into forbearance instead of

advising them to enroll in more appropriate repayment plans, such as IDRs.

---

[17]     Navient Solutions, LLC, *Postponing Payments: Avoiding Delinquency and Default*, NAVIENT.COM (2018), https://www.navient.com/loan-customers/postponing-payments/avoiding-default.

[18]     Navient Solutions, LLC, *Student Loan Repayment Options: Examples*, NAVIENTPATH.COM (2018), https://www.navientpath.com/navientpath/curriculum/show?enrollment_id=22003288&part=1&signup=1#navient-student-loan-repayment-options/examples/page-50.

[19]     *Id.*, https://www.navientpath.com/navientpath/curriculum/show?enrollment_id=22003288&part=1&signup=1#navient-student-loan-repayment-options/examples/page-8.

67.     IDRs require an enrollment application process be completed, as well as an annual recertification to document a borrower's current income and household size in order to calculate monthly payments.  Processing of that paperwork required additional time that Navient employees were discouraged to dedicate to IDR borrowers, as a result of Navient's compensation model that instead, systematically favored forbearance.

68.     This widespread practice of swaying borrowers into forbearance plans occurred as a result of Navient's compensation policies.  Navient's employees were incentivized to push borrowers into forbearance without adequately exploring IDRs, and in some cases, without even mentioning IDRs at all.  Navient's management compensated its customer representatives based, in part, on average call time, thereby dis-incentivizing employees from engaging in the required enrollment application or annual recertification forms generally necessary for enrollment in IDRs.

69.     Navient engaged in this practice in order to avoid operating costs associated with enrolling borrowers into IDR plans.  Because forbearance enrollment, in contrast, only requires a few-minute phone conversation, Navient customer representatives routinely and systematically favored forbearance without regard to its effect on loan principal or the long-term risk that a loan continually pushed into forbearance would lead to increasingly difficult payments for borrowers.  As the CFPB observed, "[a]s the volume of [IDR] applications and renewals received by Navient increases, Navient also has to increase the size of its staff to review and process those forms, thereby increasing operating costs."

70.     As a result of these forbearance practices, between January 2010 and March 2015, the number of borrowers that Navient enrolled in forbearance had generally exceeded the number of borrowers enrolled in IDRs.  For example, in December 2010, around 9% of

borrowers with Federal Family Education Loan Program ("FFELP") loans held and serviced by Navient were enrolled in voluntary forbearance, while less than 1% of borrowers with the same loan type were enrolled in IDRs.  Similarly, in December 2012, approximately 7% of Navient's borrowers with FFELPs were enrolled in forbearance, but only 2% were enrolled in IDRs.

71.     Navient customer service representatives regularly responded to borrowers' inability to make payments by placing them into voluntary forbearance without adequately advising them about the availability of more suitable alternatives, such as the IDRs.  This practice occurred despite the fact that more than 50% of Navient borrowers, who needed payment relief and were eligible for IDRs, qualified for a $0 monthly payment.  Indeed, the CFPB reported that between January 1, 2010 and March 31, 2015: (i) nearly 25% of borrowers, who ultimately enrolled in IDRs with a $0 monthly payment, were enrolled in voluntary forbearance within the 12-month period immediately preceding their enrollment in IDRs; and (ii) nearly 16% of borrowers, who ultimately enrolled in PAYE (a specific subset of IDR) with a $0 payment, were enrolled in voluntary forbearance within the 12-month period immediately preceding their enrollment in PAYE.

72.     To make things worse, Navient enrolled many borrowers in multiple, consecutive forbearances even though they had clearly demonstrated a long-term inability to repay their loans.  According to the PAAG's complaint, captioned *Commonwealth of Pa. v. Navient Corp.*, No. 3:17-cv-01814 (M.D. Pa. Oct. 5, 2017) (the "PAAG Compl."), between January 1, 2010 and March 31, 2015, Navient enrolled over 1.5 million borrowers in two or more consecutive forbearances totaling 12 months or longer.  PAAG Compl. ¶122.  More than 30% of these borrowers were enrolled in three consecutive forbearances and almost 35% were enrolled in four or more consecutive forbearances, with each forbearance period lasting, on average, six months.

*Id.* ¶¶122-23.   Therefore, nearly one million borrowers were continuously enrolled in forbearance for a period of two to three years, or more.  *Id.* ¶122.

73.     Enrollment in multiple consecutive forbearances imposed staggering financial cost on 1.5 million borrowers serviced by Navient, negatively affecting their ability to pay the balance of their loans.  *Id.* ¶124.  Had these borrowers been enrolled in an IDR, the federal government would have paid Navient the totality of the unpaid interest on the borrowers' subsidized loans during the first three years of their consecutive enrollment and borrowers would have avoided many of the additional charges.  *Id.*

D.     **Navient Provided Borrowers with Inadequate Notice Regarding Annual Renewals**

74.     In order to qualify for an affordable payment based on income, federal student borrowers enrolled in an IDR must provide updated income and household size documentation to their loan servicer each year.  The affordable payment remains in place for a period of 12 months and expires if no renewal is received.  Negative consequences result when a borrower fails to submit an annual renewal, including: (1) the borrower's monthly payment amounts may increase; (2) any unpaid interest is added to the principal balance of the loan; (3) borrowers enrolled in subsidized loans will lose the interest subsidy paid by the federal government in each month until the borrower renews his/her enrollment; and (4) progress towards loan forgiveness is delayed for borrowers who enroll in forbearance at the expiration of the 12-month period.  These consequences are irreversible.

75.     When a borrower enrolled in an IDR with Navient, the Company sent the borrower an "initial disclosure notice" identifying the beginning and end dates of the initial enrollment in the repayment plan.  The notice advised borrowers: "You'll be notified in advance

25

when your loan(s) is up for renewal for the [IDR].  At that time, you'll be provided with a date to submit a new application."  The notice did not identify a renewal deadline.

76.     Since at least January 1, 2010, federal loan servicers have been obligated to send at least one written notice concerning the annual renewal requirements to borrowers in advance of their renewal deadline.  Navient's written notices sent between January 1, 2010 and December 2012 did not inform borrowers of the actual date by which they had to submit their renewal application to maintain their income-based, lower payments.  Instead, Navient's written notices vaguely stated that the repayment period would "expire in approximately 90 days" and that the "renewal process may take at least 30 days," making it impossible for the borrower to determine whether their renewal application would be processed by the actual renewal deadline.

77.     Besides failing to clearly identify a deadline for renewal, Navient's notices also failed to advise borrowers of the consequences of submitting renewal forms that are incomplete, inaccurate, or untimely.   Instead, the notice only stated that "by providing incorrect or incomplete information the [renewal] process will be delayed," falsely implying that delay is the only consequence of any such inadequate submission.  Navient's notices said nothing at all to inform the borrowers that a submission of incomplete, inaccurate, or untimely renewal application would have the same consequence as not submitting one at all.

78.     For Navient's borrowers who consented to electronic notices (more than 75% consented), Navient sent these notices via an email containing a hyperlink to its website.  The hyperlink lead borrowers to Navient's portal, which could only be accessed by logging in with the borrowers' user ID and password.  Borrowers who accessed Navient's portal were able to view an electronic version of the renewal notice sent via U.S. mail to other borrowers.  Neither the subject line of the email nor the content of the email contained anything that would alert

borrowers to the purpose of the email.  Instead, from at least January 1, 2010 through November 15, 2010, Navient's emails were sent with a generic subject line, which merely read "Your Sallie Mae Account Information."  From at least November 16, 2012 through March 18, 2015, the subject line of Navient's email was "New Document Ready to View."  Similarly, until mid-2015, the body of the email merely provided: "a new education loan document is available.  Please log in to your account to view it."

79.     Unlike Navient's mailed correspondence containing renewal documents, Navient's electronic correspondence sent during the same time period regarding other issues clearly identified the purpose and content of the referenced document.  For example, one such email indicated in the subject line "Your Sallie Mae – Department of Education Statement is Available" and the body of the email stated, "Your monthly statement is now available. Please log in to your account at SallieMae.com to view and pay your bill."

80.     As a result, between July 2011 and March 2015, the percentage of borrowers who did not timely renew their enrollment in income-driven repayment plans **regularly exceeded 60%** – a fact well known to Navient's management who has tracked the number of borrowers who clicked on the hyperlink to view the electronic renewal documents.

**E.     Navient Failed to Provide Borrowers with Accurate Information Relating to Cosigner Release Requirements**

81.     During the Relevant Period, Navient encouraged borrowers to enlist persons to cosign their loans in order to obtain private student loans or to obtain a loan with more favorable terms, including a lower interest rate.  Navient touted the availability of a "cosigner release," which allowed cosigners to be released from loan obligations upon the fulfillment of certain criteria.

27

82.     Prior to January 21, 2014, Navient required borrowers to make a minimum of 12 or 48 "consecutive, on-time principal and interest payments" before being able to apply for a cosigner release.   Since January 21, 2014, Navient has required 12 "consecutive, on-time principal and interest payments."   However, Navient construed "consecutive" and "on-time" payments to impose undisclosed hurdles on borrowers and to make cosigner release less attainable.

83.     Until at least mid-2015, Navient treated a borrower making no payment on a $0 bill as a failure to make a "consecutive, on-time payment" in that month for purposes of determining eligibility for cosigner release.   As a result, Navient reset the borrower's progress toward "consecutive, on-time principal and interest payments" to zero months, despite the fact that the borrower did not owe any money to Navient, and so, was not obligated to make any payment.   Navient thus illicitly delayed cosigner release by at least a year for any month in which a borrower had a $0 bill.   Borrowers who prepaid several months ahead would also be found to not have made consecutive payments for the following months in which they owed no balance to Navient.

84.     Similarly, Navient did not disclose that making no payment in response to a $0 bill could impact a cosigner's eligibility for release from student loan obligations.   Navient's website, and other consumer-facing documents, also failed to advise borrowers and cosigners of this fact.   Accordingly, Navient mislead borrowers by stating that they must make 12 "consecutive, on-time" payments before applying for cosigner release.

**F.     Pioneer Misinformed Borrowers Regarding the Effects of the Federal Loan Rehabilitation Program and Failed to Implement Controls to Correct Those Misrepresentations**

85.     The federal loan rehabilitation program allows federal student loan borrowers, who have defaulted on their loans, to restore those student loans to active repayment and remove

the default notation from their credit histories.  Once a borrower completes the rehabilitation program and has the default cured, the owner of the loan removes the default indication from the borrower's credit report, while the late payments and delinquencies associated with the default remain in place.  The adverse information reported by the original lender is only expunged or excluded from credit reports after a seven-year period following the lender's report of that default, regardless of whether the loan was rehabilitated.  Accordingly, the DOE instructs its debt collectors, such as Pioneer, not to state or imply to borrowers that completion of the loan rehabilitation program (after having defaulted on their loans) will have the effect of removing adverse default information from the borrower's credit history.

86.     From at least January 2012 through December 2014, Pioneer readily advised borrowers that ALL negative information – including pre-default delinquencies – would be removed from the borrowers' credit reports after rehabilitation.  As evidenced by the scripts utilized by Pioneer's customer service representatives, as well as Pioneer training guides, Pioneer customer representatives routinely misrepresented the effects of completing the federal rehabilitation program on their credit scores and history:

> You have qualified for a rehabilitation program. What you will need to do is make a minimum of 9 qualifying monthly payments. After all payments are made, a new lender will pay off the Department of Education for you. You will then in turn owe the new lender, which means that you will no longer be in Federal Default. All of the collection fees will be removed at the time of the sale. ***Also it will be completely deleted from your credit report as though it never happened.***

[Emphasis added.]

87.     In addition to misinforming customers about the loan rehabilitation program's effect on delinquency information, Pioneer routinely misrepresented in calls with borrowers that all collection fees assessed by the DOE on defaulted loans would be forgiven.  In fact, about 20% of each rehabilitation payment would be used to pay off the delinquency fees, and only after

the ninth rehabilitation payment would default be considered cured and any remaining collection fees be waived by the DOE.  Accordingly, by the time borrowers complete the rehabilitation program, they would have paid down a significant portion of their collection fees.

88.     On February 27, 2015, the DOE announced its intention to end its contract with Pioneer and certain other collectors, in part, as a result of an external audit, which included a review of a sample of calls indicating that Pioneer misled consumers concerning the amount of collection fees that would be forgiven for borrowers who completed the rehabilitation program.

## G.     Navient Repeatedly Committed Payment Processing Errors and Failed to Implement Internal Controls to Prevent their Reoccurrence

89.     Navient repeatedly misallocated or misapplied loan payments made by borrowers and cosigners, who paid by mailing a check or through an external bill payment system, in violation of federal and state law.

90.     Since at least July 2011, many borrowers and cosigners have complained of payment processing errors relating to how payments are applied to a specific loan or loans based on the terms of each loan's promissory note or borrowers' and cosigners' instructions.  In some instances, Navient has misallocated payments intended and/or designated for a specific loan(s) among all of a borrower's loans.  For example, Navient applied a lump sum payment to all of the borrower's loans, leaving loans that the borrower intended to satisfy unpaid.  In other cases, Navient disregarded borrowers' and cosigners' instruction regarding the allocation of payments to specific loans, thereby incorrectly applying cosigners' payments to loans they did not cosign and did not intend to contribute to.

91.     The payment processing errors resulted from an undisclosed payment allocation methodology used by Navient that places borrowers' loans in one or more billing groups and uses a default allocation whenever borrowers' payment amount varies from the exact amount

owed.  The default methodology also varied based on the type of loan and the amount of payment submitted by the borrower.  None of this variation in default allocation methodology was disclosed on any billing statements, promissory notes, or printed or online customer-facing documents.

92.    Because Navient did not make its payment processing methodology public until late 2013, Navient's borrowers had no way of knowing how their payments would be allocated.

93.    Borrowers and cosigners who submitted checks along with written instructions regarding how their payment should be processed did not fare any better, as Navient's mail reading equipment did not properly detect instructions, and so, Navient *routinely ignored its customers' payment processing instructions by default*.

94.    As a result of the errors made in the course of payment processing: (1) borrowers and cosigners incurred improper late fees and increased interest charges; and (2) inaccurate information was submitted to consumer reporting agencies.

### H.    Navient Misreported the Status of Military Accounts

95.    The DOE allows borrowers who have a total and permanent disability to have their federal loans discharged, relieving them of any obligation to pay their loans.  These include federal loans held by veterans who the U.S. Department of Veterans Affairs has determined are unemployable because they are totally and permanently disabled.

96.    According to the 2006 DOE Guidance regarding appropriate credit reporting, when a non-defaulted loan is discharged due to the total and permanent disability of the borrower, servicers should only use the reporting code "05."[20]  The 2006 DOE Guidance

---

[20]    The "2006 DOE Guidance" refers to the "New Credit Bureau Reporting for Assignments for Conditional Disability Discharge – Chart."  Fed. Student Aid, Office of the U.S. Dep't of Educ., *IFAP Electronic Announcements*, IFAP.ED.GOV (July 5, 2006), https://ifap.ed.gov/eannouncements/0705CDDCreditBureau.html.

instructs to use code "AL" to indicate that a loan has been permanently assigned to the government and is to be used only: (1) by schools holding Perkins loans and not by servicers; and (2) only when the loan is in default status prior to being discharged due to the disability of the borrower. *Id.* The same instructions, regarding the use of "AL" code, were published by the Consumer Data Industry Association in 2012.

97.     From October 2012 until approximately June 2014, Navient used the "AL" code to report a loan that had been discharged due to a borrower's total and permanent disability, in contravention of the federal government's clear instruction.  As such, Navient's furnishing of information regarding these loans was inaccurate and created the impression that the borrower defaulted on his/her loan prior to the loan being discharged, when, in fact, no such default occurred, thereby incorrectly negatively impacting the borrowers' credit score and credit worthiness.

98.     At all times, Navient was aware of the harmful effects of furnishing inaccurate information to credit reporting agencies.  As Navient's website provides, "Defaulting on [] federal or private loans may result in serious consequences that might lead to a long lasting and harmful impact to [] the borrower or cosigner."

## VI.     NAVIENT SYSTEMATICALLY MAINTAINED DECEPTIVE AND ABUSIVE PRACTICES IN KNOWING VIOLATION OF FEDERAL LAW

### A.     Navient Failed to Comply with the Law

99.     As a result of the Defendants' misconduct, Navient failed to comply with basic regulatory requirements imposed on federal loan servicers, engaging in an unlawful, deceptive scheme to systematically favor forbearance, eschew IDRs, and misinform borrowers regarding basic aspects of their loans.  The Individual Defendants violated their fiduciary duties to the

Company in knowingly allowing Navient to violate positive law and other obligations Navient
incurred in servicing and collecting on student loans.

**B.     As a Result of Defendants' Breach of Their Fiduciary Duties, the Company
        Is Sued by the CFPB, ILAG, and WAAG**

100.    The Company was sued by the CFPB, ILAG, and WAAG on January 18, 2017,
captioned *CFPB v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.); *People of the State of Ill. v.
Navient Corp.*, No. 17 CH 00761 (Ill. Cir. Ct., Cook Cty.); *Washington v. Navient Corp.*, No. 17-
2-01115-1 (Wash. Sup. Ct., King Cty.), respectively.  The CFPB published a press release on the
same day that it filed its complaint that reads, in part:

> Navient, Formerly Part of Sallie Mae, Illegally Cheated Borrowers Out of
> Repayment Rights Through Shortcuts and Deception
>
> * * *
>
> **Washington, D.C.** – Today the Consumer Financial Protection Bureau (CFPB) is
> suing the nation's largest servicer of both federal and private student loans for
> systematically and illegally failing borrowers at every stage of repayment. For
> years, Navient, formerly part of Sallie Mae, created obstacles to repayment by
> providing bad information, processing payments incorrectly, and failing to act
> when borrowers complained. Through shortcuts and deception, the company also
> illegally cheated many struggling borrowers out of their rights to lower
> repayments, which caused them to pay much more than they had to for their
> loans. The Bureau seeks to recover significant relief for the borrowers harmed by
> these illegal servicing failures.
>
> "For years, Navient failed consumers who counted on the company to help give
> them a fair chance to pay back their student loans," said CFPB Director Richard
> Cordray. "At every stage of repayment, Navient chose to shortcut and deceive
> consumers to save on operating costs. Too many borrowers paid more for their
> loans because Navient illegally cheated them and today's action seeks to hold
> them accountable."
>
> * * *
>
> In today's action, the Bureau alleges that Navient has failed to provide the most
> basic functions of adequate student loan servicing at every stage of repayment for
> both private and federal loans. Navient provided bad information in writing and
> over the phone, processed payments incorrectly, and failed to act when borrowers
> complained about problems. Critically, it systematically made it harder for

borrowers to obtain the important right to pay according to what they can afford. These illegal practices made paying back student loans more difficult and costly for certain borrowers.[21]

101.    The CFPB's January 18, 2017 complaint ("CFPB Complaint") brought claims against the Company for "fail[ing] to perform its core duties in the servicing of student loans, violating Federal consumer financial laws as well as the trust that borrowers placed in the company[,]" the same misconduct it had identified and communicated to the Company by July 31, 2014.  CFPB Complaint ¶4.  The CFPB's core claims were that the Company:

- "systematically deterred numerous borrowers from obtaining access to some or all of the benefits of [IDR plans] and protections associated with these plans" (*id.*);

- falsely assured "borrowers that it would help them find the right repayment option for their circumstances," before improperly steering the borrower into long-term forbearance (*id.*);

- "failed to disclose the annual deadlines to renew [IDR] plans, misrepresented the consequences of non-renewal, and obscured [] renewal notice to borrowers" (*id.* ¶5);

- misrepresented "information to consumer reporting agencies about thousands of borrowers who were totally and permanently disabled, including veterans whose total and permanent disability was connected to their military service, by making it appear as if those borrowers had defaulted on their student loans when they had not" (*id.* ¶7);

- misrepresented "requirements for borrowers to release their cosigner from their private student loan, thereby denying or delaying" the ability of a cosigner to be relieved of responsibility even when a borrower "meets certain eligibility criteria" (*id.*);

- repeatedly committed "the same errors in processing federal and private student loan borrowers' payments month after month, even after borrowers complained to Navient about those errors" (*id.*); and

---

[21]    Press Release, CFPB, CFPB Sues Nation's Largest Student Loan Company Navient for Failing Borrowers at Every Stage of Repayment (Jan. 18, 2017), https://www.consumer finance.gov/about-us/newsroom/cfpb-sues-nations-largest-student-loan-company-navient-failing -borrowers-every-stage-repayment/.

- through its Pioneer subsidiary, "systematically misled consumers about the effect of [loan] rehabilitation on the consumer's credit report and overpromised the amount of collection fees that would be forgiven by enrolling in the program." *Id.* ¶12.

102.   The CFPB Complaint brought the claims under the CFPA, 12 U.S.C. §§5531, 5536(a), 5564, 5565; FCRA, 15 U.S.C. §1681, *et seq.*, and its implementing regulation, Regulation V, 12 C.F.R. part 1022; and FDCPA, 15 U.S.C. §1692, *et seq.* *Id.* ¶1.

103.   The 11-count CFPB Complaint requested substantial relief, including a permanent injunction against Navient enjoining the Company from committing future violations of the CFPA, FCRA, Regulation V, the FDCPA, or any other provision of federal consumer financial law, as defined by 12 U.S.C. §5481(14); restitution to borrowers harmed by Navient's unlawful conduct; injunctive relief regarding Navient's practices; disgorgement of ill-gotten revenues; the imposition of civil money penalties; the rescission or reformation of contracts where necessary to redress injury; and costs incurred by the CFPB to proceed with the action. *Id.* ¶¶138-97.

104.   Navient responded to the CFPB Complaint immediately by denying all allegations, making no efforts to fix non-compliant and misleading behaviors, and instead called the claims "unsubstantiated" and "unjustified."  Instead of taking responsibility for its actions and attempting to reform the Company's internal control failures and illegal conduct, Navient issued a press release on January 18, 2017, stating that:

> The allegations of the Consumer Financial Protection Bureau are unfounded, and the timing of this lawsuit—midnight action filed on the eve of a new administration—reflects their political motivations.
>
> * * *
>
> Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—against this unsubstantiated, unjustified and politically driven action. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will

vigorously defend against these false allegations and continue to help our customers achieve financial success.[22]

105.     On August 4, 2017, the Honorable Judge Mariani of the Eastern District of Pennsylvania ruled on a motion to dismiss the CFPB Complaint.  The court sustained all 11 counts of the CFPB Complaint.

106.     Substantively similar claims are currently being prosecuted by the ILAG, WAAG and PAAG for violations of federal and state consumer fraud statutes.

107.     In addition to the repeated notices and discussions the Company had with the CFPB, at all relevant times, Navient Board members were either aware that Navient had engaged in a broad array of loan-servicing practices that were non-compliant with state and federal law and regulation or that the Company's internal controls were so deficient that Navient could not identify whether its practices were compliant.

## VII.   SECURITIES CLASS ACTION LAWSUITS ARE FILED AGAINST THE COMPANY, EXPOSING IT TO FURTHER HARM

### A.     Defendants' Misconduct Has Exposed the Company to a Series of Lawsuits that Injured Its Reputation and Financial Health

108.     After the Company's conduct became clear through the filing of the CFPB Complaint, class action lawsuits alleging violations of the federal securities laws relating to the Company's disclosures in its public filings were filed in the U.S. District Court for the Districts of Delaware and New Jersey.  These cases were each consolidated into one action in their respective districts, captioned *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, No. 1:16-cv-00112 (D. Del.) and *In re Navient Corp. Sec. Litig.*, No. 1:17-cv-08373 (D.N.J.) (collectively, the "Securities Litigation").  Plaintiffs in the Securities Litigation asserted claims under §§10(b) and 20(a) for false and misleading statements made by the Company and certain executives,

---

[22]      Navient Corp., Exhibit 99.1 to Current Report (Form 8-K) (Jan. 18, 2017).

including Defendant Remondi.   The allegations centered on statements included in the Company's disclosures that vouched for Navient's supposed commitment to compliance and customer support.   Specifically, the plaintiffs in the Securities Litigation claim that such statements were false and misleading because of the practices identified in the CFPB Complaint, and because the Company had engaged in deceptive practices to facilitate the origination of subprime loans.

109.   Thus, as a direct and proximate result of the Individual Defendants' actions, Navient has expended, and will continue to expend, significant sums of money, including: (i) the costs incurred from defending, settling, or paying an adverse judgment in the Securities Litigation, CFPB Complaint, and State AGs actions; (ii) costs incurred from implementing any corrective and/or remedial measures ordered by state and federal authorities or agreed to by virtue of a settlement or a compromise; (iii) costs incurred from defending, settling, or paying any adverse judgment from any other legal actions pertaining to the Company's practices relating to Navient's unlawful business practices; and (iv) costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Navient.

110.   Finally, Navient's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of state and federal laws.

**B.**   **The Securities Litigation Alleges that Navient Misled Stockholders Regarding Its: (i) Forbearance Practices, the Credit Quality of Its Loan Portfolio, and Its Financial Results; (ii) Compliance with Legal and Regulatory Requirements; and (iii) Liquidity and Financing Arrangements**

**1.**   **Navient's Management Misled Stockholders Regarding Its Forbearance Practices**

111.   The Company continued to assure the public of its careful tailoring of forbearance solutions to is borrowers.  For example, Navient's 2017 Proxy Statement highlighted Navient's

commitment to counseling borrowers regarding the appropriate repayment plans, stating, in

relevant part:

> At Navient, we use our experience and expertise to assist our customers navigating the complex federal student loan program *by helping them understand their many options so they can choose the solution that best fits their needs. The results are outstanding.*
>
> &ast; &ast; &ast;
>
> We deliver this industry-leading performance by using our expertise and sophisticated data analytics to *better identify customers who need extra support, reach out in ways that result in higher rates of contact, and present repayment options they can select to fit their budget.*

[Emphasis added.]

Navient's 2015 Proxy Statement made substantially the same representations.  Similarly,

in the April 2014 "Information Statement" issued in connection with the Spin-Off, Navient

stated: (1) "[f]orbearance as a collection tool is used most effectively when applied based on a

customer's unique situation, including historical information and judgments"; (2) "[o]ur

forbearance policies include limits on the number of forbearance months granted consecutively

and the total number of forbearance months granted over the life of the loan"; and (3) "we

continue to see improvement in credit quality and continuing positive delinquency, forbearance

and charge-off trends in connection with th[e] [Private Education Loan ("PEL")] portfolio."[23]

Substantially similar representations appear in Navient's Form 10-Qs for Q1 2014, Q2 2014, Q3

2014, and the first quarter of 2015 ("Q1 2015").[24]

112.    Additionally, Navient's 2014 Form 10-K stated in relevant part:

---

[23]    Navient Corp., Exhibit 99.1 to Amended Registration Statement at 80, 99 (Form 10-12B/A) (Apr. 10, 2014).

[24]    *See* Navient Corp., Quarterly Report at 68, 80 (Form 10-Q) (May 9, 2014); Navient Corp., Quarterly Report at 68, 89 (Form 10-Q) (Aug. 1, 2014); Navient Corp., Quarterly Report at 67, 86 (Form 10-Q) (Oct. 30, 2014); Navient Corp., Quarterly Report at 56, 74 (Form 10-Q) (Apr. 30, 2015).

> Navient believes the credit risk of the Private Education Loans it owns is well
> managed through the rigorous underwriting practices and risk-based pricing
> utilized when the loans were originated, the continued high levels of qualified
> cosigners and our internal servicing and risk mitigation practices, as well as our
> careful use of forbearance and our loan modification programs.[25]

Navient's management made numerous statements touting the high quality of Navient's loan portfolio, and relatedly, the low level of delinquencies by borrowers and charge-offs. For example, in an April 16, 2014 press release announcing the Q1 2014 financial results for Sallie Mae, Defendant Remondi stated, "'We're . . . ***pleased that this quarter set a six year-record low in delinquencies, reflecting our strong underwriting and customer support***.'"[26] The following day, Navient reiterated those sentiments in an "Investor Roadshow" presentation, which (1) emphasized Navient's "[l]arge, high quality asset base," including its "[s]easoned portfolio" of Private Education loans"; and (2) highlighted, in a section titled "Leveraging Core Strengths to Drive Growth," "Default Prevention and Asset Recovery," specifying "[d]elinquency and charge-offs significantly below national average" and "[i]ndustry leading asset recovery and private credit loss mitigation capabilities."[27]

113.    Defendants made substantially similar statements regarding loan-credit quality for the remainder of 2014. *See, e.g*., (1) Q2 2014 earnings press release (reporting "continued improvement in student loan portfolio credit quality with 90-plus day delinquencies on its federal and private loan portfolio declining to the lowest levels since 2008");[28] (2) 2014 Q2 Form 10-Q (noting provisions for PEL losses "declined $36 million primarily as a result of the overall improvement in Private Education Loans' credit quality, delinquency and charge-off trends

---

[25]    Navient Corp., Annual Report at 6 (Form 10-K) (Feb. 27, 2015) ("2014 Form 10-K").

[26]    Navient Corp., Exhibit 99.1 to Current Report at 1 (Form 8-K) (Apr. 16, 2014) [emphasis added].

[27]    Navient Corp., Exhibit 99.1 to Current Report at 8-9, 16 (Form 8-K) (Apr. 17, 2014).

[28]    Navient Corp., Exhibit 99.1 to Current Report at 1 (Form 8-K) (July 16, 2014).

leading to decreases in expected future charge-offs");[29] (3) Q3 2014 earnings press release (stating financial results "show[ed] continued improvements in delinquencies and defaults since a year ago" and improved performance of Navient's Private Education Loan portfolio, claiming that "*Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008*");[30] (4) Q4 & FY 2014 press release (stating "*2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008*").[31]

114.    Defendants also touted Navient's relatively low loan loss provisions for PELs, which according to Navient's quarterly reports for each quarter in 2014 and 2015, and its annual reports for the same years, decreased as compared with the corresponding prior time periods. The reported loss provisions for PELs were understated because they failed to account for Navient's systemic use of forbearance, which prevented accounts from becoming delinquent, defaulting. and consequently being charged off.  The 2017 Proxy Statement confirms that the annual and quarterly reports were "review[ed] and discuss[ed]" by the Audit Committee members prior to being filed with the SEC.  *See* 2017 Proxy Statement at 35.

### 2.    Navient's Management Misled Stockholders Regarding Navient's Compliance with State and Federal Laws and Regulations

115.    Navient's management also falsely assured stockholders that it fully complied with the applicable legal and regulatory requirements.  For example, in the April 17, 2014 "Investor Roadshow" presentation, Navient emphasized its "*[r]obust compliance driven culture driven by a 'customer first' approach*," its "[d]emonstrated compliance infrastructure," and "[o]perational and technical expertise and capacity to adapt to [a] new regulatory environment" and represented that the Company "[d]emonstrated FFELP compliance and preserved federal

---

[29]    Q2 2014 Form 10-Q at 52.

[30]    Navient Corp., Exhibit 99.1 to Current Report at 1 (Form 8-K) (Oct. 15, 2014).

[31]    Navient Corp., Exhibit 99.1 to Current Report at 1 (Form 8-K) (Jan. 21, 2015).

loan guarantee."[32]  Defendants reiterated those sentiments repeatedly, including emphasizing (in the 2014 Form 10-K) Navient's "rigorous training programs, internal and external auditing, *escalated service tracking and analysis, and customer research to enhance [its] compliance and customer service*."[33]  Defendants' representations included Defendant Kane's statements on Navient's behalf at the February 11, 2015 Credit Suisse Forum, emphasizing the "very, very strong compliance culture at Navient across the entire Company, across all levels of management" and adding: "[s]o we take that very seriously. We keep our thumb obviously on the changing compliance landscape and we look to make updates to our processes, procedures and work activities to comply."

116.    Similarly, Navient's 2016 and 2017 Proxy Statements also vouched for the sufficiency of Navient's compliance controls, stating, in relevant part: "Our clients benefit from the higher performance, lower cost, *and strong compliance controls we deliver every day*." [Emphasis added.]

117.    Defendants also specifically addressed Navient's purported efforts to inform borrowers about IDRs: "We have been a partner in [the DOE]'s campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice."[34]

### 3.    Navient's Management Misled Stockholders About Its Liquidity and Financing Arrangements

118.    Navient's SEC filings consistently discussed the amounts of capacity available under its credit facilities.  *E.g.*, Q1 2014 Form 10-Q at 86 ("As of March 31, 2014 and December

---

[32]     Navient Corp., Exhibit 99.1 to Current Report at 12, 16 (Form 8-K) (Apr. 17, 2014) [emphasis added].

[33]     2014 Form 10-K at 4 [emphasis added]

[34]     2014 Form 10-K at 4.

31, 2013, the maximum additional capacity under these facilities was $12.7 billion and $10.6

billion, respectively. For the three months ended March 31, 2014 and 2013, the average

maximum additional capacity under these facilities was $12.3 billion and $10.8 billion,

respectively.").  Additionally, Navient stated in its 2014 Form 10-K:

> We have various secured borrowing facilities that we use to finance our FFELP
> Loans. Liquidity is available under these secured credit facilities to the extent we
> have eligible collateral and available capacity. The maximum borrowing capacity
> under these facilities will vary and is subject to each agreement's borrowing
> conditions. These include but are not limited to the facility's size, current usage
> and the availability and fair value of qualifying unencumbered FFELP Loan
> collateral. . . . The facilities are subject to termination under certain
> circumstances.[35]

119.    Those statements were false or misleading when made because, despite reporting

the available capacity on the facilities and acknowledging they were "subject to termination

under certain circumstances," Navient failed to disclose the true likelihood that the Federal

Home Loan Bank of Des Moines ("FHLB-DM") would, in fact, terminate the facilities in light of

a rule proposed by the Federal Housing Finance Agency in September 2014 (which was

ultimately adopted as a final rule in January 2016), preventing non-eligible entities from gaining

membership with the FHLB-DM – and thus access credit on extraordinarily favorable terms –

through the use of a captive insurer.  Defendants accordingly misled stockholders regarding the

risk that Navient's borrowing costs would suddenly and dramatically rise, and thereby affect the

Company's liquidity and financial performance.

120.    The statements referenced above in ¶¶111-19 were materially false and

misleading when made because, at the time they were made, Defendants were knowingly (or

recklessly), violating consumer protection and deceptive practices rules and regulations by:

engaging in a widespread and systemic practice of steering borrowers experiencing long-term

---

[35]    2014 Form 10-K at F-45.

financial hardship into forbearance, instead of instituting measures required to properly implement and enroll borrowers in IDR plans; failing to adequately advise critical notices to borrowers regarding renewal of IDR enrollment and cosigner release; regularly committing payment processing errors misallocating payments; and continuing to tout the credit quality of the Company's loan portfolio, financial results, compliance with regulatory requirements, and liquidity and financing arrangements in the face of these known issues.   The foregoing statements assuring Navient stockholders of the high quality of Navient's loan portfolio, and relatedly, the low level of delinquencies by borrowers and charge-offs; of its full compliance with the applicable legal and regulatory requirements; and that Navient's borrowing capacity, liquidity, and financial performance would remain at the levels it disclosed; failed to mention any of the key material deficiencies identified herein, and were therefore all materially false and misleading when made.

### C.    Additional Misleading Statements in Navient's Proxy Statements

121.    In addition to the misstatements identified in the Securities Litigation, Navient's 2017 Proxy Statement made a number of false and misleading representations regarding Navient's process of nominating Board members and the objectives and goals driving director compensation.   To begin with, the 2015, 2016, and 2017 Proxy Statements each listed the "minimum qualifications" of Board members, including, among other things, "[i]ntegrity and sound judgment in areas relevant to the business[]" and "*[a]bility to challenge and stimulate management*[.]"[36]   Ironically, the 2017 Proxy Statement also listed "*[w]illingness to represent*

---

[36]    2015 Proxy Statement at 28; 2016 Proxy Statement at 29; 2017 Proxy Statement at 26 [emphasis added].

*the best interests of all shareholders and objectively apprise management performance*[]" as an additional minimum qualification.[37]

122.    Furthermore, in seeking the advisory vote on executive compensation, the Board misleadingly stated that the "Company's 2016 executive compensation program strongly aligns pay to actual performance" and that its incentive plan "is designed to drive the type of performance we saw in 2016 by focusing on key performance metrics that align with our business objectives . . . include[ing] . . . (iii) private education loan defaults."  *Id.* at 40, 42-43. In addition, the Proxy Statement(s) assured stockholders that Navient's named executive officers' ("NEOs") compensation package is "tied to performance and aligned with the interests of our shareholders[,]" stating, in relevant part:

- *Pay for Performance.* A substantial portion of the total compensation paid to our NEOs is earned based on achievement of enterprise-wide goals that impact shareholder value.

- *Align Compensation with Shareholder Interests.* A significant portion of the total direct compensation provided to our NEOs is delivered in the form of equity awards, while other components of compensation are contingent on specific performance goals designed to drive shareholder value. For 2016, 86% of the total direct compensation provided to our CEO for 2016 was at-risk, including incentive awards that are dependent upon the attainment of specific performance objectives, the value of Navient's Common Stock or both.

- *Reward Annual Performance.* The annual incentive award component of our NEOs' total compensation is designed to reward achievement of key annual goals that are aligned with the Company's annual business plan, and conversely to be lower or zero in periods in which those key annual goals are only partially achieved or not achieved at all.

- *Reward Long-term Growth.* The total compensation paid to our NEOs is heavily weighted toward long-term equity-based incentives. These awards link pay to sustained performance and shareholder value creation.

---

[37]    2017 Proxy Statement at 26 [emphasis added].

- ***Retention of Top Executives.*** Our NEOs have base salaries and benefits that are competitive, which permit Navient to attract, motivate and retain executives who can drive and lead its success.[38]

123.    Thus, stockholders who have casted their vote to elect the Individual Defendants into their roles as Board members have done so under the assumption that the minimum qualifications, as set forth in the Company's Proxy Statements, have been satisfied prior to accepting the Board members' candidacy.  Furthermore, stockholders who have casted their votes to approve executive compensation have done so presuming that the proposed compensation was consistent with, and would advance, Navient's compensation philosophy and objectives, as set forth in the Company's Proxy Statements.  Put differently, stockholders would assume that executive compensation was substantially provided based on managements' performance for the benefit, and in the interest, of the Company.  Instead, however, the executive compensation was provided to management despite that Navient was subject of an intensive regulatory scrutiny by the CFPB, New York State Department of Financial Services, ILAG, and WAAG and was, at the time of the stockholder vote, named as a defendant in at least three enforcement actions and three securities class actions – all setting forth substantially the same allegations concerning Navient's deceptive and unfair forbearance practices and its misinformation of borrowers regarding various aspects of loan servicing in direct violation of the state and federal law and regulations.

**D.    The Truth Begins to Emerge About Navient's Forbearance Practices, Its Non-Compliance with Legal and Regulatory Requirements, and Its Liquidity and Financial Arrangements**

124.    On July 13, 2015, Navient suddenly announced it would need to increase its provision for loans in the private loan segment by $46 million, or 31.7%.  Defendants revealed

---

[38]    *Id.* at 43; *see also* 2015 Proxy Statement at 47; 2016 Proxy Statement at 47.

that a group of borrowers (*i.e.*, "cohort") who had returned to school during the "Great Recession" of 2007-2008, and who represented $2.5 billion in loans, had demonstrated difficulty repaying their loans.  That disclosure was followed by Defendant Remondi's revelation, during a July 22, 2015 earnings call, that those borrowers "were struggling to begin with," *i.e.*, even before they went back to school.  And on September 29, 2015, the CFPB issued a report detailing, among other widespread problems in the loan-servicing industry, that loan servicers were placing borrowers into forbearance in lieu of alternative repayment plans.  Through these disclosures, the stockholders first learned of Navient's forbearance practices, its overstated loan loss provisions for private loans, and the credit quality of its loans.  Indeed, the market responded strongly, with the price of Navient common shares dropping by 10.6%, 2.2%, and 4.4% on July 13, July 22, and September 29, 2015, respectively.

125.    Additionally, a series of disclosures throughout 2015 gradually revealed to stockholders that Navient was non-compliant with the applicable state and federal legal and regulatory requirements, but instead, was engaged in a series of unfair and deceptive practices, including misleading borrowers about the availability of IDRs and failing to provide borrowers with adequate information regarding cosigner release, renewal/recertification requirements, and the effects of completing a credit rehabilitation program.

126.    On February 27, 2015, the DOE announced its intention to end its contract with Pioneer and four other collectors, after an audit revealed that they misinformed borrowers about "the benefits to the borrowers' credit report and about the waiver of certain collection fees[]" in connection with the credit rehabilitation program.[39]  An article published a few days later by

---

[39]    Press Release, U.S. Dep't of Educ., US. Department of Education to End Contracts with Several Private Collection Agencies (Feb. 27, 2015), https://www.ed.gov/news/press-releases/us-department-education-end-contracts-severalprivate-collection-agencies.

*Inside Higher Ed* referred to a "Crackdown on Navient[,]" noting that the Company had "earned $65 million in revenue under the debt collection contract [with DOE] in 2014 and $62 million in 2013[,]" and that as a result of the contract termination, the Company would lose "about 400 jobs."[40] Following these disclosures, the price of Navient securities fell sharply, declining 8.8% from its close of $21.40, on February 27, 2015, to close at $19.51m on March 2, 2015, on unusually heavy trading volume of more than 10 million shares.

127.    On April 24, 2015, *The Huffington Post* reported on the mounting government investigations of Navient, including a previously undisclosed investigation of Pioneer by Massachusetts authorities in connection with "allegations [that] the company mistreated distressed borrowers[.]"[41] On this news, Navient's common shares fell 2.1%.

128.    On July 7, 2015, the CFPB published a report disclosing that it had continued to receive complaints about student loan servicing from servicemembers after a 2014 settlement between federal regulators and Navient and Sallie Mae.[42] The CFPB stated that since its October 2012 report on complaints received by military borrowers, which ultimately resulted in a $60 million settlement with Navient and Sallie Mae, "the [CFPB] has received more than 1,300 complaints from military borrowers related to the servicing or collection of student loans." *Id.* at 4. On this news, the price of Navient stock dropped 2.1%.

---

[40]    Michael Stratford, *Feds Fire 5 Debt Collectors*, Inside Higher Ed (Mar. 2, 2015), https://www.insidehighered.com/news/2015/03/02/us-ends-contract-5-debt-collectors-citing-mis representations-borrowers.

[41]    Shahien Nasiripour, *Student Loan Giant Navient Bemoans Cost Of Mounting Government Probes*, The Huffington Post (Apr. 24, 2015, 7:31 AM ET), https://www. huffingtonpost.com/2015/04/24/navient-governmentinvestigations_n_7131914.html.

[42]    Hollister Petraeus and Seth Frotman, *Overseas & Underserved: Student Loan Servicing and the Cost to Our Men and Women in Uniform*, ConsumerFinance.gov (July 2015), https:// files.consumerfinance.gov/f/201507_cfpb_overseas-underserved-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform.pdf.

129.    After the market closed on August 24, 2015, Navient disclosed that on August 19, 2015, Navient Solutions, Inc. ("NSI") received a letter from stating that the CFPB's Office of Enforcement was considering taking legal action against NSI regarding its disclosure and assessment of late fees.[43]  Navient nonetheless represented that "NSI continues to believe that its acts and practices relating to student loans are lawful and meet industry standards and, where applicable, the statutory or contractual requirements of NSI's other regulators."  *Id.*  On this news, the price of Navient common shares dropped 7.8% on unusually heavy trading volume of more than nine million shares.

130.    On September 29, 2015, the CFPB issued a report recounting Navient's forbearance practices.[44]  The report recounted:

- Comments from individual student loan borrowers describe how they encounter servicing problems or practices that discourage utilization of alternative repayment plans, including income-driven repayment plans. A number of comments describe how some borrowers may end up in default when they are unable to obtain an alternative repayment plan. Comments also describe how some servicing practices subsequently can result in payment shock, lost benefits, and increased interest charges for borrowers enrolled in these plans.

- Commenters detail problems related to customer service, including issues for borrowers seeking to resolve servicing errors. Commenters describe how these problems create barriers for borrowers experiencing financial hardship who are seeking to avoid default, and may cause significant credit reporting harm.

- Commenters describe how payment processing and servicing transfer practices create problems for borrowers trying to repay student debt. Public comments from individual borrowers describe how those practices cause

---

[43]    Navient Corp., Current Report (Form 8-K) (Aug. 24, 2015).

[44]    CFPB, *Student loan servicing: Analysis of public input and recommendations for reform*, CONSUMERFINANCE.GOV (Sept. 2015), https://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

payment processing problems, increase interest charges and late fees, prolong repayment, and create confusion for student loan borrowers.[45]

131.    The CFPB report further disclosed that "[s]ervicemembers consistently report difficulties obtaining the [Servicemembers Civil Relief Act] interest rate cap of six percent[,]" specifically, "that servicers continue to improperly process these requests and do not clearly convey information about the application process and other requirements." *Id.* at 91-92. The CFPB also reported that "[s]ervicemembers state that they were guided into military deferments or forbearance and were not told that their total loan debt would balloon at the end of their military service due to accrued interest." *Id.* at 92. Indeed, the CFPB recounted that "[s]ervicemembers also note that the servicers guide them into forbearance or deferment, even when the borrower is actively seeking information and assistance concerning other forms of repayment." *Id.* at 93.

132.    Notwithstanding the breadth and scope of regulators' investigative inquiries and the evidence collected during the course of their years-long investigations, Individual Defendants continued to assure stockholders that the accusations levied against them lacked merit. For example, in a joint April 13, 2017 letter, sent as a cover letter to the 2017 Proxy Statement, Defendants Remondi and Diefenderfer proclaimed: "***Let us be perfectly clear: the allegations made do not correspond with the facts and the exceptional results we deliver for consumers.***" [Emphasis added.]

## VIII.  DAMAGES TO NAVIENT

133.    As a result of the Individual Defendants' knowing misconduct, Navient engaged in an unlawful and deceptive scheme of regularly steering borrowers into forbearance and misinforming them regarding a variety of matters, including cosigner release, renewal and/or

---

[45]      *Id.* at 4.

recertification requirements, and the benefits of loan rehabilitation program, in order to avoid costs and enhance its own financial well-being to the detriment of its borrowers. Navient's conduct violated the applicable federal and state laws and regulations and operated to the detriment of the Company and its customers. State and federal governmental enforcement agencies have the authority to impose severe monetary penalties and other forms of sanctions, should they find that Navient's conduct violated the laws with respect to which they have enforcement powers.

134.    Further, as a direct and proximate result of the Individual Defendants' actions, Navient has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

      a.    costs incurred from defending, settling, or paying an adverse judgment in the Securities Litigations, the CFPB action, and/or the State AGs actions;

      b.    costs incurred from implementing any corrective and/or remedial measures ordered by state and federal authorities, or agreed to by virtue of a settlement or a compromise;

      c.    costs incurred from defending, settling, or paying any adverse judgment from any other legal actions pertaining to Navient's practices relating to forbearance enrollment and/or misinforming borrowers regarding other matters; and

      d.    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Navient.

135.    Finally, Navient's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of state and federal laws.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

137.     Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Any such demand would be futile and useless because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

138.     **First**, the Individual Defendants had an obligation to ensure that Navient complied with the law that they actively shirked.  Faced with knowledge that Navient was engaging in a scheme to illicitly steer borrowers into forbearance and misinforming them regarding an array of other issues, the Individual Defendants caused, or allowed, the Company to continue the misconduct.  Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take any meaningful action to remedy the resultant harm.

139.     **Second**, the Individual Defendants ignored the very responsibilities Navient's own Code of Conduct imposed on them.  Specifically, the Company committed to conduct its market activities with "***integrity and [a] compliance-focused mindset***" and mandated that "***[s]pecific laws and regulations that pertain to all areas of [the Company's] business must be followed.***"  Code of Conduct at 4, 7 [emphasis added].  Indeed, Navient's Code of Conduct expressly acknowledged that its customers "***depend on the information they receive from [Navient] and expect it to be accurate.***"  *Id.* at 7 [emphasis added].  Most importantly, the Code of Conduct prohibits Navient's employees from taking "***unfair advantage of another individual or company through manipulation, concealment, abuse of confidential, proprietary or privileged information or misrepresentation of material facts***."  *Id.* at 18 [emphasis added].

140.     Notwithstanding these very clear provisions, there is little doubt that the Board knowingly deserted its fiduciary duties in failing to take any meaningful action to remedy

51

Navient's scheme to generate additional income from its borrowers by committing to clearly identified illicit servicing and collection practices.

A.     **Demand on Defendant Remondi Is Futile Due to His Position as the Company's President and Chief Executive Officer**

141.     As alleged herein, Defendant Remondi signed the SOX Certifications attached to Navient's various regulatory filings in 2014, 2015, and 2016.

142.     Notwithstanding Defendant Remondi's knowledge of the Company's forbearance practices and the mounting complaints regarding Navient's provision of inadequate information to borrowers regarding a number of other servicing matters, he repeatedly touted the Company's compliance with legal and regulatory requirements.  For example, in the April 16, 2014 press release announcing Q1 2014 financial results, Defendant Remondi stated: "'We're . . . pleased that this quarter set a six year-record low in delinquencies, reflecting our strong underwriting and customer support.'"[46]  Likewise, during the July 22, 2015 earnings call, Defendant Remondi broke the news to analysts that a large group of borrowers, who caused that Navient had to increase its provision in the PEL segment, "were struggling to begin with [even before returning to school]."[47]

143.     Importantly, Defendant Remondi has been named as defendant in *In re Navient Sec. Litig.*, currently pending in New Jersey federal court.  As previously stated herein, plaintiffs in *In re Navient Sec. Litig.* are seeking damages related to the misconduct the Company, at the Board's direction and on their watch, committed.  Thus, Defendant Remondi faces a significant likelihood of liability and therefore, cannot consider a demand impartially.

---

[46]     Navient Corp., Exhibit 99.1 to Current Report at 1 (Form 8-K) (Apr. 16, 2014).

[47]     Navient Corp., Earnings Call Transcript at 12 (July 22, 2015).

144.     Finally, Navient's own 2017 Proxy Statement discloses that Defendant Remondi "was determined not to be independent under the [Board's Governance] Guidelines or the Nasdaq listing standards." 2017 Proxy Statement at 21.

**B.**     **Demand on Defendants Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams Is Futile Due to Their Positions on the Audit Committee**

145.     Defendants Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams lack the requisite level of independence necessary to weigh the merits of this litigation, having served as members of the Audit Committee at all relevant times. Pursuant to the Audit Charter, Defendants Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams were required, amongst other things, to "*[r]eview the Company's procedures for the receipt, retention and handling of complaints* regarding accounting, internal accounting controls and auditing matters, including procedures for the confidential, anonymous submission of complaints by employees about accounting and auditing matters." Audit Charter at 5 [emphasis added]. Additionally, it was the responsibility of the Audit Committee members to "*[r]eview the Company's compliance programs on a periodic basis, including (i) compliance risk assessment, (ii) compliance plan, and (iii) significant breaches or violations of compliance policies or the Company's Code of Business Conduct.*" *Id.* [emphasis added].

146.     Neither did the allegations in the CFPB action motivate Defendants Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams to further investigate the Company's internal compliance programs, policies, and procedures, not even after the CFPB advised of its intention to pursue an enforcement action against Navient for an array of service-related issues. Indeed, Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams did not implement or recommend the implementation of any policies that would save Navient the embarrassment, reputation damage, and significant organizational resources in defending,

settling, or otherwise dealing with the mounting number of legal challenges brought against the Company by private litigants and regulators. Accordingly, demand on Defendants Diefenderfer, Adams, Unger, Cabral, Gilleland, Thompson, and Williams is futile.

### C. Demand on Defendants Williams, Adams, Cabral, Lehman, Gilleland, Mills, and Thompson Is Futile Due to Their Positions on the Finance and Operations Committee

147. Defendants Williams, Adams, Cabral, Lehman, Gilleland, Mills, and Thompson lack the requisite level of independence necessary to weigh the merits of this litigation, having served as members of the Finance and Operations Committee. According to the Finance Charter, Defendants Williams, Adams, Cabral, Lehman, Gilleland, Mills, and Thompson were vested with the responsibility of providing oversight with respect to "material corporate finance matters," "business and technology operations[,]" "marketing and product development[,]" and "oversight, mitigate and remediate operational risk." Finance Charter at 1. To carry that purpose, the Finance and Operations Committee had the responsibility to "*[r]eview product design and development, marketing strategies and sales activities for the Company's products and services.*" *Id.* at 3 [emphasis added]. Additionally, the Finance and Operations Committee members were responsible for the "*[p]eriodic[] review [of] the Company's compliance and performance against the risk measures and limits contain in the Company's Board approved risk appetite framework relating to credit risk*; market risk; funding & liquidity risk; *operational risk pertaining to key business processes, including loan servicing*, *collections, information technology, and vendor management.*" *Id.* [emphasis added].

148. However, instead of "overs[eeing], mitigat[ing] and remediat[ing] operational risk" (*id.* at 1), members of the Finance and Operations Committee acquiesced to Navient's rampant violation of the state and federal law without taking any steps to remedy its practices. Namely, as described herein, Navient embarked on a campaign to sway borrowers into

forbearance in order to avoid the added costs associated with enrolling borrowers in income-driven plans.

149.    Thus, Defendants Williams, Adams, Cabral, Lehman, Gilleland, Mills, and Thompson have entirely abdicated their responsibility to ensure than Navient's disclosures made to borrowers conformed with the applicable legal and regulatory requirements and the Company's own risk appetite framework.  As such, Defendants Williams, Adams, Cabral, Lehman, Gilleland, Mills, and Thompson lack the requisite level of independence needed to consider a demand.

## X.    INSIDER TRADING ALLEGATIONS

150.    From July 26, 2016 to April 24, 2017, the Insider Trading Defendants, Defendants Diefenderfer, Bates, and Gilleland, collectively sold $1.2 million of Navient common stock while in possession of material non-public information.

151.    The Insider Trading Defendants knew that Navient steered borrowers into forbearance instead of counseling them regarding more appropriate income-based plans; failed to provide adequate notice regarding annual renewal/recertification process and cosigner release requirements; misinformed borrowers regarding the benefits of loan rehabilitation program and collection costs waiver; committed repeated payment processing errors and failed to implement internal controls to prevent their re-occurrence; and misreported the status of military accounts. Consequently, the Insider Trading Defendants were in possession of material non-public information and were prohibited from trading Company stock until such information was revealed to the public.

152.    The following chart summarizes the dates upon which Defendant Diefenderfer traded, as well as the proceeds from such trades:

**Defendant Diefenderfer**

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 11/17/16 | 18,590 | $17.65 | $328,132 |
| 8/19/16 | 16,300 | $14.20 | $231,427 |
| | | Total Proceeds: | **$559,559** |

Defendant Diefenderfer's sales were inconsistent with past trading patterns and suspicious in their timing and amount.

153.    The following chart summarizes the dates upon which Defendant Bates traded, as well as the proceeds from such trades:

**Defendant Bates**

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 7/26/16 | 9,000 | $14.23 | $128,027 |
| | | Total Proceeds: | **$128,027** |

Defendant Bates' sales were inconsistent with past trading patterns and suspicious in their timing and amount.

154.    The following chart summarizes the dates upon which Defendant Gilleland traded, as well as the proceeds from such trades:

**Defendant Gilleland**

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/24/17 | 5,467 | $15.89 | $86,889 |
| 11/14/16 | 10,000 | $17.47 | $174,711 |
| 11/09/16 | 17,240 | $15.81 | $272,609 |
| | | Total Proceeds: | **$534,209** |

Defendant Gilleland's sales were inconsistent with past trading patterns and suspicious in their timing and amount.

**XI.    CAUSES OF ACTION**

<u>COUNT I</u>
**Breach of Fiduciary Duty**
**(Against the Individual Defendants)**

155.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

156.    The Individual Defendants owed, and owe, Navient the highest fiduciary obligations of good faith, fair dealing, loyalty, and due care in managing the Company's affairs.

157.    The Individual Defendants, individually and collectively, violated and breached their fiduciary by:

        a.    failing to ensure that Navient, and its directors and officers, complied with federal laws; and

        b.    failing to conduct an adequate investigation of known potential (and/or actual) violations of federal laws.

158.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Navient has sustained significant damages – both financially and to its corporate image and goodwill.  Such damages include, among other things, the cost of defending Navient in the Securities Litigation the CFPB action, and the State AGs actions, including the costs associated with any settlements thereof.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

159.    Plaintiff, on behalf of Navient, has no adequate remedy at law.

<u>COUNT II</u>
**Violations of Section 10(b) of the Exchange Act**
**(Against the Individual Defendants)**

160.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

161.     During the Relevant Period, the Individual Defendants disseminated or approved public statements that failed to fully disclose the risk that Navient was systematically violating federal and state law by: (i) failing to advise borrowers to enter into appropriate income-driven repayment programs ("IDRs"), instead steering them to enter into costly forbearance, when not appropriate, in order to save on costs and create additional future interest; (ii) failing to provide adequate notice to borrowers for submission of the required annual paperwork to keep lower, income-based payments and/or to allow cosigners to be released from loan obligations; (iii) misinforming borrowers regarding the benefits of loan rehabilitation programs and certain collection costs; (iv) committing repeated payment processing errors and failed to implement internal controls to prevent their re-occurrence, leading to misapplied payments and the false reporting loans as delinquent; and (v) misreporting the status of military accounts.

162.     As such, the Individual Defendants caused the Company to violate §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes, and artifices to defraud; and

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.     As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace as a result of the violations of §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

164.     At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, Director Defendants were aware of, and/or had access to, the true facts concerning Navient's operation.

165.    Navient has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT III
### Violation of Section 14(a) of the Exchange Act
### (Against the Individual Defendants)

166.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

167.    SEC Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

168.    The Individual Defendants exercised control over Navient and caused the Company to disseminate the false and misleading Proxy Statements.  The Proxy Statements materially misrepresented the effectiveness of the Board's oversight of internal controls at Navient, and the Board's compliance with Navient's corporate governance documents.

169.    As stated herein, the Proxy Statements contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. These false statements and omissions were essential links in the election of certain of the Director Defendants to Navient's Board and the continued illegal management of Navient.

170.    The written communications made by the Individual Defendants, as described herein, constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

171.    At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, Director Defendants were aware of, and/or had access to, the true facts concerning Navient's operation.

172.    Navient has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT IV
### Violation of Section 29(b) of the Exchange Act
### (Against the Individual Defendants)

173.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

174.    Individual Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §§10(b) and 14(a) of the Exchange Act. The Individual Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because Individual Defendants violated §§10(b) and 14(a) of the Exchange Act by issuing false and misleading reports to Navient's stockholders regarding the nature of, and responsibility for, the Company's internal controls and operations.   All of the payments Individual Defendants received are, therefore, voidable by Navient.

175.    Navient is in privity with the Individual Defendants with respect to the incentive compensation and fees provided by Navient to Individual Defendants.   Individual Defendants have engaged in prohibited conduct in violation of the securities laws, as alleged herein.

176.    Navient has been severely injured by the misconduct of the Individual Defendants.  Accordingly, Navient is entitled to damages, *i.e.*, recession of the incentive and compensation and fees granted to Individual Defendants.

## COUNT V
### Breach of Fiduciary Duty for Insider Trading
### (Against the Insider Trading Defendants)

177.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

178.    At the time of the stock sales set forth herein, the Insider Trading Defendants knew the material non-public information described above and sold Navient common stock on the basis of such information.

179.    The information described above was proprietary non-public information concerning the Company's operation, financial condition, and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold their Navient common stock.

180.    At the time of their stock sales, the Insider Trading Defendants knew Navient engaged in loan servicing and collections practices violative of federal and state law.  The Insider Trading Defendants' sales of Navient stock, while in possession and control of this material adverse non-public information, was a breach of their fiduciary duties of loyalty and good faith, and the concealment of this material non-public information allowed the Insider Trading Defendants to knowingly sell their shares at artificially inflated prices.

181.    As a direct and proximate result of the Insider Trading Defendants' insider sales and breach of fiduciary duties, Navient has suffered damages, not only monetarily, but also to its corporate image and goodwill.  Because the Insider Trading Defendants used the Company's

proprietary information for their own gain, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in Navient's favor against the Individual Defendants as follows:

A.      Declaring that this action is a proper derivative action, Plaintiff is an adequate representative on Navient's behalf, and demand is excused;

B.      Declaring that the Individual Defendants have breached their fiduciary duties owed to Navient and its stockholders;

C.      Awarding Navient the damages it sustained due to the violations alleged herein from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.      Awarding to Navient restitution from the Individual Defendants and ordering disgorgement of all unlawfully obtained profits, benefits, and other compensation obtained by the Individual Defendants;

E.      Directing Navient to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws, and protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

DATED: January 4, 2019                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

Jonathan M. Zimmerman (PA 322668)

62

Donald A. Broggi
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  (212) 223-6444
Facsimile:  (212) 223-6334
jzimmerman@scott-scott.com
dbroggi@scott-scott.com

Geoffrey M. Johnson (admitted *pro hac vice*)
**SCOTT+SCOTT  ATTORNEYS  AT  LAW  LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44118
Telephone:  (216) 229-6088
Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

David R. Scott
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com

*Counsel for Plaintiff Buffalo Grove Police
Pension Fund*

## VERIFICATION OF TONY MONTIEL ON BEHALF OF
## BUFFALO GROVE POLICE PENSION FUND

I, Tony Montiel, Secretary of the Buffalo Grove Police Pension Fund ("Buffalo Grove"), make this Declaration on behalf of Buffalo Grove, and, being duly sworn, depose and say:

Buffalo Grove is a derivative plaintiff in this action. I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern Buffalo Grove, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

Buffalo Grove has not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs, or other payments as the Court expressly approves to be paid to Buffalo Grove, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: 7-25-18

Tony Montiel
Pension Board Secretary
Buffalo Grove Police Pension Fund

Sworn to and subscribed before me this 25 day of July , 2018.

OFFICIAL SEAL
MELESSA HORBUS
Notary Public - State of Illinois
My Commission Expires 11/01/2019

NOTARY PUBLIC

My commission expires:

11/01/19