# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BUFFALO GROVE POLICE PENSION FUND,
Derivatively on Behalf of Nominal Defendant
NAVIENT CORPORATION,

            Plaintiff,

    v.

WILLIAM M. DIEFENDERFER, III, JOHN K.
ADAMS, ANNA ESCOBEDO CABRAL,
DIANE SUITT GILLELAND, KATHERINE A.
LEHMAN, LINDA A. MILLS, JOHN (JACK)
F. REMONDI, JANE J. THOMPSON, LAURA
S. UNGER, BARRY L. WILLIAMS, ANN
TORRE BATES, STEVEN L. SHAPIRO,
BARRY A. MUNITZ, TIMOTHY J. HYNES,
IV, SOMSAK CHIVAVIBAL, JOHN M.
KANE, and CHRISTIAN M. LOWN,

            Defendants,

    - and -

NAVIENT CORPORATION,

            Nominal Defendant.

Civ. A. No. 2:19-cv-00062-LAS

## DECLARATION OF GEOFFREY M. JOHNSON IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND APPROVAL OF AGREED-UPON ATTORNEYS' FEES AND EXPENSES AND PLAINTIFF'S SERVICE AWARD

GEOFFREY M. JOHNSON, Esq., declares as follows pursuant to 28 U.S.C. §1746:

1.      I am a partner with the firm of Scott+Scott Attorneys at Law LLP ("Scott+Scott" or "Law Firm").   I am submitting this declaration in support of Plaintiff Buffalo Grove Police Pension Fund's ("Plaintiff") application for an award of attorneys' fees and expenses in connection with services rendered in the above-captioned action (the "Action").   I have personal knowledge of the facts set forth herein and, if called upon, could and would testify thereto.

1.      Scott+Scott served as counsel for Plaintiff in the Action.   Scott+Scott helped to advance the litigation and position the case for settlement, as set forth in the accompanying Memorandum of Law in Support of Plaintiff's Unopposed Motion for Final Approval of Settlement and Approval of Agreed-Upon Attorneys' Fees and Expenses and Plaintiff's Service Award.

2.      The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff of Scott+Scott who was involved in the prosecution of the Action and the lodestar calculation based on the Law Firm's current rates.   The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by the Law Firm.   Time expended in preparing this application for fees and payment of expenses has not been included in this request.   The hourly rates for the attorneys and professional support staff included in Exhibit A are their customary rates, which have been accepted in other securities or shareholder derivative litigation.

3.      The total number of hours expended on this litigation by Scott+Scott's attorneys and other professionals from inception through March 7, 2019 is 1,796.7 hours.   The total lodestar for those hours is $1,339,820.   Scott+Scott's compensation for services rendered in this case was wholly contingent on the success of the Action for Plaintiff.   None of the attorneys' fees and

fees and expenses submitted to this Court have been paid from any source or been the subject of any prior request or prior award in any litigation or other proceeding.

4.      Scott+Scott's lodestar figures are based upon the Law Firm's rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in the Law Firm's rates.

5.      As detailed in Exhibit B, Scott+Scott has incurred a total of $50,118.09 in expenses in connection with the prosecution of the Action. The expenses are reflected on the books and records of the Law Firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses.

6.      With respect to the standing of Scott+Scott, attached hereto as Exhibit C is a brief biography of the Law Firm, as well as biographies of its partners and co-counsel.

7.      Attached to this declaration are true and correct copies of the following:

Exhibit A:    An itemized chart of Scott+Scott's lodestar;

Exhibit B:    An itemized chart of Scott+Scott's expenses;

Exhibit C:    Scott+Scott's firm résumé;

Exhibit D:    Expert Report of Matthew D. Cain, Ph.D.; and

Exhibit E:    Revised Risk Oversight Responsibilities.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 11th day of March, 2019, in Cleveland Heights, Ohio.

GEOFFREY M. JOHNSON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 12th day of March, 2019.

> _/s/ Geoffrey M. Johnson_
> GEOFFREY M. JOHNSON (*pro hac vice*)
> **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
> 12434 Cedar Road, Suite 12
> Cleveland Heights, OH 44118
> Telephone: (216) 229-6088
> Facsimile:  (860) 537-4432
> gjohnson@scott-scott.com

# EXHIBIT A

**EXHIBIT A**

Scott+Scott Attorneys at Law LLP

Lodestar

| Name | Total Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Partners | | | |
| David Scott | 62.00 | $1,050.00 | $ 65,100.00 |
| Geoff Johnson | 947.30 | $900.00 | $ 852,570.00 |
| Amanda Lawrence | 32.20 | $825.00 | $ 26,565.00 |
| Michael Burnett | 19.90 | $775.00 | $ 15,422.50 |
| Total Partners | 1,061.40 | | $ 959,657.50 |
| | | | |
| Associates | | Rate | Amount |
| Andrea Farah | 161.10 | $450.00 | $ 72,495.00 |
| Jonathan Zimmerman | 12.50 | $450.00 | $ 5,625.00 |
| Joseph Pettigrew | 75.50 | $650.00 | $ 49,075.00 |
| Jing-Li Yu | 206.10 | $650.00 | $ 133,965.00 |
| Scott Jacobsen | 226.10 | $450.00 | $ 101,745.00 |
| Total Associates | 681.30 | | $ 362,905.00 |
| | | | |
| Paralegals/Non-Attorney | | Rate | Amount |
| Elena Dowd | 11.70 | $300.00 | $ 3,510.00 |
| Kaitlin Steinberger | 42.30 | $325.00 | $ 13,747.50 |
| Total Paralegals | 54.00 | | $ 17,257.50 |
| | | | |
| Total | 1,796.70 | | $ 1,339,820.00 |

# EXHIBIT B

**EXHIBIT B**

Scott+Scott Attorneys at Law LLP

Expenses

| | | |
|---|---|---:|
| Courier | $ | 185.35 |
| Expert | $ | 20,000.00 |
| Filing, Witness & Other Fees | $ | 678.00 |
| Mediation | $ | 9,662.69 |
| On-Line Research | $ | 4,662.89 |
| Photocopies | $ | 3,899.25 |
| Postage | $ | 9.39 |
| Press Releases | $ | 1,188.00 |
| Telephone, Facsimile | $ | 503.89 |
| Travel (Meals, Hotels & Transportation) | $ | 9,328.63 |
| Total | $ | 50,118.09 |

# EXHIBIT C

# SCOTT+SCOTT
##   ATTORNEYS AT LAW LLP



## MISSION STATEMENT

Scott+Scott Attorneys at Law LLP ("Scott+Scott") is a nationally recognized law firm headquartered in Connecticut with offices in California, New York City, and Ohio.  Scott+Scott represents individuals, businesses, public and private pension funds, and others who have suffered from corporate fraud and wrongdoing.  Scott+Scott is directly responsible for recovering hundreds of millions of dollars and achieving substantial corporate governance reforms on behalf of its clients.  Scott+Scott has significant expertise in complex securities, antitrust, consumer, ERISA, and civil rights litigation in both federal and state courts.  Through its efforts, Scott+Scott promotes corporate social responsibility.

## SECURITIES AND CORPORATE GOVERNANCE

Scott+Scott represents individuals and institutional investors that have suffered from stock fraud and corporate malfeasance.  Scott+Scott's philosophy is simple – directors and officers should be truthful in their dealings with the public markets and honor their duties to their shareholders.  Since its inception, Scott+Scott's securities and corporate governance litigation department has developed and maintained a reputation of excellence and integrity recognized by state and federal and state courts across the country.  "It is this Court's position that Scott+Scott did a superlative job in its representation, which substantially benefited Ariel . . . .  For the record, it should be noted that Scott+Scott has demonstrated a remarkable grasp and handling of the extraordinarily complex matters in this case . . . .  They have possessed a knowledge of the issues presented and this knowledge has always been used to the benefit of all investors."  *N.Y. Univ. v. Ariel Fund Ltd.*, No. 603803/08, slip. op. at 9-10 (N.Y. Sup. Ct. Feb. 22, 2010).  "The quality of representation here is demonstrated, in part, by the result achieved for the class.  Further, it has been this court's experience, throughout the ongoing litigation of this matter, that counsel have conducted themselves with the utmost professionalism and respect for the court and the judicial process."  *In re Priceline.com, Inc. Sec. Litig.*, No. 00-cv-01884, 2007 WL 2115592, at *5 (D. Conn. July 20, 2007).

Scott+Scott has successfully prosecuted numerous class actions under the federal securities laws, resulting in the recovery of hundreds of millions of dollars for shareholders.  Representative cases prosecuted by Scott+Scott under the Securities Exchange Act of 1934 include: *In re Priceline.com, Inc. Sec. Litig.*, No. 00-cv-01884 (D. Conn. July 19, 2007) ($80 million settlement); *Irvine v. ImClone Sys., Inc.*, No. 02-cv-00109 (S.D.N.Y. July 29, 2005) ($75 million settlement); *Cornwell v. Credit Suisse Group*, No. 08-cv-03758 (S.D.N.Y. July 20, 2011) ($70 million settlement); *Schnall v. Annuity and Life Re (Holdings) Ltd.*, No. 02-cv-2133 (D. Conn. June 13, 2008) ($26.5 million settlement); and *St. Lucie County Fire District Firefighter's*

*Pension Trust Fund v. Oilsands Quest Inc.*, No. 11-cv-1288-JSR (S.D.N.Y. Dec. 6, 2013) ($10.23 million settlement) ($7.85 million settlement preliminarily approved).  Representative cases prosecuted by Scott+Scott under the Securities Act of 1933 include:  *In re Washington Mutual Mortgage-Backed Securities Litigation*, No. 09-cv-0037 (W.D. Wash. Jan. 7, 2014) ($26 million settlement); *In re Pacific Biosciences Securities Litigation,* No.CIV509210 (Cal. Super. Ct., San Mateo County, Oct. 31, 2013) ($7.68 million settlement); *West Palm Beach Police Pension Fund v. CardioNet, Inc.*, No. 37-2010-00086836-CU-SL-CTL (Cal. Super. Ct., San Diego County, 2010) ($7.25 million settlement); *Parker v. National City Corp.*, No. CV-08-657360 (Ohio Ct. Com. Pl., Cuyahoga County, June 23, 2010) ($5.25 million settlement); and *Hamel v. GT Solar International, Inc.*, No. 217-2010-CV-05004 (N.H. Super. Ct., Merrimack County, May 10, 2011) ($10.25 million settlement).

Scott+Scott currently serves as court-appointed lead counsel in various federal securities class actions, including *Birmingham Retirement and Relief System, v. S.A.C. Capital Advisors*, No. 1:12-cv-09350 (S.D.N.Y. June 17, 2013); *In re NQ Mobile Securities Litigation*, No. 13-cv-07608 (S.D.N.Y. April 9, 2014); *In re Conn's Inc. Securities Litigation*, No. 14-cv-00548 (S.D. Tex. June 3, 2014) and *Weston v. RCS Capital Corp.,* No. 14-10136 (S.D.N.Y., Dec. 29, 2014).

In addition to prosecuting federal securities class actions, Scott+Scott has a proven track record of handling corporate governance matters through its extensive experience litigating shareholder derivative actions.  In addition, Scott+Scott has been singularly successful in its shareholder derivative appellate practice, and as a result, has been instrumental in fashioning the standards in this area of law.  In *Westmoreland County Employee Retirement System v. Parkinson*, No. 12-3342 (7th Cir. Aug. 16, 2013), the Seventh Circuit clarified the parameters of demand futility in those instances where a majority of directors of a corporation are alleged to have breached the fiduciary duty of loyalty by consciously disregarding positive law.  In *Cottrell v. Duke*, No. 12-3871 (8th Cir. Dec. 28, 2013), the Eighth Circuit, in a case of first impression, clarified that the *Colorado River* stay is virtually never appropriate where there are exclusive federal claims.  And in *King v. Verifone Holdings, Inc.*, No. 330, 2010 (Del. Jan. 28, 2011), the Supreme Court of Delaware has clarified the availability of the Delaware Corporate Code Section 220 "books and records" demands to a shareholder whose original plenary action was dismissed without prejudice in a federal district court.  Representative actions prosecuted by Scott+Scott include: *In re DaVita Healthcare Partners Derivative Litigation*, No. 13-cv-1308 (D. Colo.) (corporate governance reform valued at $100 million); *North Miami Beach General Employees Retirement Fund v. Parkinson*, No. 10C6514 (N.D. Ill.) (corporate governance valued between $50 million and $60 million); *In re Marvell Tech. Group Ltd. Derivative Litigation*, No. C-06-03894-RMW (RS) (N.D. Cal. Aug. 11, 2009) ($54.9 million and corporate governance reforms); *In re Qwest Communications International, Inc.*, No. Civ. 01-RB-1451 (D. Colo. June 15, 2004) ($25 million and corporate governance reform); *Plymouth County Contributory Retirement Fund v. Hassan*, No. 08-cv-1022 (D.N.J.) (settlement of derivative claims against Merck Schering Plough and its officers and directors providing for corporate governance reforms valued between $50 million and $75 million); *Carfagno v. Schnitzer*, No. 08-cv-912-SAS (S.D.N.Y. May 18, 2009) (modification of terms of preferred securities issued to insiders valued at $8 million); and *Garcia v. Carrion*, No. 3:09-cv-01507 (D.P.R. Sept. 12, 2011) (settlement of derivative claims against the company and its officers and directors providing for corporate governance reforms valued between $10.05 million and $15.49 million).

Currently, Scott+Scott is actively prosecuting shareholder derivative actions, including *In re Bio-Rad Laboratories, Inc. Stockholder Litigation*, C.A. No. 11387 (Del. Ch. Aug. 13, 2015); *In re Tile Shop Holdings, Inc. Stockholder Derivative Litigation*, C. A. No. 108884 (Del. Ch. July 31, 2015); *West Palm Beach Fire Pension Fund v. Page*, No. 15-1334 (N.D. Cal. March 23, 2015); *In re Duke Energy Corp. Coal Ash Derivative Litigation*, C.A. No. 9682 (Del. Ch. May 21, 2014); and *In re OSI Systems, Inc. Derivative Litigation*, No. 14-2910 (C. D. Cal. April 15, 2014).

## ANTITRUST

Scott+Scott litigates complex antitrust cases throughout the United States. Scott+Scott represents investors, business, and consumers in price-fixing, bid-rigging, monopolization, and other restraints of trade cases on both a class-wide and individual basis, helping to ensure that markets remain free, open, and competitive. With the opening of a London Office, Scott+Scott's commitment to competition now includes pursuing its clients' claims on a global basis.

Scott+Scott's class action antitrust practice includes serving as court-appointed lead counsel with the responsibility for the prosecution of class claims. Scott+Scott serves as court-appointed lead counsel in high-value antitrust class action cases, including *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388 (D. Mass.) (challenging bid rigging and market allocation of leveraged buyouts by private equity firms resulting in $590.5 million in settlements)); *In Re: Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.) (challenging price-fixing of foreign exchange rates (over $2 billion in partial settlements negotiated)); and *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-cv-7126 (S.D.N.Y.) (challenging price-fixing of the ISDAfix benchmark interest rate). Scott+Scott has served as court-appointed lead counsel in other cases, including *In re Korean Air Lines Co., Ltd. Antitrust Litigation*, MDL No. 1891, No. CV 07-06542 (C.D. Cal.) (challenging price-fixing/illegal surcharge ($86 million in cash and travel voucher settlements) and *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Limited Company*, No. 12-cv-03824 (E.D. Pa.) (challenging monopolization in the sale of name-brand pharmaceutical ($8 million settlement)).

When not serving as lead counsel, Scott+Scott has served on the executive leadership committees in numerous class action cases. Representative actions include *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-md-1720 (E.D.N.Y.) (challenging price-fixing in the payment cards industry ($7.25 billion settlement)); *Kleen Products LLC v. Packaging Corporation of America*, No. 1:10-cv-05711 (N.D. Ill.) (challenging price-fixing of containerboard products); and *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420-YGR (DMR) (N.D. Cal.) (challenging price-fixing of lithium-ion batteries).

Scott+Scott's class action antitrust experience includes serving as co-trial counsel in *In re Scrap Metal Antitrust Litigation*, 02-cv-0844-KMO (N.D. Ohio), where it helped obtain a $34.5 million jury verdict, which was subsequently affirmed by the United States Court of Appeals for the Sixth Circuit (*see In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 524 (6th Cir. 2008)), and in the consolidated bench trial in *Ross v. Bank of America N.A.*, No. 05-cv-7116, MDL No. 1409 (S.D.N.Y.), and *Ross v. American Express Co.*, No. 04-cv-5723, MDL No. 1409 (S.D.N.Y.).

Scott+Scott also represents large clients in opt-out antitrust litigation. Scott+Scott currently represents Eastman Kodak Company, Agfa Corporation, Agfa Graphics, N.V., and Mag Instrument, Inc. in *In re: Aluminum Warehousing Antitrust Litigation*, MDL No. 2481 (S.D.N.Y.). Scott+Scott previously represented publicly traded corporations, such as Parker Hannifin Corporation and PolyOne Corporation, in matters such as *In re Rubber Chemicals Antitrust Litigation*, MDL No. 1648 (N.D. Cal.); *In re Polychloroprene Rubber (CR) Antitrust Litigation*, MDL No. 1642 (D. Conn.); and *In re Plastic Additives Antitrust Litigation (No. II)*, MDL No. 1684 (E.D. Pa.).

## CONSUMER RIGHTS

Scott+Scott and its attorneys have a proven track record of obtaining significant recoveries for consumers in class action cases. Scott+Scott is one of the premier advocates in the area of consumer protection law and has been appointed to a number of prominent leadership positions.

Cases where Scott+Scott has played a leading role in the area of consumer protection litigation include:

- *In re Providian Financial Corp. Credit Card Terms Litigation*, MDL No. 1301 (E.D. Pa.) ($105 million settlement was achieved on behalf of a class of credit card holders who were charged excessive interest and late charges on their credit cards);

- *The Vulcan Society, Inc. v. City of New York*, No. 07-cv-02067 (E.D.N.Y.) ($100 million settlement and significant injunctive relief was obtained for a class of black and Hispanic applicants who sought to be New York City firefighters but were denied or delayed employment due to racial discrimination);

- *In re Prudential Ins. Co. SGLI/VGLI Contract Litigation*, MDL No. 2208 (D. Mass.) ($40 million settlement was achieved on behalf of a class of military service members and their families who had purchased insurance contracts);

- *In re Target Corp. Customer Data Security Breach Litigation*, MDL No. 2522 (D. Minn.) ($59 million settlement achieved on behalf of financial institutions involving data breach of personal and financial information of approximately 40 million credit and debit card holders);

- *Greater Chautauqua Federal Credit Union v. Kmart Corporation*, No. 15-cv-02228 (N.D. Ill.) ($18 million monetary and injunctive settlement on behalf of financial institutions involving data breach of credit and debit card information);

- *Winsouth Credit Union v. Mapco Express Inc*., Case No.: 3:14-cv-1573 (M.D. Tenn.) (largest dollar-per-card settlement obtained on behalf of financial institutions involving data breach of credit and debit card information);

- *Gunther v. Capital One, N.A.*, No. 09-2966 (E.D.N.Y.) (a net settlement resulting in class members receiving 100% of their damages was obtained);

- *In re Pre-Filled Propane Tank Marketing and Sales Practices Litigation*, MDL No. 2086 (W.D. Mo.) ($37 million settlement obtained on behalf of class of propane purchasers who alleged defendants overcharged the class for under-filled propane tanks);

- *Murr v. Capital One Bank (USA), N.A.*, No. 1:13-cv-1091 (E.D. Va.) ($7.3 million settlement pending on behalf of class of consumers who were misled into accepting purportedly 0% interest offers); and

- *Howerton v. Cargill, Inc.,* No. 13-cv-00336 (D. Haw.) ($6.1 settlement obtained on behalf of a class of consumers who purchased Truvia, purported to be deceptively marketed as "all-natural").

Moreover, Scott+Scott is currently serving in a leadership capacity in a number of class action consumer protection cases, including:

- *In re The Home Depot, Inc., Customer Data Security Breach Litigation*, MDL No. 2583 (N.D. Ga.) (co-lead counsel, preliminary approval of $27.25 million settlement on behalf of financial institutions involving data breach and the theft of the personal and financial information of over 40 million credit and debit card holders);

- *First Choice Federal Credit Union v. The Wendy's Co.*, 2:16-cv-00506 (W.D. Pa.) (co-lead counsel, claims on behalf of financial institutions involving data breach of personal and financial information of millions of credit and debit card holders);

- *In re UnitedHealth Group PBM Litigation*, Case No. 0:16-cv-3352 (D. Minn.) (co-lead counsel, claims on behalf of plan participants involving overcharge of copayments for prescription drugs);

- *In re Cigna Corporation PBM Litigation*, Case No. 3:16-cv-1702 (D. Conn.) (Chair of Executive Committee, claims on behalf of plan participants involving overcharge of copayments for prescription drugs);

- *Midwest America Federal Credit Union v. Arby's Restaurant Group, Inc.*, 1:17-cv-00514 (N.D. Ga.) (member of Executive Committee, claims on behalf of financial institutions involving data breach of credit and debit card information); and

- *In re Herbal Supplements Marketing and Sales Practices Litigation*, MDL No. 2519 (N.D. Ill.) (claims on behalf of a class of consumers alleging major retail-chain defendants misrepresent the ingredients in store-branded herbal supplements).

## EMPLOYEE BENEFITS (ERISA)

Scott+Scott litigates complex class actions across the United States on behalf of corporate employees alleging violations of the federal Employee Retirement Income Security Act. ERISA was enacted by Congress to prevent employers from exercising improper control over retirement plan assets and requires that pension and 401(k) plan trustees, including employer corporations, owe the highest fiduciary duties to retirement plans and their participants as to their retirement

funds.  Scott+Scott is committed to continuing its leadership in ERISA and related employee-retirement litigation, as well as to those employees who entrust their employers with hard-earned retirement savings.  Representative recoveries by Scott+Scott include:  *In re Royal Dutch/Shell Transport ERISA Litigation*, No. 2:04-cv-01398-JWB-SDW (D.N.J. Aug. 30, 2005) ($90 million settlement); *In re General Motors ERISA Litigation*, No. 2:05-cv-71085-NGE-RSW (E.D. Mich. June 5, 2008) ($37.5 million settlement); and *Rantala v. ConAgra Foods*, No. 8:05-cv-00349-LES-TDT (D. Neb.) ($4 million settlement).

## CIVIL RIGHTS LITIGATION

Scott+Scott has also successfully litigated cases to enforce its clients' civil rights.  In *The Vulcan Society, Inc. v. The City of New York*, No. 1:07-cv-02067-NGG-RLM (E.D.N.Y.), Scott+Scott was part of a team of lawyers representing a class of black applicants who were denied or delayed employment as New York City firefighters due to decades of racial discriminatory conduct.  The district court certified the class in a post-*Walmart v. Dukes* decision, granted summary judgment against the City on both intentional discrimination and disparate impact claims, and after trial ordered broad injunctive relief, including a new examination, revision of the application procedure, and continued monitoring by a court-appointed monitor for at least 10 years.  The back pay and compensatory damage award will be determined in a subsequent ruling. In *Hohider v. United Parcel Services, Inc.*, No. 2:04-cv-00363-JFC (W.D. Penn.), Scott+Scott obtained significant structural changes to UPS's Americans with Disabilities Act compliance policies and monetary awards for some individual employees in settlement of a ground-breaking case seeking nationwide class certification of UPS employees who were barred from reemployment after suffering injuries on the job.

## ATTORNEY BACKGROUND AND EXPERIENCE

**MELVIN SCOTT** is a graduate of the University of Connecticut (B.A. 1950) and the University of Kentucky (M.A. 1953; LL.B. 1957).  Mr. Scott founded the firm in 1975.  He formerly practiced in Kentucky and is presently admitted to practice in Connecticut and Pennsylvania.  Mr. Scott was a member of the Kentucky Law Review, where he submitted several articles for publication.  He has served as an Attorney Trial Referee since the inception of the program in the State of Connecticut and is a member of the Fee Dispute Committee for New London County.  Mr. Scott also formerly served as a Special Public Defender in criminal cases and as a member of the New London County Grievance Committee.  Mr. Scott actively represents aggrieved parties in securities, commercial and criminal litigation and served or serves as counsel in *Irvine, et al. v. ImClone Systems, Inc.*; *Schnall v. Annuity and Life Re (Holdings) Ltd.*; *In re 360networks Class Action Securities Litigation*; *In re General Motors ERISA Litigation*, and *Hohider v. UPS*, among others.

**DAVID R. SCOTT** is the managing partner of Scott+Scott.  He represents multinational corporations, hedge funds, and institutional investors in high-stakes complex litigation, including antitrust, commercial, and securities actions.

Mr. Scott has received widespread recognition for his antitrust work.  He has been elected to Who's Who Legal: Competition 2015, 2016, and 2017 which lists the world's top antitrust lawyers who are selected based on comprehensive, independent survey work with both general counsel and lawyers in private practice around the world.  He has also received a highly recommended ranking by Benchmark Litigation for each of the years 2013-2015.

Mr. Scott's antitrust experience includes matters dealing with unlawful price-fixing cartels, illegal tying, and anticompetitive monopolization.  Currently, Mr. Scott is lead counsel in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, a cartel action alleging a longstanding and widespread conspiracy to manipulate the foreign exchange market, in which billions in settlements have been announced to date.  He is co-lead counsel in a class action case alleging that the world's largest banks and their broker, ICAP, entered a conspiracy to manipulate ISDAfix, a financial benchmark that is tied to over $379 trillion of outstanding interest-rate swaps around the world.

Mr. Scott's previous antitrust cases have resulted in significant recoveries for victims of price-fixing cartels.  Among other cases, Mr. Scott served as co-lead counsel in *Dahl v Bain Capital Partners*, No. 1:07-cv-12388 (D. Mass.), an action alleging that the largest private equity firms in the United States colluded to suppress prices that shareholders received in leveraged buyouts and that the defendants recently agreed to settle for $600 million.  He also played a leadership role in a lawsuit accusing Visa and MasterCard of engaging in anticompetitive conduct in setting credit card and debit card acceptance fees that recently settled for a record $7.25 billion.  And he was lead counsel in *Red Lion Medical Safety v. Ohmeda*, No. 06-cv-1010 (E.D. Cal.), a lawsuit alleging that Ohmeda, one of the leading manufacturers of medical anesthesia equipment in the United States, excluded independent service organizations from the market for servicing its equipment.  The case was successfully resolved in settlement negotiations before trial.

Mr. Scott has also taken the lead in bringing claims on behalf of institutional investors, such as sovereign wealth funds, corporate pension schemes, and public employee retirement funds, against mortgaged-backed securities trustees for failing to protect investors. Such cases include *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. The Bank of New York Mellon* (MBS sponsored by Countrywide Financial Corp.), No. 1:11-cv-05459 (S.D.N.Y.); *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America* (MBS sponsored by Washington Mutual Bank), No. 1:12-cv-02865 (S.D.N.Y.); and *Oklahoma Police Pension and Retirement System v. U.S. Bank National Association* (MBS sponsored by Bear Stearns), No. 1:11-cv-08066 (S.D.N.Y.). He also represented a consortium of regional banks in litigation relating to toxic auction rate securities ("ARS") and obtained a sizable recovery for the banks in a confidential settlement. This case represents one of the few ARS cases in the country to be successfully resolved in favor of the plaintiffs.

In addition, Mr. Scott has extensive experience litigating shareholder derivative cases, achieving substantial corporate governance reforms on behalf of his clients. Representative actions include: *In re Marvell Tech. Group Ltd. Derivative Litigation*, No. C-06-03894 (N.D. Cal.) (settlement obtaining $54.9 million in financial benefits for the company, including $14.6 million in cash, and corporate governance reforms to improve stock option granting procedures and internal controls, valued at more than $150 million); *In re Qwest Communications International, Inc.*, No. 01-RB-1451 (D. Colo.) (settlement obtaining $25 million for the company and achieving corporate governance reforms aimed at ensuring board independence); *Plymouth County Contributory Retirement System v. Hasan*, No. 08-1022 (D.N.J.) (settlement requiring annual reporting to the company's board where any clinical drug trial is delayed, valued at between $50 million - $75 million); *Carfagno v. Schnitzer*, No. 08-cv-0912 (S.D.N.Y.) (settlement resulting in modification of terms of preferred securities issued to insiders, valued at $8 million); and *Garcia v. Carrion*, No. 09-cv-1507 (D.P.R.) (settlement achieving reforms aimed at rectifying internal control weaknesses and improving director education in accounting and ethics, valued at between $10 million - $15 million).

Mr. Scott is frequently quoted in the press, including in publications such as *The Financial Times*, *The Guardian*, *The Daily Telegraph*, *The Wall Street Journal*, and *Law360*. He is regularly invited to speak at conferences around the world and before Boards of Directors and trustees responsible for managing institutional investments.

Mr. Scott is admitted to practice in Connecticut, New York, the United States Tax Court, and numerous United States District Courts.

Mr. Scott is a graduate of St. Lawrence University (B.A., *cum laude*, 1986), Temple University School of Law (J.D., Moot Court Board, 1989), and New York University School of Law (LLM in taxation).

**BETH A. KASWAN**, during her tenure as an Assistant U.S. Attorney and subsequent promotions to Chief of the Commercial Litigation Unit and Deputy Chief of the Civil Division of the U.S. Attorney's Office for the Southern District of New York, was appointed by the FDA as lead counsel in litigation to enjoin the manufacture of adulterated generic drugs in the landmark

case *United States v. Barr Laboratories, Inc.*, 812 F. Supp. 458 (D.N.J. 1993). Ms. Kaswan, who began her career as an accountant at the offices of Peat, Marwick, Mitchell & Co., and then worked as a civil trial attorney at the U.S. Department of Justice in Washington, D.C., is the recipient of several awards from the Justice Department and other agencies she represented, including the Justice Department's John Marshall award, Special Commendation from the Attorney General, a Superior Performance award from the Executive Office of U.S. Attorneys and Tax Division Outstanding Achievement awards.

While at Scott+Scott, Ms. Kaswan served as lead counsel in *Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass Through Certificates*, No. 09-cv-00037 (W.D. Wa.), the WaMu RMBS Section 11 Securities Act case which settled after plaintiffs succeeded in defeating the defendants' motion for summary judgment, only weeks before it was scheduled to proceed to a jury trial. Ms. Kaswan just completed the nine-week trial in *In the Matter of the Application of The Bank of New York Mellon*, Index No. 651786/2011 (N.Y. Supr. Ct.) in which she and other interveners challenged the proposed settlement between Bank of New York Mellon and Bank of America to resolve repurchase and servicing claims for 530 Countrywide trusts. She and others at Scott+Scott recently settled federal and state law claims against the Securitization Trustees for WaMu and Bear Stearns Trusts in *Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America, N.A.*, No. 12-cv-2865 (S.D.N.Y.) and *Oklahoma Police Pension and Retirement System v. U.S. Bank N.A.*, No. 11-cv-8066 (S.D.N.Y.), respectively. Ms. Kaswan brought a derivative suit on behalf of New York University against Ezra Merkin to freeze funds belonging to a feeder fund to Bernard Madoff. She also served as lead counsel to another shareholder derivative case, *Carfagno v. Schnitzer*, No. 08-CV-912-SAS (S.D.N.Y.), where she successfully negotiated a settlement on behalf of Centerline Holding Company and Centerline shareholders. Ms. Kaswan has served as lead counsel in *Cornwell v. Credit Suisse Group*, No. 08-cv-3758 (S.D.N.Y.) and *In re Tetra Technologies, Inc. Securities Litigation*, No. 08-cv-0965 (S.D. Tex.), among others.

Ms. Kaswan is a member of the New York and Massachusetts bars. Ms. Kaswan has been practicing law for over 35 years and is a partner in the firm's New York office.

**CHRISTOPHER M. BURKE** chairs Scott+Scott's competition practice and sets the Firm's litigation standards. Mr. Burke's principal practice is in complex antitrust litigation, particularly in the financial services industry and he has served as lead counsel in some of the world's largest financial services antitrust matters. He currently sits as a partner in the firm's San Diego and New York offices.

Currently, Mr. Burke is co-lead counsel in *In Re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789 (S.D.N.Y.) ($2.3 billion settlement); and *Alaska Electrical Pension Fund v. Bank of America Corporation*, 14-cv-7126 (S.D.N.Y) (ISDAfix litigation) ($500 million settlement).

Mr. Burke has previously served as co-lead counsel in *Dahl v. Bain Capital Partners*, 07-cv-12388 (D. Mass.) ($590.5 million settlement); *Axiom Investment Advisors, LLC, by and through its Trustee, Gildor Management LLC v. Barclays Bank PLC*, 15-cv-09323 (S.D.N.Y.) ($50 million settlement); *In re Currency Conversion Antitrust Litigation*, MDL No. 1409

(S.D.N.Y.) ($336 million settlement); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.) (over $5 billion settlement); *LiPuma v. American Express Co*., Case No. 1:04-cv-20314 (S.D. Fla.) ($90 million settlement); and was one of the trial counsel in *Schwartz v. Visa*, Case No. 822505-4 (Alameda Cty. Super. Ct.) ($780 million plaintiff's judgment after six months of trial); and *In re Disposable Contact Lens Antitrust Litigation*, MDL No. 1030 (M.D. Fla.).  Mr. Burke was one of the original lawyers in the *Wholesale Elec. Antitrust* cases in California, which settled for over $1 billion.

Further, Mr. Burke was trial counsel in *Ross v. Bank of America N.A*., No. 05-cv-7116, MDL No. 1409 (S.D.N.Y.) and *Ross v. American Express Co*., No. 04-cv-5723, MDL No. 1409 (S.D.N.Y.).  He was also co-lead counsel for indirect purchasers in *In re Korean Air Lines Co., Ltd. Antitrust Litigation*, MDL No. 1891 (C.D. Cal.) ($86 million settlement), and *In re Prudential Ins. Co. of America SGLI/VGLI Contract Litigation*, No. 11-md-2208 (D. Mass.) ($40 million settlement).  Mr. Burke also investigated and filed the first complaint in *In re Credit Default Swaps Antitrust Litigation*, 13-md-2476 (S.D.N.Y.).

Mr. Burke frequently lectures at professional conferences and CLEs on competition matters, including litigation surrounding financial benchmarks, class-barring arbitration clauses, the effects of *Twombly* in 12(b)(6) motions, and the increasing use of experts at class certification and trial.  The American Antitrust Institute ("AAI") honored Christopher Burke and Scott+Scott Attorneys at Law with an *Outstanding Antitrust Litigation Achievement in Private Law Practice* award at their 2018 Antitrust Enforcement Awards for efforts in the *ISDAfix* litigation.  In 2014, he was also recognized for his exemplary work in the *Dahl v. Bain Capital Partners* matter by the AAI and has regularly been designated as a Super Lawyer by Thomson Reuters.

Mr. Burke is a graduate of The Ohio State University (B.A. 1984), William & Mary (M.A. 1988), and the University of Wisconsin (M.A. 1989; J.D. 1993; Ph.D. 1996).  He has also served as an Assistant Attorney General at the Wisconsin Department of Justice and has lectured on law-related topics, including constitutional law, law and politics, and civil rights at the State University of New York at Buffalo and at the University of Wisconsin.  Mr. Burke's book, *The Appearance of Equality: Racial Gerrymandering, Redistricting, and the Supreme Court* (Greenwood, 1999), examines conflicts over voting rights and political representation within the competing rhetoric of communitarian and liberal strategies of justification.

Mr. Burke is admitted to practice by the Supreme Courts of the States of California, New York, and Wisconsin, and numerous United States District Courts and Courts of Appeal.

**JUDITH S. SCOLNICK** is a partner in the firm's New York office.  Ms. Scolnick has extensive experience in the fields of shareholder derivative law, particularly in the pharmaceutical industry, employment law and employment class actions, and corporate governance.

Ms. Scolnick began her career by serving as a law clerk to the late Honorable Anthony Julian of the United States District Court in Massachusetts.  Thereafter, she served as a trial attorney in the Civil Division of the United States Department of Justice, where she was lead counsel in several high-profile employment discrimination lawsuits against various U.S. agencies around the country.

Since then, Ms. Scolnick has served as lead counsel in many shareholder derivative actions including *North Miami General Employees Retirement Fund v. Parkinson*, No. 10-cv-6514 (N.D. Ill.), a shareholder derivative case on behalf of pharmaceutical company, Baxter International, arising from the Board's failure to comply with FDA orders to remediate a medical device known as the Colleague Pump.  She was also lead counsel in *In re DaVita Healthcare Partners Inc. Derivative Litigation*, No. 12-cv-2074 (D. Colo.), also a shareholder derivative case, brought against the directors of one of the largest dialysis providers in the U.S. that falsely billed Medicare for unnecessary dialysis payments and paid off physicians in violation of federal anti-kickback statutes.  The plaintiff was able to obtain extensive corporate governance reform in every aspect of the Company from the board level to the manner in which medical records were maintained in coordination with reforms mandated by the Department of Justice.

Through her work in the area of shareholder derivative actions, Ms. Scolnick contributed substantially to recent jurisprudence, expanding shareholders' rights to examine books and records of the corporations in which they hold stock.  In *Cain v. Merck & Co., Inc.*, 415 N.J. Super. 319 (N.J. Super. A.D. 2010), the New Jersey Appellate Division agreed with Ms. Scolnick and held in a precedential decision that the New Jersey Business Corporation Act allows shareholders to inspect the minutes of board of directors and executive committee meetings upon a showing of proper purpose. In *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140 (Del. Supr. 2011), the Delaware Supreme Court ruled in a groundbreaking decision that plaintiffs may, in certain circumstances, inspect a corporation's books and records to bolster a shareholder derivative complaint even after they have filed a lawsuit.

Ms. Scolnick has also litigated a number of important employment discrimination class actions. These include *U.S. v. City of New York*, No. 07-cv-2067, 2011 WL 4639832 (E.D.N.Y. Oct. 5, 2011) (successfully representing a class of black applicants for entry-level firefighter jobs who were discriminated against by the City of New York), *Hohider v. UPS*, 243 F.R.D. 147 (W.D. Pa. 2007), *reversed and remanded*, 574 F.3d 169 (3d Cir. 2009), where Ms. Scolnick – through negotiation – achieved a change in a UPS return-to-work policy applicable to injured workers.

Ms. Scolnick has experience litigating shareholder derivative actions at both the trial and appellate court level.  She successfully argued the Baxter appeal in which the Court of Appeals for the Seventh Circuit, reversing a trial court's dismissal, held that a pension fund's complaint on behalf of all shareholders passed the pre-suit demand futility threshold test under Delaware substantive law.  *Westmoreland County Employees' Retirement System v. Parkinson*, 727 F.3d 719 (7th Cir. 2013).  Also in 2013, Ms. Scolnick obtained a landmark ruling in the Wal-Mart shareholder derivative litigation from the Court of Appeals for the Eighth Circuit in which the Eighth Circuit reversed the district court's stay of the federal action in favor of a related proceeding in Delaware Chancery Court.  *Cottrell v. Duke*, 737 F.3d 1238 (8th Cir. 2013).

Ms. Scolnick has been selected for the past five years in Thompson Reuter's "New York Super Lawyers."  Ms. Scolnick is admitted to practice in New York, New Jersey, and Massachusetts.

Ms. Scolnick serves on several charitable boards that are dedicated to medical research in the field of addiction causes and treatment.

11

**JOSEPH P. GUGLIELMO** is a partner in the firm's New York office and represents institutional and individual clients in antitrust, consumer, and securities litigation in federal and state courts throughout the United States and has achieved numerous successful outcomes.

Mr. Guglielmo, along with other attorneys at Scott+Scott, was recognized for his efforts representing New York University in obtaining a monumental temporary restraining order of over $200 million from a Bernard Madoff feeder fund. Specifically, New York State Supreme Court Justice Richard B. Lowe III stated, "Scott+Scott has demonstrated a remarkable grasp and handling of the extraordinarily complex matters in this case. The extremely professional and thorough means by which NYU's counsel has litigated this matter has not been overlooked by this Court."

Mr. Guglielmo serves in a leadership capacity in a number of complex antitrust, securities, and consumer actions, including: *In Equifax, Inc. Customer Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.), co-lead counsel, claims on behalf of financial institutions involving data breach of personal and financial information of approximately 150 million consumers, *In Re: Disposable Contact Lens Antitrust Litigation*, No. 3:15-md-2626 (M.D. Fla.), co-lead counsel, claims on behalf of a class of contact lens purchasers alleging violations of the antitrust laws, *In re The Home Depot, Inc., Customer Data Security Breach Litigation*, MDL No. 2583 (N.D. Ga.), co-lead counsel, $27.25 million settlement on behalf of financial institutions involving data breach and the theft of the personal and financial information of over 40 million credit and debit card holders; *In re Cigna Corporation PBM Litigation*, No. 3:16-cv-1702 (WWE) (D. Conn.), Chair of Executive Committee, asserting RICO and ERISA claims on behalf of nationwide class of plan participants involving overcharge of copayments for prescription drugs; *Forth v. Walgreen Co, Inc.*, No. 1:17-cv-02246 (N.D. Ill.), lead counsel, asserting claims on behalf of class of consumers alleging overcharge for medically necessary, covered prescription drugs, *Bellwether Community Credit Union v. Chipotle Mexican Grill, Inc.*, No. 1:17-cv-01102-WJM-STV (D. Colo.) co-lead counsel, on behalf of financial institutions involving data breach and the theft of the personal and financial information. Mr. Guglielmo is also actively involved in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789-LGS (S.D.N.Y), which involves claims on behalf of purchasers of foreign exchange instruments alleging violations of federal antitrust laws.

Mr. Guglielmo has achieved significant victories and obtained numerous settlements for his clients. He was one of the principals involved in the litigation and settlement of *In re Managed Care Litigation*, MDL No. 1334 (S.D. Fla.), which included settlements with Aetna, CIGNA, Prudential, Health Net, Humana, and WellPoint, providing monetary and injunctive benefits exceeding $1 billion. Additional cases Mr. Guglielmo played a leading role and obtained substantial recoveries for his clients include: *Love v. Blue Cross and Blue Shield Ass'n*, No. 03-cv-21296 (S.D. Fla.), which resulted in settlements of approximately $130 million and injunctive benefits valued in excess of $2 billion; *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1897 (D.N.J.), settlements in excess of $180 million; *In re Target Corporation Customer Data Security Breach Litigation*, MDL No. 2522 (D. Minn.), $59 million settlement achieved on behalf of financial institutions involving data breach of personal and financial information of approximately 110 million credit and debit cardholders; *Winsouth Credit Union v. Mapco Express Inc.*, No.: 3:14-cv-1573 (M.D. Tenn.), largest dollar-per-card settlement obtained on behalf of financial institutions involving data breach of credit and debit card information; *Valle*

12

*v. Popular Community Bank*, Case No. 653936/2012 (N.Y. Supreme Ct.), $5.2 million settlement on behalf of consumers, *In re Pre-Filled Propane Tank Marketing and Sales Practices Litigation*, MDL No. 2086 (W.D. Mo.), consumer settlements in excess of $40 million; *Bassman v. Union Pacific Corp.*, No. 97-cv-02819 (N.D. Tex.), $35.5 million securities class action settlement; *Garcia v. Carrion*, No. CV. 11-1801 (D. P.R.), substantial corporate governance reforms; *Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates*, No. 09-cv-00037 (W.D. Wash.), $26 million securities class action settlement, *Murr v. Capital One Bank (USA), N.A.*, No. 13-cv-1091 (E.D. Va.), $7.3 million settlement pending on behalf of class of consumers who were misled into accepting purportedly 0% interest offers, and *Howerton v. Cargill, Inc.*, No. 13-cv-00336 (D. Haw.), $6.1 settlement obtained on behalf of class of consumers who purchased Truvia, purported to be deceptively marketed as "all-natural." Mr. Guglielmo was the principle litigator and obtained a significant opinion from the Hawaii Supreme Court in *Hawaii Medical Association v. Hawaii Medical Service Association*, 113 Hawaii 77 (Haw. 2006), reversing the trial court's dismissal and clarifying rights for consumers under the state's unfair competition law.

Mr. Guglielmo lectures on electronic discovery and is a member of the Steering Committee of the Sedona Conference®, an organization devoted to providing guidance and information concerning issues such as discovery and production issues, as well as areas focusing on antitrust law, complex litigation, and intellectual property.  Recently, Mr. Guglielmo was selected as a speaker for electronic discovery issues at the Sedona Conference as well as the Advanced eDiscovery Institute at Georgetown University Law Center.  Mr. Guglielmo was also recognized for his achievements in litigation by his selection to *The National Law Journal*'s "Plaintiffs' Hot List."  In 2019, Mr. Guglielmo was again named by Super Lawyers as a top Antitrust lawyer in the New York metro area.

Mr. Guglielmo graduated from the Catholic University of America (B.A., *cum laude*, 1992; J.D., 1995) and also received a Certificate of Public Policy.

Mr. Guglielmo is admitted to practice before numerous federal and state courts: the United States Supreme Court, the United States Court of Appeals for the First Circuit, Second Circuit, Third Circuit, Eighth Circuit, Ninth Circuit and Eleventh Circuit, the United States District Courts for the Southern and Eastern Districts of New York, District of Massachusetts, District of Connecticut, District of Colorado, Eastern District of Wisconsin, New York State, the District of Columbia, and the Commonwealth of Massachusetts.

He is also a member of the following associations: District of Columbia Bar Association, New York State Bar Association, American Bar Association, and The Sedona Conference®.

**GEOFFREY M. JOHNSON** is a partner in the firm's Ohio office.  Mr. Johnson's practice focuses on shareholder derivative, corporate governance, and securities class action litigation. Mr. Johnson is also active in the firm's settlement and appellate practice groups.

Mr. Johnson has served as lead or co-lead counsel in several securities class action cases brought under Section 11 of the Securities Act of 1933, including *In re King Digital Entertainment plc Shareholder Litigation*, Case No. 15-544770 (Superior Court of California, San Francisco County), a shareholder lawsuit that settled for $18.5 million after suriving two separate motions to dismiss, and *Rosenberg v. Cliffs Natural Resources, Inc.*, Case No. 14-1531 (Court of

Common Pleas, Cuyahoga County, Ohio), a shareholder lawsuit that settled for $10 million after the firm had engaged in extensive litigation and motion practice.

Mr. Johnson has been active in the firm's mortgage-backed securities litigation practice, serving as lead or co-lead counsel in mortgage-backed securities class action cases involving Washington Mutual (*In re Washington Mutual Mortgage-Backed Securities Litigation*, 2:09-cv-00037 (W. D. Wash.)) and Countrywide Financial (*Putnam Bank v. Countrywide Financial, Inc.*, No. 10-cv-302 (C.D. Cal.)).  Mr. Johnson also helped develop the theories that the firm's pension fund clients have used to pursue class action cases against mortgage-backed security trustees.  *See Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon* (Case No. 11-cv-05459 (S.D.N.Y.)); *Oklahoma Police Pension & Retirement System v. U.S. Bank NA* (Case No. 11-cv-8066 (S.D.N.Y.)).

Mr. Johnson has also served as lead or co-lead counsel in other major securities and ERISA cases, including: *In re Royal Dutch/Shell ERISA Litigation*, No. 04-1398 (D.N.J.), which settled for $90 million and is one of the three largest recoveries obtained in an ERISA class action case; *In re Priceline Securities Litigation*, 00-cv-1884 (D. Conn.), which settled for $80 million and is the largest class action securities settlement ever obtained in the State of Connecticut; and *In re General Motors ERISA Litigation*, 05-cv-71085 (E.D. Mich.), a case that settled for $37.5 million and ranks among the largest ERISA class settlements ever obtained.

Mr. Johnson is a graduate of Grinnell College (B.A., Political Science with Honors, 1996) and the University of Chicago Law School (J.D., with Honors, 1999), where he served on the law review.  Prior to joining Scott+Scott, Mr. Johnson clerked for the Honorable Karen Nelson Moore, United States Court of Appeals for the Sixth Circuit.

**WALTER W. NOSS** serves as the managing partner for Scott+Scott's San Diego office.  He practices complex federal litigation with an emphasis on prosecuting antitrust actions on both a class-wide and individual, opt-out basis.

Currently, Mr. Noss represents class plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789 (S.D.N.Y.), an action challenging collusion regarding foreign exchange rates, and *Alaska Electrical Pension Fund v. Bank of America Corporation*, No. 1:14-cv-07126 (S.D.N.Y.), an action challenging collusion regarding the setting of the ISDAfix benchmark interest rate.

Mr. Noss represented class plaintiffs in *Dahl v. Bain Capital Partners LLC*, No. 1:07-cv-12388 (D. Mass.), a case challenging collusion among private equity firms.  In *Dahl*, Mr. Noss served as one of the primary litigation counsel prosecuting the case, including deposing key managing directors, drafting dispositive motions, and arguing in court in opposition to defendants' summary judgment motions.  The defendants in *Dahl* settled for $590.5 million.

Mr. Noss represented the indirect purchaser class plaintiffs in *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Limited Company*, No. 2:12-cv-03824 (E.D. Pa.), a case challenging monopolistic conduct known as "product hopping" by the defendants.  In *Mylan*, he was appointed sole lead counsel for the indirect class, and directed their prosecution and eventual settlement of the case for $8 million.

14

Mr. Noss also represents corporate opt-out clients in *In re: Aluminum Warehousing Antitrust Litigation*, MDL No. 2481 (S.D.N.Y.), a case challenging collusion regarding the spot metal price of physically-delivered aluminum.  He has previously represented out-out clients in *In re Rubber Chemicals Antitrust Litigation*, MDL No. 1648 (N.D. Cal.); *In re Polychloroprene Rubber (CR) Antitrust Litigation*, MDL No. 1642 (D. Conn.); and *In re Plastics Additives (No. II) Antitrust Litigation*, MDL No. 1684 (E.D. Pa.), which were cases involving price-fixing by horizontal competitors in the synthetic rubber industry.

Mr. Noss has experience successfully litigating in federal civil jury trials.  In April 2011, Mr. Noss served as lead trial counsel in *Novak v. Gray*, No. 8:09-cv-00880 (M.D. Fla.), winning a $4.1 million jury verdict for breach of oral contract and fraudulent inducement.  In December 2009, Mr. Noss served as plaintiffs' local counsel at trial in *Lederman v. Popovich*, No. 1:07-cv-00845 (N.D. Ohio), resulting in a $1.8 million jury verdict for plaintiffs on claims of breach of fiduciary duties, conversion, and unjust enrichment.  In January and February 2006, Mr. Noss assisted the trial team for *In re Scrap Metal Antitrust Litigation*, No. 1:02-cv-0844 (N.D. Ohio 2006), resulting in a $34.5 million class action plaintiffs' verdict.

Mr. Noss graduated *magna cum laude* from the University of Toledo with a Bachelor of Arts in Economics in 1997 and *with honors* from The Ohio State University College of Law in 2000. He is a member of the California, New York, and Ohio Bars.  Mr. Noss is also a member of the bars of the United States District Courts for the Northern, Central, and Southern Districts of California, the Southern District of New York, and the Northern and Southern Districts of Ohio, as well as the United States Court of Appeals for the Sixth, Ninth, and Eleventh Circuits.  Prior to joining Scott+Scott in April 2004, he was an associate in the Cleveland, Ohio office of Jones Day.

**DONALD A. BROGGI** is a partner in the firm's New York office.  Mr. Broggi is a graduate of the University of Pittsburgh (B.A., 1990) and Duquesne University School of Law (J.D., 2000). He is engaged in the firm's complex securities, antitrust, and consumer litigation, including:  *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.), *In re: Priceline.com Inc. Securities Litigation*, No. 00-cv-1884 (D. Conn.), *Irvine v. ImClone Systems, Inc.*, No. 02-cv-0109 (S.D.N.Y.), *In re: Rubber Chemicals Antitrust Litigation*, No. C04-01648 (N.D. Cal.), *In re: Plastics Additives Antitrust Litigation*, No. 03-cv-2038 (E.D. Pa.), and *In re Washington Mutual Mortgage-Backed Securities Litigation*, No. 09-cv-0037 (W.D. Wash.), among others.

Mr. Broggi also works with the firm's institutional investor clients, including numerous public pension systems and Taft-Hartley funds throughout the United States to ensure their funds have proper safeguards in place to ensure against corporate malfeasance.  Similarly, Mr. Broggi consults with institutional investors in the United States and Europe on issues relating to corporate fraud in the U.S. securities markets, as well as corporate governance issues and shareholder litigation.  Mr. Broggi has lectured at institutional investor conferences throughout the United States on the value of shareholder activism as a necessary component of preventing corporate fraud abuses, including the Texas Association of Public Employee Retirement Systems, Georgia Association of Public Pension Trustees, Michigan Association of Public

Retirement Systems, Illinois Public Pension Fund Association, and the Pennsylvania Association of County Controllers, among others.

Mr. Broggi is admitted to practice in New York and Pennsylvania.

**DEBORAH CLARK-WEINTRAUB** is a partner in the firm's New York office. Ms. Weintraub graduated from St. John's University, Queens, New York (B.A., *summa cum laude*, 1981; President's Award in recognition of achieving highest GPA among graduates of St. John's College of Liberal Arts and Science) and Hofstra Law School in Hempstead, New York (J.D., with distinction, 1986). While in law school, Ms. Weintraub was a member and research editor of the Hofstra Law Review. Following her graduation from Hofstra Law School, Ms. Weintraub served as a law clerk to the Honorable Jacob Mishler, United States District Judge for the Eastern District of New York (1986-1987). Ms. Weintraub is a member of the New York bar.

Ms. Weintraub has extensive experience in all types of class action litigation. Ms. Weintraub has served as lead counsel for investors in mortgage-backed securities (MBS) in litigation against MBS trustees for failure to pursue repurchase remedies with respect to mortgage loans in MBS trusts that breached representations and warranties. These matters include *Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America, NA*, 1:12-cv-2865 (S.D.N.Y.), which recovered $69 million for investors.

Ms. Weintraub is also currently representing investors in several ongoing securities class action cases including *Weston v. RCS Capital Corporation*, 1:14-cv-10136 (S.D.N.Y.); *ECD Investor Group v. Credit Suisse International*, 14-cv-8484 (S.D.N.Y.); and *In re Conn's, Inc. Sec. Litig.*, No. 4:14-cv-00548 (S.D. Tex.).

Ms. Weintraub has extensive securities class action experience and has acted as plaintiffs' co-lead counsel in numerous cases that have obtained substantial recoveries for defrauded investors. Ms. Weintraub was one of the lead counsel in *In re Oxford Health Plans, Inc. Securities Litigation*, MDL No. 1222 (S.D.N.Y.), in which a cash settlement of $300 million was obtained on the eve of trial after more than five years of litigation. At the time, the $300 million cash recovery was one of the largest recoveries ever achieved in a securities class action. The Honorable Charles L. Brieant, Jr., who presided over this case described it as "perhaps the most heavily defended, ardently pursued defense of a similar case that I can recall." Ms. Weintraub also served plaintiffs' co-lead counsel in *In re CVS Corporation Securities Litigation*, No. 01-11464 (D. Mass.), in which a cash settlement of $110 million was obtained for investors. Following the settlement in March 2006, CVS disclosed that the SEC had opened an inquiry into the manner in which CVS had accounted for a barter transaction, a subject of the class action suit, and that independent counsel to the firm's audit committee had concluded in December 2005 that various aspects of the company's accounting for the transaction were incorrect, leading to the resignations of the company's controller and treasurer.

Ms. Weintraub is the co-author of "Gender Bias and the Treatment of Women as Advocates," Women in Law (1998), and the "Dissenting Introduction" defending the merits of securities class action litigation contained in the 1994 monograph "Securities Class Actions: Abuses and

Remedies," published by the National Legal Center for the Public Interest.  She is a member of the Association of the Bar of the City of New York.

**WILLIAM C. FREDERICKS** holds a B.A. (with high honors) from Swarthmore College, an M. Litt. in International Relations from Oxford University (England), and a J.D. from Columbia University Law School.  At Columbia, Mr. Fredericks was also a three-time Harlan Fiske Stone Scholar, a Columbia University International Fellow, and the winner of the law school's Beck Prize (property law), Toppan Prize (advanced constitutional law) and Greenbaum Prize (written advocacy).  A three-judge panel chaired by the late Justice Antonin Scalia also awarded Mr. Fredericks the Thomas E. Dewey Prize for the best oral argument in the final round of Columbia's Stone Moot Court Honor Competition.

After clerking for the Hon. Robert S. Gawthrop III (E.D. Pa.) in Philadelphia, Mr. Fredericks spent seven years practicing securities and complex commercial litigation at Simpson Thacher & Bartlett LLP and Willkie Farr & Gallagher LLP in New York before moving to the plaintiffs' side of the bar in 1996.  Since 1996, Mr. Fredericks has represented investors as a lead or co-lead plaintiff in dozens of securities class actions, including *In re Wachovia Preferred Securities and Bond/Notes Litig.* (S.D.N.Y.) (total settlements of $627 million, reflecting the largest recovery ever in a pure Securities Act case not involving any parallel government fraud claims); *In re Rite Aid Securities Litig.* (E.D. Pa.) (total settlements of $323 million, including the then-second largest securities fraud settlement ever against a Big Four accounting firm); *In re Sears Roebuck & Co. Sec. Litig.* (N.D. Ill.) ($215 million settlement, representing the then-largest §10(b) class action recovery in an action that did not involve either a financial restatement or parallel government fraud claims); *In re State Street ERISA Litig.* (S.D.N.Y.) (one of the largest ERISA class settlements to date); *In re King Digital Sec. Enter. PLC S'holder Litig.* (Super. Ct. San Fran. Cty.) ($18.5 million settlement, representing one of the largest state court §11 class action recoveries to date); and *Irvine v. ImClone Systems, Inc.* (S.D.N.Y.) ($75 million settlement).  Mr. Fredericks also played a leading role on the team that obtained a rare 9-0 decision for securities fraud plaintiffs in the U.S. Supreme Court in *Merck & Co., Inc. v. Reynolds* (which later settled for $1.052 billion), and has also coauthored amicus briefs in various other Supreme Court cases (including *Halliburton*, *Amgen*, *CALPERS v. ANZ Securities*, and *Cyan*) involving significant securities law issues.

At Scott+Scott, Mr. Fredericks' current cases include representing investors in several pending securities fraud actions, and in antitrust litigation against over a dozen leading banks based on their involvement in manipulating foreign exchange ("FX") rates and spreads.

Mr. Fredericks has been recognized in the 2012-18 editions of "America's Best Lawyers" in the field of commercial litigation, in "Who's Who in American Law" (Marquis), and in the New York City "SuperLawyers" listings for securities litigation.  He has been a frequent panelist on various securities litigation programs sponsored by the Practising Law Institute (PLI) – including ten years as a panelist on civil liabilities under the Federal Securities Act – and has lectured overseas on American class action litigation on behalf of the American Law Institute/American Bar Association (ALI/ABA).  He is also a member of the New York City Bar Association (former chair, Committee on Military Affairs and Justice), the Federal Bar Council and the American Bar Association.

**DARYL F. SCOTT** graduated in 1981 from Vanderbilt University with a Bachelor of Arts in Economics. He received his Juris Doctorate from Creighton University School of Law in 1984, and a Masters of Taxation from Georgetown University Law Center in 1986. Mr. Scott is a partner involved in complex securities litigation at Scott+Scott. In addition to his work with the firm, Mr. Scott has specialized in private foundation and ERISA law. He was also formerly an executive officer of a private equity firm that held a majority interest in a number of significant corporations. Mr. Scott is admitted to the Supreme Court of Virginia and a member of the Virginia Bar Association and the Connecticut Bar Association.

**DEIRDRE DEVANEY** is a graduate of New York University (B.A., *cum laude*, 1990) and the University of Connecticut School of Law (J.D., with honors, 1998) where she was the managing editor of the Connecticut Journal of International Law. Ms. Devaney's experience includes commercial and probate litigation, as well as trusts and estates. Currently, Ms. Devaney's practice areas include commercial and securities litigation, including: *In re Priceline.com, Inc. Securities Litigation*, among others. Ms. Devaney is admitted to practice in Connecticut, New York, and the United States District Court for the District of Connecticut.

**SYLVIA M. SOKOL** is a New York- and London-based partner in the firm's Antitrust and Competition Law Practice. She focuses on representing national and international clients in litigation involving domestic and international cartels. Ms. Sokol has substantial experience in all aspects of complex litigation, including the day-to-day management of cases. She also has substantial experience in counseling corporate clients, evaluating potential claims, and developing strategies to recoup losses stemming from anticompetitive conduct.

Ms. Sokol currently represents a nationwide class in price-fixing litigation regarding the $5.3 trillion-a-day foreign exchange market. She also represents a proposed nationwide class in an action involving ISDAfix, a financial benchmark that is tied to over $379 trillion of interest-rate swaps around the world. In addition, Ms. Sokol represents several large multinational corporations alleging that Goldman Sachs, JPMorgan, Glencore, and their warehouse affiliates conspired to restrict the supply of aluminum in London Metal Exchange-approved warehouses. And she represents several government entities in a national lawsuit alleging bid-rigging in the municipal derivatives market.

In addition, Ms. Sokol's civil litigation experience has involved defending corporate clients charged with unlawful business practices and monopolizations. She has also represented clients in criminal and extradition matters.

Ms. Sokol was selected for the International Who's Who of Competition Lawyers & Economists and for Competition - U.S. in 2016, 2017, and 2018. Honorees are selected based on comprehensive and independent survey responses received from general counsel and private practitioners around the world. She has been selected to be a Fellow in The Trial Lawyer Honorary Society of the Litigation Counsel of America, which is a trial lawyer honorary society composed of less than one-half of one percent of American lawyers. *Lawyer Monthly* magazine awarded her the Women in Law Award 2017. She was also named a "Super Lawyer" in 2014,

2015, 2016, 2017, and 2018 Super Lawyers New York Metro Edition, and was named a "Super Lawyer" in 2011-2012, Super Lawyers Northern California Edition.

She is a 1998 graduate of the New York University School of Law (*cum laude*), and completed her undergraduate studies at the University of British Columbia.  After law school, Ms. Sokol was awarded the Soros Justice Fellowship to serve a year in the Capital Habeas Unit of the Federal Public Defender's Office, where she represented clients condemned to death and developed training materials for members of the capital defense bar.  She then served as a judicial law clerk to the Honorable Warren J. Ferguson, United States Court of Appeals for the Ninth Circuit, before spending several years working at Morrison & Foerster LLP.

Ms. Sokol is a member of the American Bar Association and is admitted to practice in New York, California, and the District of Columbia.  She is also admitted to the Southern District of New York, the Northern, Southern, and Eastern Districts of California, as well as the United States Supreme Court.

She is bilingual in English and French, and holds French and United States citizenships.

**PETER A. BARILE III** is a partner in Scott+Scott's competition practice.  His focus is on complex antitrust and commodity litigation.

Mr. Barile has extensive experience representing clients on both sides of the docket in a variety of industries and contexts, from consumers and investors to institutions and corporations, whether as individual plaintiffs, class plaintiffs, opt-outs, or defendants in complex matters. Prior to joining the firm, he practiced both in New York and in Washington D.C., with major law firms renowned for their historically leading antitrust practices.

Mr. Barile devotes a substantial amount of his practice to federal antitrust and commodity class action litigation involving the financial services industry in the Southern District of New York. Mr. Barile is or has been involved in representing investor rights in major cases involving commodities and financial benchmarks, including: *Aluminum*, *Cotton*, *Crude Oil*, *FX*, *Gold*, *ISDAfix*, *LIBOR*, *Silver*, and *Zinc*.

He also has significant experience litigating high-tech antitrust cases in the Northern District of California, including *In re Online DVD Antitrust Litigation*; *In re Lithium Ion Batteries Antitrust Litigation*; and *In re High Tech Employees Antitrust Litigation*.

In addition to his work in federal district trial courts, Mr. Barile has considerable experience in other arenas, including the Judicial Panel on Multidistrict Litigation, federal Circuit Courts of Appeal, and the United States Supreme Court.

Mr. Barile is active in the antitrust bar, having held a number of leadership posts in the ABA and other organizations.  He serves on the Advisory Board of the Loyola Institute for Consumer Antitrust Studies.  Mr. Barile has published numerous articles and served as a panelist or speaker on antitrust issues.  His work has been cited by the Federal Trade Commission and the Antitrust Modernization Commission, as well as leading academics and practitioners.

Mr. Barile also has helped nonprofit advocacy groups be heard in matters of national importance as Friends of the Court in major cases before the United States Supreme Court.  His work has included *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), in which he served as lead counsel for *amicus curiae* Consumer Federation of America in a landmark antitrust case on resale price fixing, and *Giles v. State of California*, 554 U.S. 353 (2008), in which he served as lead counsel for *amicus curiae* Battered Women's Justice Project, in a case concerning the scope of the Confrontation Clause of the United States Constitution.

Mr. Barile earned his law degree in 1999 from the University of Connecticut School of Law, *magna cum laude*, where he was an Editor of the Connecticut Law Review and Moot Court Champion.  His bachelor's degree is from the University of Connecticut.

Mr. Barile is a member of the bars of New York, Connecticut, and the District of Columbia.  He is admitted to practice in the United States District Courts for the Southern District of New York, Eastern District of New York, District of Columbia, Northern District of Illinois, District of Connecticut; United States Courts of Appeal for the Second, Fourth, Sixth, Seventh, Ninth, Federal, and District of Columbia Circuits, and the Supreme Court of the United States.

**BELINDA HOLLWAY** is the head of Scott+Scott's office in London.  She has over a decade of competition law experience, and specialises in competition damages litigation before the English High Court, Competition Appeal Tribunal and the Court of Appeal, particularly on behalf of multinational corporations in follow-on damages claims.  She has extensive expertise in developing and coordinating multijurisdictional litigation strategies, both within Europe and beyond.  She also represents investors in shareholder litigation.

Prior to joining Scott+Scott, Ms. Hollway spent nine years in the London office of Freshfields Bruckhaus Deringer LLP.  She represented clients across a wide range of industries, acting in many of the leading English competition damages cases, such as *Cooper Tire*, relating to the synthetic rubber cartel, and *National Grid v. ABB*, relating to the cartel in gas insulated switchgear.  She was the lead associate on the defence team in *Enron v. EWS*, which was the first follow-on damages claim ever to reach trial in the Competition Appeal Tribunal.  Her wide experience on the defence side gives her a special insight into the issues that claimants must address and overcome in order to recoup losses stemming from breaches of competition law in Europe.

Ms. Hollway has also acted for numerous clients in competition law investigations, both internal investigations and those brought by the UK Office of Fair Trading (now the Competition and Markets Authority) and the European Commission.  She has been involved in immunity applications, Commission cartel settlements, and contested cases.  From this work, she has an in-depth understanding of the interaction between private and public enforcement in Europe and the ramifications that public enforcement has for the strategy and progression of damages claims.

Ms. Hollway attended the Australian National University and graduated in 2001 with a First Class Honours degree in History and a First Class Honours Degree and University Medal in Law.  She then spent a year as an Associate to Her Honour Justice Catherine Branson at the

Federal Court of Australia and then worked for the competition and litigation teams of Allens Arthur Robinson in Sydney, prior to moving to the United Kingdom in 2006. She has a Master's Degree in Competition Law from King's College London.

She has published on competition law issues, including in relation to the EU Damages Directive and has been quoted in the press on competition law in Europe.

Ms. Hollway is admitted to practice in England and Wales and in New South Wales, Australia.

**AMANDA F. LAWRENCE** is a partner in the firm's Connecticut office. Ms. Lawrence is a graduate of Dartmouth College (B.A., *cum laude*, 1998) and Yale Law School (J.D., 2002). Ms. Lawrence has been at the firm since 2007 where she splits her time between antitrust and securities matters.

In the antitrust realm, Ms. Lawrence has been intricately involved in the "ISDAFix case" (*Alaska Electrical Pension Fund v. Bank of America*, 1:14-cv-07126-JMF-OTW (S.D.N.Y)), taking depositions and working through expert discovery, including numerous *Daubert* motions and responses. That case has to date achieved over $504.5 million in recovery from large financial institutions for investors. Ms. Lawrence is also a principal attorney litigating *Axiom Investment Advisors, LLC v. Deutsche Bank AG*, 1:15-cv-09945-LGS (S.D.N.Y.), which alleges manipulation of trading algorithms to benefit the defendant financial institution. She likewise has managed complex international investigations into suspected collusion or manipulation of financial markets. For example, she devoted herself to the international investigation of SSA bonds, which included multiple interviews with former managers of trading banks as well as extensive work with New York University professors to analyze trading data and unearth manipulation.

In her securities practice, Ms. Lawrence has worked on numerous Exchange Act and 1933 Act cases that have resulted in substantial settlements, including: *Police and Fire Retirement System of the City of Detroit v. Crane*, No. 13-cv-00945-VC (N.D. Cal.) ($5.1 million settlement); *Rosenberg v. Cliffs Natural Resources, Inc.*, No. CV-14-828140 (Ohio Com. Pleas) ($10 million settlement in 1933 Act case); *Rubenstein v. Oilsands Quest Inc.*, No. 11-1288 (S.D.N.Y.) (securities settlement of $10.235 million); *Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates*, No. 09-cv-00037 (W.D. Wash.) ($26 million securities class action settlement); and *In re TETRA Technologies, Inc. Securities Litig.*, No. 07-cv-00965 (S.D. Tex.) ($8.25 million securities class action settlement); *In re LendingClub Corporation Shareholder Litig.*, No. CIV 537300 (Cal. Super., San Mateo) ($125 million securities class action settlement); and *In Re: FireEye, Inc. Securities Litig.*, No. 1-14-cv-066866 (Cal. Super., Santa Clara) ($10.25 million securities class action settlement).

In addition to antitrust and securities matters, Ms. Lawrence has also worked on consumer cases that have resulted in significant settlements for the affected classes. For example, Ms. Lawrence helped achieve a settlement in *Vulcan Society, Inc. v. The City of New York*, No. 07-CV-2067 (E.D.N.Y.) that brought both monetary and injunctive relief to a class of African American and Hispanic firefighters in New York City, as well as a settlement in *In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation*, No. 3:11-md-02208-MAP (D. Mass.) that brought both forms of relief to relatives of deceased servicemen and women.

Ms. Lawrence has taught Trial Practice at the University of Connecticut School of Law and is very actively involved in her community, particularly in recreational organizations and events. A five-time NCAA National Champion cyclist who has raced throughout the United States, Europe, Bermuda, and Pakistan, Ms. Lawrence is now an avid endurance athlete. She has competed in dozens of marathons, including the New York City Marathon and the Boston Marathon, and in 16 full-distance Ironman competitions – four of which were at the Ironman World Championships in Kona, Hawaii.

She is licensed to practice in Connecticut and Massachusetts, as well as the District of Connecticut, District of Massachusetts, and the Southern District of New York. Additionally, she is admitted to the Ninth and First Circuit Courts of Appeals, before which she has argued.

**ERIN GREEN COMITE** is a partner in the firm's Connecticut office. Ms. Comite is a graduate of Dartmouth College (B.A., *magna cum laude*, 1994) and the University of Washington School of Law (J.D., 2002). Ms. Comite litigates complex class actions throughout the United States, representing the rights of shareholders, employees, consumers, and other individuals harmed by corporate misrepresentation and malfeasance.

Ms. Comite currently serves in a leadership role in a number of complex class actions including: *First Choice Federal Credit Union v. The Wendy's Company* (W.D. Pa.), co-lead counsel on behalf of financial institutions arising out of data breach; *In Re Arby's Restaurant Group, Inc. Litigation* (N.D. Ga.), member of Plaintiffs' Executive Committee on behalf of financial institutions arising out of a data breach and *In Equifax, Inc. Customer Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.).

Recently, Ms. Comite has played a significant role in the prosecution of consumer class cases such as: *In re The Home Depot, Inc., Customer Data Security Breach Litigation*, MDL No. 2583 (N.D. Ga.) ($27.25 million settlement) and *In re Target Corporation Customer Data Security Breach Litigation*, MDL No. 2522 (D. Minn.) ($59 million settlement), two of the largest data breaches impacting consumer personal data to date; *Greater Chautauqua Federal Credit Union v. Kmart Corporation*, No. 15-cv-02228 (N.D. Ill.), Chair of the Plaintiffs' Steering Committee ($8.1 million settlement), *Howerton v. Cargill, Inc.*, No. 13-cv-00336 (D. Haw.) ($6.1 settlement), *Murr v. Capital One Bank (USA), N.A.*, No. 13-cv-1091 (E.D. Va.) ($7.3 million settlement); and *In re Nutella Mktg. & Sales Practices Litig.*, No. 11-cv-01086 (D.N.J.) ($2.5 million settlement). Ms. Comite's appellate victories in consumer class actions include *Chavez v. Nestle USA, Inc.*, 511 F. App'x 606 (9th Cir. 2013) (achieving a reversal of dismissal), and *In re Nutella Mktg. & Sales Practices Litig.*, 2014 WL 4801262 (3d Cir. Sept. 29, 2014) (defending settlement from professional objectors).

Since joining Scott+Scott in 2002, she has litigated such cases as *In re Priceline.com Securities Litigation* ($80 million settlement); *Schnall v. Annuity and Life Re (Holdings) Ltd.* ($27 million settlement); and *In re Qwest Communications International, Inc.* (settlement obtaining $25 million for the company and achieving corporate governance reforms aimed at ensuring board independence). While Ms. Comite is experienced in all aspects of complex pre-trial litigation, she is particularly accomplished in achieving favorable results in discovery disputes.

In *Hohider v. United Parcel Service, Inc.*, Ms. Comite spearheaded a nearly year-long investigation into every facet of UPS's preservation methods, requiring intensive, full-time efforts by a team of attorneys and paralegals well beyond that required in the normal course of pre-trial litigation.  Ms. Comite assisted in devising the plan of investigation in weekly conference calls with the Special Master, coordinated the review of over 30,000 documents that uncovered a blatant trail of deception and prepared dozens of briefs to describe the spoliation and its ramifications on the case to the Special Master.  In reaction to UPS's flagrant discovery abuses brought to light through the investigation, the Court conditioned the parties' settlement of the three individual ADA case on UPS adopting and implementing preservation practices that passed the approval of the Special Master.

Prior to entering law school, Ms. Comite served in the White House as Assistant to the Special Counsel to President Clinton.  In that capacity, she handled matters related to the White House's response to investigations, including four independent counsel investigations, a Justice Department task force investigation, two major oversight investigations by the House of Representatives and the Senate, and several other congressional oversight investigations.

Ms. Comite's volunteer activities have included assisting immigrant women, as survivors of domestic violence, with temporary residency applications as well as counseling sexual assault survivors.  Currently, Ms. Comite supports Connecticut Children's Medical Center and March of Dimes/March for Babies.

Ms. Comite is licensed to practice in the State of Connecticut and is admitted to practice in the U.S. District Court for the District of Connecticut, the Southern District of New York, the District of Colorado, the Eastern District of Wisconsin, and the U.S. Court of Appeals for the Second, Third, Ninth, and Eleventh Circuits.

**KRISTEN M. ANDERSON** is a partner in the firm's New York office.  Ms. Anderson's practice focuses on complex and class action litigation with an emphasis on antitrust matters.  Ms. Anderson is recognized as a Rising Star in the 2014-15, 2015-16, and 2016-17 editions of Super Lawyers.

A substantial portion of Ms. Anderson's practice is devoted to antitrust cases within the financial services industry.  Currently, Ms. Anderson represents plaintiff-investors in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.) and *Axiom Investment Advisors, LLC, by and through its Trustee Gildor Management LLC v. Barclays Bank PLC*, No. 15-cv-9323 (S.D.N.Y.), cases alleging misconduct in the foreign exchange market by many global financial institutions.  Ms. Anderson also represented pension funds and individual investors in *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388 (D. Mass.) ($590.5 million settlement), an antitrust action alleging collusion in the buyouts of large publicly traded companies by private equity firms.  Ms. Anderson also served on the trial team representing certified classes of cardholders in antitrust cases challenging class action-banning arbitration clauses in credit card agreements as restraints of trade in *Ross v. Bank of America N.A.*, No. 05-cv-7116, MDL No. 1409 (S.D.N.Y.) and *Ross v. American Express Co.*, No. 04-cv-5723, MDL No. 1409 (S.D.N.Y.).

Ms. Anderson is an active member of the American Bar Association's Antitrust Section. She served as Vice Chair of the Antitrust Section's Trial Practice Committee and was an editor of the Committee's newsletter, Trying Antitrust. She has also served as a Vice Chair of the Antitrust Section's Books & Treatises Committee. She has been a contributing author to the Antitrust Section's *Antitrust Discovery Handbook* (2d ed.), *Joint Venture Handbook* (2d ed.), and the *2010 Annual Review of Antitrust Law Developments*. In addition, Ms. Anderson served as an editor for *Model Jury Instructions in Civil Antitrust Cases* (2016 ed.). Ms. Anderson was a co-author of an article appearing in the Fall 2014 edition of *Competition: Journal of the Antitrust and Unfair Competition Section of the State Bar of California*, entitled *The Misapplication of Associated General Contractors to Cartwright Act Claims*, 23 COMPETITION: J. ANTI. & UNFAIR COMP. L. SEC. ST. B. CAL. 120 (2014).

Ms. Anderson is a graduate of St. Louis University (B.A. Philosophy, *summa cum laude*, 2003) and the University of California, Hastings College of the Law (J.D. 2006). During law school, Ms. Anderson served as an extern at the U.S. Department of Justice, Antitrust Division, in San Francisco. While at Hastings, Ms. Anderson also served as an extern to Justice Kathryn Mickle Werdegar of the Supreme Court of California and was the research assistant to Professor James R. McCall in the areas of antitrust and comparative antitrust law.

Ms. Anderson is admitted to practice in California, New York, and the District of Columbia.

**THOMAS LAUGHLIN** is a partner in the firm's New York office. Mr. Laughlin is a graduate of Yale University (B.A. History, *cum laude*, 2001) and New York University School of Law (J.D., *cum laude*, 2005). After graduating from law school, Mr. Laughlin clerked for the Honorable Irma E. Gonzalez, United States District Court Judge for the Southern District of California.

Mr. Laughlin's practice focuses on securities class action, shareholder derivative, ERISA and other complex commercial litigation. While at Scott+Scott, Mr. Laughlin has worked on several cases that have achieved notable victories, including *Cornwell v. Credit Suisse,* No. 08-3758 (S.D.N.Y.) (securities settlement of $70 million), *Rubenstein v. Oilsands Quest Inc.*, No. 11-1288 (S.D.N.Y.) (securities settlement of $10.235 million) *Plymouth County Contributory Ret. Sys. v. Hassan,* No. 08-1022 (D.N.J.) (corporate governance reform); and *Garcia v. Carrion,* No. 09-1507 (D.P.R.) (corporate governance reform). Mr. Laughlin is a member of the New York bar and is admitted to practice in the Southern District of New York and the Eastern District of New York.

Mr. Laughlin also has significant appellate experience, having represented clients in connection with several appellate victories, including *Cottrell v. Duke,* 737 F.3d 1238 (8th Cir. 2013); *Westmoreland County Employee Retir. Sys. v. Parkinson,* 727 F.3d 719 (7th Cir. 2013); *Pfeil v. State Street Bank and Trust Co.,* 671 F.3d 585 (6th Cir. 2012); and *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140 (Del. Supr. 2011).

In 2014, Mr. Laughlin was co-chair of a 13-day bench trial in *Bankers' Bank Northeast v. Berry, Dunn, McNeil & Parker, LLC*, No. 12-cv-00127 (D. Me.). Mr. Laughlin represented a consortium of 10 community banks asserting negligence and professional malpractice claims

against the former officers and directors of a bank and its auditor in connection with an $18 million loan made to that bank in September 2008.  Among other things, Mr. Laughlin conducted the cross-examination of all three witnesses from the defendant's auditing firm and the direct examination of plaintiff's auditing expert.  The parties to the action succeeded in resolving the action after trial.

**MAX SCHWARTZ** is a partner based in New York.  His main practice area is complex civil litigation, with an emphasis on financial products and services.  He also counsels investment firms and institutional investors on strategies to enhance returns, or recoup losses, through a variety of legal actions.

Following the financial crisis, Mr. Schwartz served as lead counsel in several cases that set important precedents regarding mortgage-backed securities.  He argued the first cases to find that securitization trustees must seek to have defective mortgages repurchased from MBS trusts.  These efforts recently led to the recovery of $69 million for investors in Washington Mutual MBS and $6 million for investors in Bear Stearns MBS.  *Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America, NA*, 1:12-cv-2865 (S.D.N.Y.); *Oklahoma Police Pension and Retirement System v. U.S. Bank National Association*, 1:11-cv-8066 (S.D.N.Y.).

Currently, Mr. Schwartz represents investment firms pursuing claims against MBS servicers.  He also represents plaintiffs in a securities action against Nicholas Schorsch and RCS Capital Corp., among others.  *Weston v. RCS Capital Corp.*, 1:14-cv-10136 (S.D.N.Y.).

Mr. Schwartz has substantial experience in competition and antitrust matters as well.  He was part of the team that secured a $590 million settlement stemming from allegations that several of the largest leveraged buyouts were subject to collusion.  *Dahl v. Bain Capital Partners, LLC*, 1:07-cv-12388 (D. Mass.).  In addition, Mr. Schwartz has advised clients in antitrust matters ranging from pharmaceuticals to precious metals and has advised companies seeking merger review before a number of regulatory agencies.

*Super Lawyers* named Mr. Schwartz a Rising Star.  The Legal Aid Society also recognized him with a Pro Bono Service Award for work before the New York Court of Appeals.

Mr. Schwartz holds a B.A. from Columbia University (*cum laude*), and a J.D. from New York University School of Law.

**DAVID HOWE** is a competition, EU and public lawyer, and Senior Counsel at Scott+Scott Europe.  He trained at Freshfields Bruckhaus Deringer LLP and, after qualification, spent a further eight years in the competition and dispute resolution teams there.

David has acted for a range of multinational clients on the full spectrum of competition investigations (in both the UK and internationally) litigation and advice.  He has conducted competition damages claims in the English High Court, Court of Appeal and Competition Appeal Tribunal, and also appeared in the European Court of Justice.  He acted for Roche on its defence of litigation arising out of the Vitamins cartel (including in the Devenish litigation, which ruled on the availability of restitutionary and exemplary damages in follow-on claims)

25

and, for EWS in its defence of claims brought by the administrators of Enron for damage following EWS' abuse of dominance (the first follow-on damages action to go to trial in the Competition Appeal Tribunal).  He has published several articles on competition law, including in relation to the new EU Damages Directive.

David also has significant wider expertise, including in bribery, public and regulatory law, and human rights matters.  For instance, he was the lead associate co-ordinating a multi-jurisdictional regulatory and public law strategy for a major consumer products company, and has acted on a number of judicial reviews for a range of clients, including (as lead associate) on a significant judicial review of the lawfulness of domestic consumer products legislation, relying primarily on EU free movement and human rights grounds.  In addition to "classic" human rights claims, David also has expertise in the evolving body of hard and soft law arising out of the UN "Ruggie Principles" on Business and Human Rights, having assisted a major technology company on a full Ruggie-compliant assessment of, and mitigation strategy for, a new project.

David attended Oxford University.  He studied Law and French Law, was appointed a scholar, and graduated in 2003 with First Class Honours (being placed in the top 3% of his year), and a Diploma in French Law from the Universite Pantheon-Assas (Paris II).  After a year completing professional qualifications, he returned to Oxford University to study the BCL (Oxford University's LLM equivalent), graduating in 2005 with a Distinction and a university prize, and was subsequently short-listed for the All Souls Prize Fellowship.  In the early years of his practice at Freshfields, David also completed an LLM in European Law at Kings College London.

**TOM SOUTHWELL** is a partner in Scott+Scott Europe LLP's London office.

Tom specialises in international arbitration and has represented individuals, corporate clients, and financial institutions in arbitration proceedings under the rules of the major arbitral institutions and before all levels of the English Courts.  He has particular expertise in the oil and gas, energy and financial services sectors, and in relation to disputes arising out of share sale transactions, joint ventures, and civil fraud.

Tom also acts in competition damages litigation and is currently acting for a number of potential claimants in follow-on damages actions arising from the Trucks cartel.

Before joining Scott+Scott, Tom was a member of the International Litigation and Arbitration group at Skadden, Arps, Slate, Meagher & Flom (UK) LLP, in London.

**DAVID H. GOLDBERGER** is an associate in Scott+Scott's San Diego office.  Currently, Mr. Goldberger's practice is focused on antitrust litigation, initial case investigations, and other special projects.

Representative actions include *Kleen Products LLC v. Packaging Corporation of America*, No. 10-cv-5711 (N.D. Ill.), an action challenging price-fixing in the containerboard industry, and *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420 (N.D. Cal.), an action challenging price-fixing of Li-Ion batteries.  Mr. Goldberger has also worked on antitrust cases involving delayed generic drug entry, such as *Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Ltd.*

*Co.*, No. 12-cv-3824 (E.D. Pa.) ($8 million settlement) and *In re Prograf Antitrust Litig.*, No. 1:11-md-02242 (D. Mass.).

Previously, Mr. Goldberger was active in Scott+Scott's securities fraud and ERISA practice, including *In re: Priceline.com Securities Litigation*, 03-cv-1884 (D. Conn.) ($80 million settlement), *Alaska Electrical Pension Fund v. Pharmacia Corporation*, No. 03-1519 (D.N.J.) ($164 million settlement), and *In re: General Motors ERISA Litigation*, No. 05-71085 (E.D. Mich.) (resulting in significant enhancements to retirement plan administration in addition to $37.5 million settlement for plan participants).

Mr. Goldberger was also a member of Scott+Scott's institutional investor relations staff, providing the Firm's many institutional clients with assistance in various matters pertaining to their involvement in complex civil litigations.

Mr. Goldberger is also a frequent contributing author to Market+Litigation, Scott+Scott's monthly client newsletter.

Mr. Goldberger graduated from the University of Colorado (B.A., 1999) and California Western School of Law (J.D., 2002).  Mr. Goldberger is admitted to practice by the Supreme Court of the State of California and in all California United States District Courts.

A San Diego native, Mr. Goldberger was a founding member of the Torrey Pines High School "Friends of the Library" and coaches youth sports in his spare time.

**JULIE A. KEARNS** has been litigating complex class action cases, focusing primarily on violations of federal antitrust and securities laws, since 2006.  She also has experience handling civil matters in California state court, and is located in Scott+Scott's San Diego office.  Ms. Kearns has been recognized as a Rising Star in the 2015, 2016, 2017, and 2018 editions of Super Lawyers.  She was also honored by the San Diego Business Journal as Best of the Bar in 2015.

At Scott+Scott, Ms. Kearns presently devotes much of her time representing investors in cases involving the manipulation of financial benchmarks by numerous major banks, including *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y) and *Alaska Elec. Pension Fund v. Bank of America Corp.*, No. 14-cv-7126 (S.D.N.Y).

A native Southern Californian, Ms. Kearns earned her Bachelor of Arts degree from the University of California, Santa Barbara, in 2003, with a double major in Political Science and Law & Society.  She graduated *cum laude* from Thomas Jefferson School of Law in 2006.  During law school, Ms. Kearns served as Executive Board Co-Chair of the Moot Court Society, and participated in multiple competitions across the country.  She also served as judicial intern to the Honorable Judge William S. Cannon, who oversaw civil matters in the Superior Court of California, County of San Diego.  She completed internships at various public defender entities at both the state and federal levels, and drafted sponsorship agreements and similar documents as legal intern for the local minor league ice hockey team, the San Diego Gulls.

As an avid animal lover and supporter of animal rights, Ms. Kearns has served as *pro bono* volunteer attorney in association with the non-profit association Expand Animal Rights Now ("EARN") since 2016.  She is a long-time supporter of the San Diego Humane Society, the San Diego Zoological Society, the ASPCA, and other similar organizations.  Ms. Kearns has also made presentations to middle and high school students around San Diego County as part of the annual, non-partisan Constitution Day event organized by the San Diego ACLU.

Ms. Kearns is licensed to practice law in the state of California, and is admitted to the U.S. District Court for the Southern, Central, and Northern Districts of California, the District of Colorado, and the U.S. Court of Appeals for the Fifth Circuit.

**CIAN MANSFIELD** is a senior associate in Scott+Scott Europe LLP's London office.  He specialises in competition damages litigation before the English High Court, Competition Appeal Tribunal, and the Court of Appeal.

Cian is currently acting as lead associate for a large number of retailers in their claims in the English High Court against Visa and MasterCard in relation to anti-competitive interchange fees; and as lead associate on behalf of a number of potential claimants in follow-on damage actions arising from the Trucks cartel.

Prior to joining Scott+Scott Europe LLP, Cian spent over six years in the London office of Freshfields Bruckhaus Deringer LLP.  During his time at Freshfields, Cian worked on a number of competition damages claims arising from European Commission infringement decisions in relation to a number of cartels, including in the energy and industrial sectors.  He also acted in a number of investigations, both internal investigations and those brought by international regulators (including the European Commission and the Competition and Markets Authority), and on pieces of general commercial litigation.

Cian also has extensive pro bono experience.  He currently acts as an advocate on behalf of failed and pending asylum seekers at the Asylum Support Tribunal as a member of the charity, the Asylum Support Appeals Project.  While at Freshfields, Cian worked on UK Supreme Court interventions for the Office of the Children's Commissioner and the Open Society Justice Initiative.

Cian attended University College Dublin, Ireland and graduated in 2007 with a Bachelors of Civil Law (European Legal Studies) (First Class Honours).  As part of his degree he spent a year studying at the University of Lausanne in Switzerland.  Cian has an LL.M from the University of Cambridge and a Postgraduate Diploma in EU Competition Law from King's College London.

Following his LL.M, Cian completed a five-month *stage* (internship) at the Legal Service of the European Commission in Brussels.

Cian is admitted to practice in England & Wales and the Republic of Ireland.

**THOMAS K. BOARDMAN** is an associate in the Scott+Scott's New York office, focusing on antitrust litigation.  At his prior firm, Mr. Boardman was a member of the trial team in *In re TFT-*

*LCD (Flat Panel) Antitrust Litigation*.  For his work on that case, Mr. Boardman was nominated by Consumer Attorneys of California as a finalist for Consumer Attorney of the Year.  Mr. Boardman was also an instrumental part of the lead counsel team in *In re Potash Antitrust Litigation (II)*, a case that featured a unanimous victory before an *en banc* panel of the Seventh Circuit, resulting in one of the most influential antitrust appellate opinions in recent memory.  The case ended in $90 million in settlements.

At Scott+Scott, Mr. Boardman represents plaintiff-investors in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* and represents opt-out plaintiffs in *Mag Instrument Inc v. The Goldman Sachs Group Inc*.  Mr. Boardman also represents indirect purchaser plaintiffs in *In re Lithium Ion Batteries Antitrust Litigation*.

Mr. Boardman received his Bachelor of Arts degree from Vassar College in 2004, majoring in Political Science and Film Studies.  He received his Juris Doctorate from the University of California, Hastings College of the Law in 2009.  While at Hastings, Mr. Boardman was a member of the Hastings Science and Technology Law Journal and worked as a research assistant to professors Geoffrey C. Hazard, Jr. and Rory K. Little.  Mr. Boardman is a member of the following Bars: California, New York, Ninth Circuit Court of Appeals, Central District of California, Northern District of California, and Southern District of California.  He is also a member of the following professional associations:  ABA Antitrust Section – Model Jury Instruction Revision Task Force, ABA Antitrust Section – Young Lawyers Division – Litigation Committee, ABA Antitrust Section – Young Lawyers Division – Civil Practice and Procedure Committee, New York State Bar Association – Antitrust Section, Bar Association of San Francisco, and Public Justice Foundation.

Mr. Boardman has co-authored the following articles: "Reverse Engineering Your Antitrust Case: Plan for Trial Even Before You File Your Case," *Antitrust Magazine*, Spring 2014, Vol. 28, No. 2, with Bruce L. Simon; and "Class Action for Health Professionals," chapter from *Advocacy Strategies for Health and Mental Health Professionals*, Springer Publishing Co., 2011, with Bruce L. Simon, Stuart L. Lustig, Editor.

Prior to joining Scott+Scott, Mr. Boardman worked at Pearson, Simon & Warshaw, LLP in San Francisco and served as a judicial law clerk to the Hon. Christina Reiss in United States District Court, District of Vermont.

Mr. Boardman enjoys running and regularly does so for charity.  He has run several races to fundraise for various causes, including the New York City Marathon (National Multiple Sclerosis Foundation) and the Boston Marathon (Cystic Fibrosis Foundation).

**PATRICK McGAHAN** is an associate in Scott+Scott's London office.  He specialises in competition damages litigation before the English High Court, Competition Appeal Tribunal and the Court of Appeal.  Mr. McGahan works closely with other members of the firm's Antitrust and Competition Practice in counseling corporate and institutional clients, evaluating potential claims and developing strategies to recover losses caused by anticompetitive conduct.  He has also acted for clients in a variety of arbitrations (both investment treaty and commercial) and pieces of general commercial litigation.

Mr. McGahan is presently representing numerous clients who may have European claims arising from the manipulation of the foreign exchange market. He is also acting for various national and multinational retailers in relation to competition damages claims arising from Visa and MasterCard's card payment schemes.

Prior to joining Scott+Scott, Mr. McGahan spent four years in the London office of Freshfields Bruckhaus Deringer LLP. During this time he acted in many of the leading English competition damages cases, including *National Grid Electricity Transmission Plc v ABB Ltd*. He also acted for numerous clients in competition law investigations, both internal investigations and those brought by the Competition and Markets Authority, the European Commission, and other regulators.

Mr. McGahan attended the University of Queensland and graduated in 2010 with a Bachelor of Laws (First Class Honours) and a Bachelor of Arts (Economics/Political Science). He then spent a year as the Associate to His Honour Justice Andrew Greenwood at the Federal Court of Australia. Mr. McGahan has a Postgraduate Diploma in Competition Law from King's College London.

Mr. McGahan is admitted to practice in England and Wales and in Queensland, Australia.

**JAMES HAIN-COLE** is located in Scott+Scott's London office. He specialises in competition damages litigation before the English Courts and the Competition Appeal Tribunal. Mr. Hain-Cole works with the firm's Antitrust and Competition Practice in advising international clients on their potential to claim damages arising from anticompetitive conduct and working with them to design an effective strategy to compensate them for losses arising from such conduct. He has also has experience in commercial arbitration and general commercial litigation.

Prior to working with Scott+Scott, Mr. Hain-Cole spent two and a half years at Cuatrecasas in Madrid, where he advised on competition damages claims before the courts of Spain, England and Italy and also formed part of the team that drafted the legal section of the "*Study on the Passing-on of Overcharges*" for the European Commission. Prior to that, Mr. Hain-Cole spent six years in the London office of Freshfields Bruckhaus Deringer LLP, where he advised clients in some of the leading competition damages before the English courts and tribunals, including *Deutsche Bahn AG and others v Morgan Advanced Materials Plc* and *Cooper Tire and Rubber Company Europe Ltd and others v. Dow Deutschland Inc and others*. He also acted for a major financial institution in competition law investigations before the European Commission and other competition regulators worldwide, including in the North America and Asia.

Mr. Hain-Cole attended the University of St. Andrews and graduated in 2006 with a Master of Arts (First Class Honours) in International Relations and Modern History. He then gained the Graduate Diploma in Law and the Legal Practice Course at BPP Law School, London. In 2015, obtained the BASL DMU Postgraduate Certificate in Sports Law from De Montfort University, Leicester.

Mr. Hain-Cole is admitted to practice in England and Wales.  He has professional proficiency in Spanish.

**JOHN JASNOCH**'s practice areas include securities and antitrust class actions, shareholder derivative actions, and other complex litigation.  Mr. Jasnoch represented plaintiffs in *In re Washington Mutual Mortgage-Backed Securities Litigation*, Case No. 2:09-cv-00037 (W.D. Washington), a case that was litigated through summary judgment and settled on the eve of trial for $26 million.  Mr. Jasnoch was also one of the lead attorneys that secured a $7.68 million settlement in *In re Pacific Biosciences Securities Litigation*, Case No. CIV509210 (San Mateo County, California).  Other cases Mr. Jasnoch has worked on that have achieved notable results include:  *West Palm Beach Police Pension Fund v. Cardionet, Inc.*, Case No. 37-2010-00086836-CU-SL-CTL (San Diego County, California) ($7.25 million settlement), *Hodges v. Akeena Solar*, 09-cv-2147 (N.D. Cal.) ($4.77 million settlement), *Plymouth County Contributory Ret. Sys. v. Hassan*, No. 08-1022 (D.N.J.) (corporate governance reform), and *In re HQ Sustainable Maritime Industries, Inc., Derivative Litigation*, Case No. 11-2-16742-9 (King County, Washington) ($2.75 million settlement).

As an active member of the Consumer Attorneys of California, Mr. Jasnoch has prepared and submitted successful *amicus curie* briefs to the Ninth Circuit Court of Appeals, including on California's Anti-SLAPP law and consumer protection issues.

Mr. Jasnoch graduated *cum laude* from Creighton University with a Bachelor of Arts in Political Science in 2007.  He received his Juris Doctorate from The University of Nebraska College of Law in 2011 and is a member of the California Bar.

**MICHAEL G. BURNETT** is a graduate of Creighton University (B.A., 1981) and Creighton University School of Law (J.D., 1984).  Mr. Burnett practices complex securities litigation at the firm where he consults with the firm's institutional clients on corporate fraud in the securities markets as well as corporate governance issues.  In addition to his work with the firm, Mr. Burnett has specialized in intellectual property and related law.  Mr. Burnett is admitted to the Nebraska Supreme Court and United States District Court, District of Nebraska.  He is a member of the Nebraska Bar Association.

**DOUGLAS CAMPBELL** is an associate in Scott+Scott's London office who specialises in competition damages litigation.  Douglas regularly works with clients and counsel, considering competition and regulatory claims, assessing their merits and viability.  He has knowledge of the third-party funding sector and has experience of working on funded cases and preparing proposals for third-party funding.

Douglas is currently representing a number of clients with potential claims against financial institutions for manipulation of the foreign exchange market, and acting for several retailers with claims against Visa and Mastercard in respect of charges and rules imposed in respect of their card payment schemes.

Prior to joining Scott+Scott, Douglas spent five years working for a major UK law firm in Edinburgh and London.  During this time he acted in a number of competition damages and

general commercial claims in the English High Court and Court of Appeal.  His experience includes acting for a Part 20 Defendant airline in the *Air Cargo* follow-on and stand-alone damages claims and acting for a FTSE 250 listed company coordinating a claim against a major UK bank for manipulation of the foreign exchange market.  Douglas represented clients across a broad range of industries in the public and private sectors.

Douglas studied law at the University of Edinburgh and spent a year studying law and politics at Université Paul Cézanne Aix-Marseille III in France.

Douglas is admitted to practise in England & Wales and Scotland.

**J. ALEX VARGAS** serves as Scott+Scott's Director of Investigations.  He has devoted over a decade of his career investigating claims on behalf of institutional investors and other stakeholders.  At Scott+Scott, Mr. Vargas conducts and oversees investigations across all practice groups.  Prior to joining the firm, Mr. Vargas was involved in several high-profile securities fraud cases, including one where he served as the principal investigator in connection with a 14-year litigation, resulting in the largest securities fraud settlement following a trial; a record $1.575 billion recovery in *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.).

Representative antitrust class actions include:  *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789 (S.D.N.Y.); *In re SSA Bonds Antitrust Litigation*, No. 1:16-cv-03711-ER (S.D.N.Y.); and *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-cb-27240-CMR (E.D. Pa.).

Representative securities class actions include:  *Ret. Bd. of the Policemen's Annuity and Benefit Fund of Chicago v. FXCM Inc.*, No. 1:15-cv-03599-KMW (S.D.N.Y.); *Union Asset Management Holding AG v. SanDisk LLC*, No. 3:15-cv-01455-VC (N.D. Cal.); *In re LendingClub Corp. Shareholder Litig.*, No. CIV537300 (Cal. Super. Ct., San Mateo County) (settlement of $125 million); *In re MobileIron, Inc. S'holder Litig.*, No. 1-15-cv-284001 (Cal. Super. Ct., Santa Clara County) (settlement of $7.5 million); *In re Endochoice Holdings, Inc. Sec. Litig.*, C.A. No. 2016 cv 277772 (Ga. Super. Ct. Fulton County); and *Rubenstein v. Oilsands Quest Inc.*, No. 11-cv-288 (S.D.N.Y.) (settlement of $10.235 million).

Representative consumer and data breach class actions *include In re Pacific Coast Oil Trust Sec. Lit.*, No. BC550418 (Cal. Sup. Ct., Los Angeles County) (settlement of $7.6 million); *Greater Chautauqua Federal Credit Union v. Kmart Corp.*, No. 15-cv-2228 (N.D. Ill.) (settlement of $5.2 million); *WinSouth Credit Union v. MAPCO Express, Inc.*, No. 14-cv-1573 (M.D. Tenn.) (largest dollar-per-card settlement obtained on behalf of financial institutions involving data breach of credit and debit card information); *Selco Community Credit Union v. Noodles & Co.*, C.A. No. 1:16-cv-2247 (D. Colo.); and *First Choice Fed. Credit Union v. The Wendy's Co.*, No. 2:16-cv-00506 (W.D. Pa.).

Mr. Vargas graduated from the University of San Diego (B.A., 1997) and the University of San Diego School of Law (J.D., 2004).  He is admitted to practice in New York, California, and the District of Columbia.

**STEPHANIE HACKETT** is an associate in Scott+Scott's San Diego office.  She primarily practices in the area of antitrust litigation on behalf of classes and individual plaintiffs.

Ms. Hackett has represented class plaintiffs in *Dahl v. Bain Capital Partners, LLC, No. 1:07-cv-12388 (D. Mass.)* ($590.5 million settlement) and *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.*, No. 12-3824 (E.D. Pa.) ($8 million settlement).  She represented corporate opt-out clients in *In re Polychloroprene Rubber (CR) Antitrust Litigation*, MDL No. 1642 (D. Conn.); and *In re Plastics Additives (No. II) Antitrust Litigation*, MDL No. 1684 (E.D. Pa.).

Ms. Hackett's current cases include representing class plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789 (S.D.N.Y.), an action challenging collusion regarding foreign exchange rates, and *Alaska Electrical Pension Fund v. Bank of America Corporation*, No. 1:14-cv-07126 (S.D.N.Y.), an action challenging collusion regarding the setting of the ISDAfix benchmark interest rate.  Ms. Hackett also represents corporate opt-out clients in *In re: Aluminum Warehousing Antitrust Litigation*, MDL No. 2481 (S.D.N.Y.), a case challenging collusion regarding the spot metal price of physically-delivered aluminum.

As a part of her *pro bono* work, Ms. Hackett has worked with the San Diego Volunteer Lawyer Program, providing assistance to immigrant victims of domestic violence, and the ABA Immigration Justice Project, where she obtained a grant of asylum on behalf of her client.

Ms. Hackett is an active member of the American Bar Association's Antitrust Section and the San Diego La Raza Lawyers Association.  She is also a contributing author to Market+Litigation, Scott+Scott's monthly newsletter.

Ms. Hackett is a graduate of the University of Iowa (B.S. Political Science, International Business Certificate, 2001) and of the University of Iowa College of Law (J.D., with distinction, 2005), where she was a recipient of the Willard L. Boyd Public Service Distinction award.  While obtaining her law degree, Ms. Hackett worked as a judicial extern for the Honorable Celeste F. Bremer, United States District Court for the Southern District of Iowa.  Ms. Hackett is admitted to practice in California.

In addition to her legal education, Ms. Hackett has engaged in accounting study and passed all four parts of the CPA exam.  This background has proved particularly useful in cases involving the financial services industry.

**HAL CUNNINGHAM** is a graduate of Murray State (B.S. Biological Chemistry) and the University of San Diego School of Law.  Prior to joining Scott+Scott, Mr. Cunningham was engaged in research and development in the chemical and pharmaceutical industries.

Mr. Cunningham's practice focuses on securities class action, shareholder derivative, and consumer litigation.  While at Scott+Scott, Mr. Cunningham has worked on several cases that have achieved notable results, including *In re Washington Mutual Mortgage Backed Securities Litigation*, No. C09-0037 (W.D. Wash.) (securities settlement of $26 million).  Mr. Cunningham is also involved in the Firm's securities lead plaintiff motion practice, having briefed several successful lead plaintiff applications for the firm's institutional and individual clients.

Mr. Cunningham is a regular contributor to and editor of Scott+Scott's monthly newsletter, MARKET+LITIGATION.

Mr. Cunningham is admitted to practice in California.

**S. SINAI MEGIBOW** is an Investigator in Scott+Scott's Investigations Department.  He has extensive experience conducting a wide range of investigations, including securities fraud, internal investigations, antitrust matters, Foreign Corrupt Practices Act compliance, corporate due diligence, and litigation intelligence.  Prior to joining Scott+Scott, Sinai served as a Director in a global private investigation and intelligence consulting firm.  Sinai began his career as an associate attorney practicing in the areas of White Collar Criminal matters and commercial litigation.

Mr. Megibow graduated from Tulane University (B.A., 1995), University of Chicago (M.A., 1998) and UCLA School of Law (J.D., 2001).  He is admitted to practice in New York.  He is also a Certified Fraud Examiner and a licensed private investigator in New York and Florida.

**YIFAN ("KATE") LV** is an associate in Scott+Scott's San Diego office.  Her practice focuses on prosecuting antitrust actions with an emphasis on intercultural cartels.

Ms. Lv represents plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y), challenging foreign-exchange market manipulation by many global financial institutions.  Ms. Lv also represents and advises the Firm's Asian clients.

Ms. Lv graduated from Tianjin University of Commerce, Tianjin, China, with a Dual Bachelors in Law and Economics in 2008, from Peoples University of China, Beijing, China with a Master in Law in June 2010, and from William & Mary School of Law in 2014.

Ms. Lv is bilingual, speaking fluent Chinese and English.

Ms. Lv is a member of the California, New York, and China Bars.

**MICHELLE CONSTON** is an associate at Scott+Scott's New York office, focusing on antitrust litigation.

Prior to joining Scott+Scott, Ms. Conston represented institutional investors, hedge funds, and individual investors in complex class action litigation arising under the Commodity Exchange Act, Sherman Act, RICO Act, and common law.  She was heavily involved in litigating actions alleging the manipulation of the London Interbank Offered Rate ("LIBOR") for several currencies by large financial institutions (*e.g.*, *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (S.D.N.Y.) and *Sullivan v. Barclays plc*, No. 13-cv-00281 (S.D.N.Y.)), as well as an action alleging manipulation of the daily London Silver Fixing by the Fixing Banks and several other financial institutions (*In re London Silver Fixing, Ltd., Antitrust Litigation*, No. 14-md-02573 (S.D.N.Y.)).

At Scott+Scott, Ms. Conston presently devotes much of her time representing investors in cases involving the manipulation of financial benchmarks by numerous major banks, including *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y) and *Alaska Elec. Pension Fund v. Bank of America Corp.*, No. 14-cv-7126 (S.D.N.Y).

Ms. Conston is a graduate of Marist College (B.A., *magna cum laude*, 2010) and the University of Miami School of Law (J.D., *magna cum laude*, 2013). During law school, Ms. Conston served as a judicial intern for the Honorable Stephen T. Brown, the Chief Magistrate Judge of the United States District Court for the Southern District of Florida. Ms. Conston also served as a certified legal intern for the United States Attorney's Office for the Southern District of Florida.

Ms. Conston is licensed to practice law in New York, New Jersey, and Florida, and is admitted to the U.S. District Court for the Southern District of New York.

**SCOTT JACOBSEN** is an associate in Scott+Scott's New York office. Mr. Jacobsen practices in the areas of shareholder derivative actions, securities class action litigation, and other complex litigation.

While at Scott+Scott, Mr. Jacobsen has primarily focused on securities and derivative litigation, including investigation of corporate books and records to evaluate potential claims on behalf of shareholders. Cases include *International Union of Operating Engineers Local No. 478 Pension Fund v. McInerney*, C.A. No. 11901-VCN (Del. Ch. Jan 13, 2016) (derivatively on behalf of Genworth Financial Inc.); *Carlson v. Dipp*, No. 1:15-cv-14032 (D. Mass. Dec. 7, 2015) (securities class action); *Fernicola v. Hugin*, C.A. No. 11748-VCMR (Del. Ch. Nov. 24, 2015) (derivatively on behalf of Celgene Corp.); *Feldman v. Kulas*, C.A. No. 11614-VCG (Del. Ch. Oct. 15, 2015) (derivatively on behalf of Santander Consumer USA Holdings Inc.); *Fortunato v. Akebia Therapeutics, Inc.*, No. 1:15-cv-13501 (D. Mass. Oct. 5, 2015) (securities class action).

Mr. Jacobsen graduated from The George Washington University (B.A. English, *magna cum laude*; M.A., English) and William & Mary Law School (J.D. 2014). During law school, Mr. Jacobsen externed at the American Civil Liberties Union of Virginia and served as a staff member for the William & Mary Bill of Rights Journal.

Mr. Jacobsen is a member of the following professional associations: ABA Business Section and ABA Young Lawyers Division. Mr. Jacobsen is also a regular contributor to Scott+Scott's monthly newsletter. He is admitted to practice in New Jersey, New York, and the United States District Court for the Southern District of New York.

**RHIANA SWARTZ** is an associate in the firm's New York office. Ms. Swartz graduated *magna cum laude* from Brooklyn Law School in 2006, and received her B.A. from Swarthmore College in 2000. After graduating from law school, Ms. Swartz clerked for the Honorable Joan M. Azrack in the Eastern District of New York.

Ms. Swartz's practice focuses on securities class actions and shareholder derivative actions.

35

Prior to joining Scott+Scott, Ms. Swartz was Senior Counsel in the Special Federal Litigation Division of the New York City Law Department, Office of Corporation Counsel, where she handled federal cases brought under 42 U.S.C. §1983 from initial receipt of complaint through trial verdict.  Ms. Swartz settled more than 80 cases and conducted four federal trials. Ms. Swartz also spent more than four years as an Associate at Sullivan & Cromwell LLP in New York, representing major financial institutions in civil and regulatory matters involving securities, antitrust, corporate governance, and employment law issues.

Ms. Swartz is a member of the New York bar and is admitted to practice in the Southern District of New York, Eastern District of New York, and Second Circuit.

**SEAN T. MASSON** is an associate in Scott+Scott's New York office.  Mr. Masson's practice focuses on securities class action, mass torts, and other complex commercial litigation.  *Super Lawyers* has named Mr. Masson a Rising Star for four consecutive years (2015-2018) for his work as a securities class action litigator.

Prior to entering the private sector, Mr. Masson served as an Assistant District, successfully argued over 40 appeals in state and federal courts and gained extensive experience with large-scale government and regulatory investigations.  Notable cases include: *People v. McKelvey* (upheld 75-year sentence for serial rapist preying on homeless women); *People v. Doyle* (affirming conviction for notorious fine art thief); and *People v. Wong* (affirming conviction of driving school instructor involved in hit and run of a child).

Mr. Masson graduated from Queens College (*summa cum laude*) and Hofstra University School of Law (*cum laude*).  During law school, Mr. Masson served as the Senior Notes and Comments Editor of the *Hofstra Law Review* and won various awards during Moot Court competitions.

Mr. Masson's publications include:

*The Presidential Right of Publicity*, 2010 Boston College Intellectual Property & Technology Forum 012001.

Note, *Cracking Open the Golden Door: Revisiting U.S. Asylum Law's Response To China's One-Child Policy*, 37 Hofstra Law Review 1135 (2009).

**MARGARET (MAGGIE) FERRON** is an associate at the Firm's Connecticut office. Ms. Ferron is a graduate of Middlebury College (B.A., 2003) and the University of Connecticut School of Law (J.D., High Honors, 2009).  During law school, Ms. Ferron worked for the Honorable Janet Bond Arterton of the U.S. District Court for the District of Connecticut and for the Iran Human Rights Documentation Center in New Haven, Connecticut.  As an undergraduate, she studied classical languages and history in Athens, Greece; as a law student, she studied international human rights law at Trinity College, Dublin, Ireland.

Prior to joining the firm, Ms. Ferron worked as a plaintiffs' employment lawyer in Hartford for several years.  Her experience also encompasses municipal affairs and state grant compliance. Ms. Ferron practices in varied Connecticut state court matters as well as federal class actions.

She is admitted to practice in Connecticut and the U.S. District Court for the District of Connecticut.

Ms. Ferron is a trustee of Joshua's Tract Conservation and Historic Trust, located in Mansfield, Connecticut.  She successfully led an effort to build an accessible playground in Mansfield and enjoys trail running and reading with her family.

**LAUREN S. MCCABE** is an associate in Scott+Scott's New York office.  Ms. McCabe's practice focuses on securities class actions.

Prior to joining Scott+Scott, Ms. McCabe practiced complex commercial litigation for ten years at the New York office of Gibson Dunn & Crutcher LLP.

Ms. McCabe graduated from Pepperdine University (*summa cum laude*) and New York University School of Law, where she was a McKay Scholar.

Ms. McCabe's publications include:

"*Justice Holland's Lasting Imprint on Corporate Law*," Delaware Business Court Insider (March 14, 2017).

**JING-LI YU** is an associate in the New York office where he focuses on shareholder derivative and federal securities litigation.

Mr. Yu is a graduate of the University of Pennsylvania (B.A., Economics, *cum laude*, 2001), University of Chicago (M.A., Social Sciences, 2005), and the University of Chicago Law School (J.D., 2010).

Prior to joining Scott+Scott, Mr. Yu was a litigation associate based in Wilmington, Delaware at a litigation boutique that primarily represented institutional plaintiffs, and before then, he was a litigation and investigations associate based in New York, New York at two international law firms that primarily represented institutional defendants.

Mr. Yu is admitted to practice before the States of Delaware and New York.  He is also admitted to the United States District Courts for the Eastern District of New York and Southern District of New York, as well as the United States Court of Appeals for the Second Circuit.

**CAREY ALEXANDER** is an associate in Scott+Scott's New York office where he focuses on complex consumer litigation and class actions.

Mr. Alexander received his B.A. from Skidmore College in 2004, and graduated *magna cum laude* from St. John's University School of Law in 2012.  During law school, Mr. Alexander served as Associate Managing Editor of the *St. John's Law Review*.  His student note, *Abusive: Dodd–Frank Section 1031 and the Continuing Struggle To Protect Consumers*, 85 St. John's L. Rev. 1105 (2012), has been cited in several legal journals, including the *Harvard Law Review*.

Prior to law school, Mr. Alexander served as an editor of the consumer-advocacy blog, *Consumerist.com*. He also served as an advisor to the Bronx Borough President and worked as part of the National Campaign to Restore Civil Rights.

Mr. Alexander is admitted to practice in the State of New York and in several federal courts, including New York's Southern, Eastern, and Western Districts, the Northern District of Illinois, and Court of Appeals for the Ninth Circuit.

**ANJALI BHAT** is an associate at the Firm's New York office. Ms. Bhat is a graduate of Swarthmore College (B.A., High Honors, 2007) and Columbia Law School (J.D., High Honors, 2011). During law school, Ms. Bhat was a Harlan Fiske Stone Scholar and a finalist in the Harlan Fiske Stone Moot Court Competition. As an undergraduate, she studied history.

Prior to joining the firm, Ms. Bhat clerked for the Honorable William F. Kuntz II of the United States District Court for the Eastern District of New York. In addition to securities class actions, her experience also encompasses real estate litigation in New York state courts. She is admitted to practice in New York and the U.S. District Courts for the Southern and Eastern Districts of New York. She enjoys reading, tennis, and rock climbing.

**JOSEPH G. CLEEMANN** is an associate at the Firm's New York Office. He represents dozens of governmental entities in seven states who are prosecuting pharmaceutical manufacturers and distributors in opioid litigation.

Prior to coming to the Firm, Joe worked eight years at Ropes & Gray, LLP, where he principally represented corporate defendants in government prosecutions, class actions, and complex business litigation. He has extensive experience in the area of data privacy.

Joe is a graduate of Brooklyn Law School, from which he graduated *cum laude* in 2009. He spent his first year out of law school at a Ropes-sponsored fellowship with the Legal Aid Society's Prisoners' Rights Project. During law school, he interned with the Hon. Robert Sack in the Second Circuit and the Hon. Shira A. Scheindlin in the Southern District of New York.

Joe has additional degrees from Columbia University (M.S., Journalism, 2004) and Harvard University (A.B., History, 1998). Prior to entering the law, he worked seven years in trade book publishing.

**RANDY MOONAN** is an associate in the firm's New York office. Mr. Moonan's practice focuses on securities class actions.

Prior to joining Scott+Scott, Mr. Moonan was a litigation associate at Simpson Thacher & Bartlett LLP, representing major financial institutions in civil and regulatory matters involving securities, antitrust, corporate governance, and insurance law issues.

Mr. Moonan is a graduate of the University at Albany (B.A., History and Political Science, *magna cum laude*, Phi Beta Kappa, 2010) and Cornell Law School (J.D. 2013). During law

school, Mr. Moonan served as a Managing Editor of the Cornell Journal of Law and Public Policy.

Mr. Moonan is admitted to practice in New York and the United States District Court for the Southern and Eastern Districts of New York.

**KASSANDRA NELSON** is an associate in the firm's New York office where she focuses on securities and antitrust litigation.

Ms. Nelson is a graduate of the University of Alabama (B.A., *cum laude* 2012) and Southern Methodist University (J.D., 2016).  During law school, Ms. Nelson volunteered over 450+ hours in Legal Public Service and received the distinction of Pro Bono Honor Roll upon graduation. She worked as an intern for the Domestic Violence Division at the Dallas County District Attorney's Office as well as an extern for the Honorable Judge Martin Hoffman.  Ms. Nelson served as a student attorney for SMU's Innocence Clinic, working with the Dallas County Public Defender's Office and New York Innocence Project, and successfully advocated for the release and exoneration of Steven Chaney, freed after wrongfully serving more than 25 years.

Ms. Nelson is admitted to practice in the State of Texas.

**JONATHAN ZIMMERMAN** is an associate in the New York office where he focuses on shareholder derivative and federal securities litigation.

Mr. Zimmerman is a graduate of McGill University, Desautels School of Management (B.Commerce, 2009) and Temple University, Beasley School of Jaw (J.D., 2016).  While in law school, Mr. Zimmerman served as a Staff Editor on Temple's International and Comparative Law Journal.  He also received the Best Paper Award in Advanced Financial Regulations for his work entitled *Corporate Diversions*: *Short-Term Tax Savings at the Expense of Shareholder Rights* (Spring 2015).

Prior to joining Scott+Scott, Mr. Zimmerman practiced in the areas of shareholder derivative, federal securities, and *Qui Tam* litigation as an Associate at The Weiser Law Firm, located in the suburbs of Philadelphia, Pennsylvania.

Mr. Zimmerman is a member of the New Jersey and Pennsylvania Bars.  He is also a admitted to the U.S. District Court for the District of New Jersey and the U.S. District Court for the Eastern District of Pennsylvania.

A former two-time All-Canadian collegiate lacrosse player and co-captain of McGill University's men's varsity team, Mr. Zimmerman loves watching and playing sports when he, his wife, and his son are not exploring New York City's vibrant food scene.

**PHILIPPA (PIPPA) WINSTANLEY** is an associate in Scott+Scott Europe LLP's London office.  She specialises in competition damages litigation before the English High Court, Competition Appeal Tribunal and the Court of Appeal.

Pippa is currently representing potential claimants in follow-on damage actions against Visa and MasterCard in relation to anti-competitive interchange fees.  She is also acting on behalf of clients seeking compensation from participants in a long-running multinational cartel.  Pippa also works on general commercial litigation, including a dispute relating to a major property portfolio in the UK.

Prior to joining Scott+Scott Europe LLP, Pippa trained at Marriott Harrison LLP and qualified in commercial litigation at Clyde & Co LLP, where she represented major energy and aviation clients in relation to various debt recovery and breach of contract claims.  Pippa has experience representing both corporations and individual shareholders.

Pippa attended the University of Oxford and graduated in 2012 with a Bachelor of Music.  Pippa subsequently undertook a Graduate Diploma of Law and LLM in Law at the University of Law, London.

Pippa is admitted to practice in England and Wales.

**RUTH MANSON** is an associate in Scott+Scott Europe LLP's London office.

Ruth specialises in commercial and competition litigation.  She is currently working as part of the firm's Antitrust and Competition Practice advising a number of retailers regarding claims against Visa and MasterCard in respect of anti-competitive interchange fees, and working with numerous clients assessing potential claims arising from the manipulation of the foreign exchange market.

Prior to joining Scott+Scott Europe LLP, Ruth completed her traineeship at a major UK law firm in London.  During her traineeship, Ruth worked on a number of large scale litigations including a multi-million pound breach of contract claim and acting on behalf of a Part 20 Defendant in the on-going Air Cargo cartel litigation.

Ruth attend the University of Cambridge (Trinity Hall) and graduated in 2015 with a Bachelor of Arts in Law.  She subsequently completed her Legal Practice Course, which she passed with distinction, at the University of Westminster.

Ruth is admitted to practice in England and Wales.

**JEFFREY P. JACOBSON** is an associate in the New York office where he focuses on federal securities litigation.

Jeff is a graduate of the George Washington University Law School (J.D., High Honors, Order of the Coif, 2017) and George Washington University (B.A., Journalism & Political Science, *summa cum laude*, Distinguished Scholar, 2013).

Prior to joining Scott+Scott, Jeff was a litigation associate at a major international law firm where he represented clients in securities cases, bankruptcy proceedings, and antitrust matters, and advised clients on employment matters.

Jeff is admitted to practice in the State of New York.

**JUSTIN W. BATTEN** is an associate in the firm's New York office.  Mr. Batten's practice focuses on complex and class action litigation with an emphasis on antitrust and consumer protection matters.  Prior to joining Scott+Scott, Mr. Batten served as an Assistant Attorney General in the New York Attorney General's Antitrust Bureau.

Mr. Batten is an active member of the New York State Bar Association's Antitrust Section.  He serves as the Young Lawyer Liaison to the Antitrust Section's Executive Committee, and is a member of the Donnelly Act Revision Committee.

Mr. Batten is a graduate of New York University School of Law (J.D., 2017) and Georgia State University (B.A. Spanish, *cum laude*, 2012).  While at NYU, Mr. Batten served as an intern with the Georgia Attorney General's Office and Texas RioGrande Legal Aid, assisted clients in a clinic with employment law matters, and was a Teaching Assistant to Professor Mark Geistfeld for a first-year torts course.  Mr. Batten also served as an articles editor for NYU's *Journal of Law & Liberty*.

Mr. Batten is admitted to practice in New York.

**G. DUSTIN FOSTER**'s main practice areas include antitrust, securities, and complex litigation, which includes such cases as *In Re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.), *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass.), and *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.*, No. 2:12-cv-03824 (E.D. Pa.).  Mr. Foster is a member of the West Virginia State Bar.

Mr. Foster is a graduate of West Virginia Wesleyan College (B.S., Biology, *cum laude*, 1999) and of the West Virginia University College of Law (J.D., 2002), where he earned a position on the Moot Court Board and Lugar Trial Association.  During law school, Mr. Foster served as a law clerk for the West Virginia Supreme Court of Appeals, after which he assumed a full-time term position as a law clerk for the Hon. Thomas C. Evans, III, of the Fifth Circuit Court of West Virginia.

**JOSEPH A. PETTIGREW**'s practice areas include securities, antitrust, shareholder derivative litigation, and other complex litigation, including work on the following cases:  *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388 (D. Mass.); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y); and *Marvin H. Maurras Revocable Trust v. Bronfman*, 12-cv-3395 (N.D. Ill.).

Mr. Pettigrew graduated from Carleton College (B.A., Art History, *cum laude*, 1998) and from the University of San Diego School of Law (J.D., 2004).  Mr. Pettigrew has served on the board and as legal counsel to several nonprofit arts organizations.

Mr. Pettigrew is admitted to practice in California and Maryland.

**JACEY BOGLER** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Jacey graduated, *cum laude*, from Iowa State University with a Bachelor of Arts degree in Psychology and Criminal Justice (minor) in 2010.  She graduated with *honors* from Drake University Law School in 2014.  While at Drake, Jacey was a junior staff and editorial board member of the Drake Law Review.

Jacey is admitted to practice in the State of Iowa.

**JOEL BOORAS** is a staff attorney in Scott+Scott's California office where he focuses on complex antitrust litigation and class actions.

Mr. Booras received his B.A. from the University of San Diego in 2008, and graduated from the University of San Diego School of Law in 2012.

Prior to joining Scott+Scott, Mr. Booras practiced in the personal injury field and managed cases in the electronic discovery arena for several high-profile technology clients.

Mr. Booras is admitted to practice in the State of California.

**VICTORIA BURKE** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Victoria received her B.A. from Arizona State University in 1997, and graduated from Southwestern Law School in 2011.  Additionally, in 2014, Victoria attained a certificate of completion from Loyola Law School's Fashion Law Summer Intensive program.

On behalf of the American Bar Association, Victoria serves as Vice-Chair of the Trademark Transactions Committee, Chair of the Fashion Law Subcommittee, and former Vice-Chair of the Trademark Litigation Committee.  She also frequently authors law articles on a range of topics for various legal publications, most recently for the Daily Journal in November 2016, "*Blunt Talk About Trademarks in the Marijuana Business*."  Victoria has also served as panelist for many programs, such as the ABA's webinar *Runway Ready: Fashion Law Fundamentals* (2016). Victoria has volunteered her time to Bet Tzedek's *Employment Rights Project: Wages and Hour* cases and regularly serves as a moot court judge for Pepperdine University School of Law's Annual National Entertainment Law Moot Court Competition.

Victoria is admitted to practice in the State of California and the District of Columbia, and in several federal courts, including the U.S. District Court for the Central District of California.

**ELIZABETH A. CAMPOS** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Ms. Campos received her B.A. from the University of Southern California in 1997, and graduated from Thomas Jefferson School of Law in 2001.

Ms. Campos is admitted to practice in the State of California and is registered to practice in front of the U.S. Patent and Trademark Office.

**NGA CUNNINGHAM** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Nga received her B.A. from the University of California, San Diego in Political Science with an emphasis on Public Policy, and graduated, *cum laude*, from Thomas Jefferson School of Law in 2005.

Nga is admitted to practice in the State of California and in the U.S. District Court for the Central District of California.

**YVONNE FUNK** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Yvonne received her B.A. from UCLA in 2001, and graduated from UC Hastings law school in 2007.  She is admitted to practice in the State of California.

**CARLY HENEK** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Carly received her B.S. from State University of New York at Albany in Human Biology, and graduated from St. John's School of Law in 2001.

Carly has extensive state and federal court experience litigating against and representing major U.S. and international corporations and individual clients in all phases of the litigation process. Her practice focuses on complex commercial litigation and securities fraud litigation.

Carly is admitted to practice in the State of California and New York, including all federal courts in California and New York.

**TODD S. HIPPER** is an attorney in Scott+Scott's California office where he focuses on complex antitrust litigation and class actions.

Todd received his B.A. in Political Science from University of California, Berkeley in 1996, and graduated from Georgetown University Law Center in 2001.

Todd is admitted to practice in the States of California and New York, and in several federal courts, including all federal courts in California, and the U.S. District Court for the Eastern District of New York.

**RANDALL AUBREY PETRIE** is an attorney in Scott+Scott's California office where he focuses on complex antitrust litigation and class actions.

Randall received his B.A. from Hamilton College in 1988, and graduated from George Washington University School of Law in 1992, Dean's Fellow.

Randall is admitted to practice in the States of New York and New Jersey and in U.S. District Court for the Southern District of New York.

**MELANIE PORTER** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Melanie graduated from UCLA with a B.A. in Psychology in 2003.  She received her J.D. from California Western School of Law in 2006, where she graduated *cum laude* in her concentration. While at CWSL, Melanie served as President of the Asian Pacific Law Student Association and Hawaiian Law Student Association, as well as Secretary and Chair of Community Relations for the Health Law Society and Co-Chair of the Social and Membership Committee for Phi Alpha Delta.

In 2016 and 2017, Melanie received the Rising Star recognition by Super Lawyers.  She is currently a member of the California State Bar, San Diego County Bar Association, Consumer Attorneys of San Diego, and the American Bar Association.

She is admitted to practice in the State of California and the U.S. Southern District of California.

**SEAN RUSSELL** is an attorney in Scott+Scott's California office where he focuses on complex antitrust litigation and class actions.

Mr. Russell graduated in 2008 from the University of California, Davis with a Bachelor of Arts in Economics.  He received his Juris Doctorate from Thomas Jefferson School of Law in 2015, *cum laude*, where he was Chief Articles Editor of the Thomas Jefferson Law Review and a Moot Court Competitor.  While at Thomas Jefferson, Mr. Russell also served as an extern to the Honorable William V. Gallo of the U.S. District Court for the Southern District of California. Mr. Russell received a Masters of Taxation from the University of San Diego School of Law in 2016.

Mr. Russell is admitted to practice in the State of California and the U.S. District Court for the Southern District of California.

**AMY SIPE** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Ms. Sipe received her B.A. and M.A. from the University of Missouri in Communications, and graduated from the University of Missouri School of Law in Kansas City.

Prior to joining Scott+Scott, Ms. Sipe worked as in-house counsel for a highly diversified Fortune 500 corporation and for an Am Law Top 20 Litigation Firm.  Most recently, in addition to antitrust litigation and class actions, Ms. Sipe has focused on best practices in the areas of electronic discovery, information governance, compliance, and risk management.

Ms. Sipe is admitted to practice in the State of Kansas and in the U.S. Court of Appeals for the 10th Circuit.

**BRANDON ZAPF** is an attorney in Scott+Scott's California office where he focuses on complex antitrust litigation and class actions.

Brandon received his B.A. from the University of California, Santa Barbara, in 2002, and graduated from the University of San Francisco School of Law, *cum laude*, in 2007.  He received his LL.M. in taxation from the University of San Diego School of Law in 2011.

Brandon is admitted to practice in the State of California and is admitted in the U.S. District Court for the Central District of California.

**CAITLIN ZAPF** is an attorney in Scott+Scott's California office where she focuses on complex antitrust litigation and class actions.

Caitlin received her B.A. from the University of California, San Diego in 2003, and graduated from the University of San Francisco School of Law, *cum laude*, in 2007.

Caitlin is admitted to practice in the State of California and is admitted in the U.S. District Court for the Central, Eastern, and Northern Districts of California.

# EXHIBIT D

IN RE BUFFALO GROVE POLICE PENSION
FUND DERIVATIVE ACTION ON BEHALF
OF NAVIENT CORP.

**EXPERT REPORT OF MATTHEW D. CAIN, PH.D.**

## I.      Introduction

1.      I have been requested by counsel at Scott + Scott Attorneys at Law LLP, which serves as counsel for Plaintiff Buffalo Grove Police Pension Fund ("Plaintiff") in the above matter ("Counsel"), to review and comment on the proposed settlement of this litigation. To perform this task, I have reviewed the Verified Stockholder Derivative Complaint draft, the Plaintiff's Confidential Mediation Statement (collectively, the "Complaint"), the Memorandum of Understanding dated September 21, 2018 relating to the proposed settlement of claims in this matter, (the "Settlement"), the Confidentiality Agreement dated January 15, 2018, academic literature relating to corporate governance and firm value, and publicly available data regarding the stock price and shares outstanding of Navient Corporation ("Navient" or the "Company").

2.      I am being paid $20,000 by Counsel for the preparation of this expert report. No portion of this fee is contingent upon my opinions or conclusions contained herein, or upon the outcome of this case or Settlement. My prior testimonial experience is listed in my curriculum vitae, which is attached hereto as Exhibit A.

3.      The remainder of my report proceeds as follows. First, I provide a summary of my conclusions. Next, I provide an overview of my qualifications. I then proceed to summarize the Settlement and I estimate the anticipated valuation effects of the Settlement. Finally, I conclude with a summary of my opinions.

## II.     Summary of Conclusions

4.      The Settlement provides for several significant corporate governance reforms, including:

> a.  The addition of two new independent directors to Navient's board of directors (the "Board") by the end of 2019;

b.    Training Board members on compliance with applicable state and federal consumer protection and collection laws;

c.    The empowerment of independent directors to properly monitor risk oversight responsibilities within the Company through meetings in executive session;

d.    Limits to directors' other board commitments to ensure that they are focused on Company issues;

e.    Public summary of the Board's risk oversight responsibilities, which will improve Navient's transparency among investors and the general public; and

f.    Improvements to the internal monitoring of loan servicing and collections compliance with applicable laws by creating a new executive position and a new executive-level committee for this purpose. The committee will provide reports directly to the Company's Audit Committee. These reports will include the committee's oversight responsibilities relating to the Company's loan servicing and loan-related collections efforts and their oversight of internal controls relating to Navient's loan servicing and loan-related collections efforts.

5.    My opinion is that the Settlement provides significant benefits to Navient and its shareholders. These corporate governance improvements by the Company are directly targeted to the lack of board engagement and monitoring oversight alleged in the Complaint. Prior academic research has consistently documented the beneficial effects of independent directors and proper board functioning. Moreover, improved internal controls and monitoring of loan servicing and collections will improve the firm's regulatory compliance significantly. Given the Company's numerous alleged violations of laws regarding loan servicing and loan-related collections, I believe

the creation of a new monitoring position and committee will help to remedy prior violations and prevent such conduct going forward.

6.      Based upon the academic literature relating to the types of corporate governance improvements obtained through the Settlement, I estimate that the Settlement will increase shareholder value at the Company by up to $139 million. The Settlement thus strengthens Navient's corporate governance structure and significantly enhances shareholder value.

## III.    Overview of Qualifications

7.      I am currently a Visiting Research Fellow at the Harvard Law School Program on Corporate Governance. I participate in academic seminars and conduct research related to corporate governance topics, including board independence, board oversight, company internal controls and financial reporting quality, and the relation between corporate governance and firm value. My current research at Harvard includes topics relating to board and executive-level merger negotiations and deal process issues, retail shareholder voting, and investor class action lawsuits against foreign firms.

8.      Prior to this fellowship, I was a Financial Economist at the U.S. Securities and Exchange Commission (the "SEC") from 2014 through 2018. During that time I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations, and litigated cases, including cases alleging insider trading. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on topics including corporate governance. While employed at the SEC as a Financial Economist, I continued to work on and publish academic research, and I was awarded the Chairman's Award for Economic Research. In 2016 I published an article in the *University of*

*Pennsylvania Law Review* titled "How Corporate Governance is Made: The Case of the Golden Leash."[1] This study documented the value that independent directors create at firms targeted by activist investors, which is a common type of corporate governance improvement sought by shareholders.

9.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research into various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and I continue to publish in peer-reviewed academic journals across these disciplines. Some of this research investigates issues relating to corporate governance and boards of directors.

10.    Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity.

11.    In addition to teaching at Notre Dame, I have delivered guest lectures to undergraduate and graduate students at Cornell University, UC Berkeley School of Law, and UC Berkeley School of Law Executive Education. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae.

12.    In the course of my engagement, I have reviewed and relied upon the documents referred to in this report. In addition, I have relied upon my prior education, professional

---

[1] Cain, Matthew D., Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon, 2016, How Corporate Governance Is Made: The Case of the Golden Leash, *University of Pennsylvania Law Review* 164, 649-702.

experience, and academic research. I reserve the right to update this report and any opinions contained herein to the extent new information comes to my attention.

## IV.    The Settlement

13.    Navient was formed in April 2014 as a public company spin-off from Sallie Mae. Navient services and manages private and federal student loans. As alleged in the Complaint, the Company has failed to comply with numerous state and federal laws, as well as the Fair Debt Collections Practices Act ("FDCPA"). Moreover, the board of directors has allegedly failed in its fiduciary duties to adequately monitor and address multiple compliance failures, risk management problems, and illegal business practices, including unfair, deceptive, or abusive acts or practices ("UDAAP"), in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as summarized below.

14.    According to the Complaint, the Consumer Financial Protection Bureau ("CFPB") has been investigating Navient since at least 2014, including reviewing the Company's compliance management, training protocols, potential UDAAP, internal controls and operations relating to the FDCPA, and examining whether the Company has been complying with other federal and state debt collection laws. The CFPB notified Navient in August 2014 that it would be referring its findings to the CFPB's enforcement division in order to pursue actions against the Company for numerous violations and deficiencies identified by the CFPB, including at least 18 categories of practices the CFPB found to be UDAAP. This was followed by CFPB civil investigative demands on the Company relating to the FDCPA compliance issues and UDAAP. In August 2015 the CFPB notified the Company that its business practices were in violation of federal and state laws and that it could institute legal action against the Company for numerous loan servicing problems.

15.     The CFPB initiated a civil lawsuit against Navient in January 2017 (the "CFPB Complaint"). The CFPB Complaint brought 11 claims against Navient relating to the issues raised by the CFPB over the preceding years. Despite raising these issues with the Company over the preceding several years, Navient's board allegedly failed to take appropriate action to monitor, address, and remediate these numerous violations of law.

16.     The CFPB Complaint alleged that Navient improperly steered hundreds of thousands of federal student loan borrowers into loan forbearance instead of adequately advising them about income-driven repayment programs ("IDRs"). IDRs allow low-income borrowers and under- or unemployed borrowers to lower their monthly payments, potentially to $0 per month. Additionally, IDRs can allow borrowers experiencing long-term financial hardship forgiveness of debt after certain amounts of time with qualifying payments. In contrast, under loan forbearance, interest continues to accrue and is added to the principal balance of the loan after expiration of the forbearance. Borrowers are also subject to additional fees and costs under loan forbearance. As a result, forbearance is a poor long-term solution for borrowers.

17.     Despite the benefits of IDRs over forbearance, Navient allegedly steered numerous borrows experiencing financial hardship into forbearance instead of IDRs. Moreover, despite the intended short-term nature of forbearance, the Company allegedly enrolled many borrowers into multiple, consecutive forbearances. Navient allegedly enrolled over 1.5 million borrowers into two or more consecutive forbearances totaling 12 months or longer between 2010 and 2015. The CFPB Complaint alleged that Navient had committed UDAAP relating to such steering behavior.

18.     The CFPB also alleged that Navient sent inadequate renewal notices for IDRs to borrowers, comprised only of a single e-mail with no information about the content or purpose of the notice in the subject line or body of the e-mail. This resulted in the expiration of a majority of

Navient's federal student loan borrowers' IDRs, which caused increased monthly payments, additional interest, and/or loss of federal government interest subsidies for borrowers. The CFPB further alleged that Navient failed to notify borrowers of these potential consequences if borrowers provided incomplete information in their renewal applications. This category of conduct, too, was found to be an UDAAP by the CFPB.

19.     The CFPB separately alleged that Navient failed to notify cosigners of student loans that they could apply for a release from a loan if the borrower made a number of consecutive minimum payments. Moreover, the Company improperly disqualified some cosigners from release consideration when borrowers had no bills due in a given month and thus paid $0 towards a loan in that month. Navient allegedly counted these months as failures of the consecutive payment requirements even though no payments were due in these months. This category of conduct, too, was found to be an UDAAP by the CFPB.

20.     Finally, the CFPB alleged that Navient failed to correct systematic and ongoing loan servicing errors, including the misallocation and misapplication of borrower loan payments. The Company allegedly falsely reported to credit agencies that borrowers were delinquent in loan payments when these delinquencies resulted from the Company's loan servicing errors. The Company thus allegedly failed to ensure adequate internal controls and monitoring of its loan servicing operations. This category of conduct, too, was found to be an UDAAP by the CFPB.

21.     Many of these violations were investigated by state attorneys general, including from the states of Illinois, California, Washington, and the Middle District of Pennsylvania. All of these state attorneys general have since filed civil lawsuits against the Company alleging such violations of federal and state laws.  In addition, numerous private parties have also filed civil lawsuits based on the same alleged underlying misconduct.

22.     Despite these ongoing investigations, allegations, and enforcement complaints, the Board has allegedly failed to take sufficient action to remedy the multitude of alleged violations. The Complaint alleges that the Board learned in May 2014 that Navient's internal auditing practices were insufficient to adequately monitor its compliance with CFPB examinations, loan servicing regulations, and consumer protection laws. At this time the Board also allegedly learned that the Company routinely failed to send required correspondences to borrowers when their benefits were terminated or disqualified, as required by the CFPB, and that the Company did not appropriately track consumer complaints. The CFPB notified the Board in August 2014 of multiple problems, including weaknesses in compliance management, insufficient training received by the board of directors, and inadequate guidance provided by the board regarding FDCPA compliance. According to the Complaint, the Board was aware of over 30 high risk breaches relating to such problems as forbearance fee credits, compliance violations of state collection laws, failures to disclose, and payment allocation control deficiencies.  Moreover, at this time, the Board was also told that they themselves represented a large governance risk for the Company, including the risk that the Company would not establish and maintain a control environment that would align with stockholder and regulatory expectations, "including tone at the top and board performance."

23.     The Complaint alleges that the Board was required to provide responses to the CFPB and implement remediation measures by March 2015, but that the board failed to take any steps to meet this deadline. In August 2014 the Board was allegedly aware that the Company did not monitor roughly half of the CFPB-required issues to ensure regulatory compliance. At the same time, the Board was notified that the CFPB had identified 18 specific UDAAP, but the Complaint alleges that instead of seeking to reform these practices, the Board intended to vigorously defend

its existing practices. The Complaint provides numerous other details and documentation relating to the board's inaction throughout 2015, 2016, and 2017.

24.     Finally, the Complaint alleges that three members of the Board collectively sold $1.2 million of Navient common stock from July 2016 through April 2017 while they were in possession of material non-public information. The Complaint alleges that instead of attempting to remedy the multitude of Company issues summarized above, these directors instead used their private knowledge of the Company's problems and sold their stock at artificially inflated prices.

25.     The Settlement directly addresses the allegations contained in the Complaint by instituting corporate governance reforms and improvements that are aimed at remedying these Company failures and preventing recurrences in the future. In my view and based upon published academic research on these specific corporate governance areas, these reforms will create significant shareholder value for the Company. Below I summarize each component of the Settlement, and then I follow with an analysis of the anticipated valuation impacts of the Settlement categories.

26.     As part of the Settlement, Navient commits to appoint two new independent directors to the board by the end of 2019. Given the Complaint's alleged lack of engagement by incumbent directors throughout the investigations and enforcement proceedings, Navient's existing Board would clearly benefit from the addition of new outsiders and the perspectives they could bring going forward. Additional independent directors should help the Company to more fully engage in the monitoring and oversight roles for which the board is ultimately responsible. Prior academic research has shown significant benefits from independent directors and I believe this will create additional shareholder value, as discussed further in the following section.

27. In addition, the Settlement provides that going forward, within six months of their election, new board members will receive training on relevant state collection laws and consumer protection laws. Moreover, all Board members will receive annual training on compliance with consumer protection laws, standards, and regulations. Again, given the numerous alleged violations of these laws by the Company and lack of progress in addressing these violations by existing board members, I believe this requirement obtained through the Settlement will directly improve the board's and Company's practices going forward.

28. The Settlement also stipulates that the Company will prepare a summary of the board's risk oversight responsibilities and will make this summary publicly available. Navient will also review and revise if necessary each board committee's charter to ensure that each committee's risk oversight responsibilities are clearly explained. The Settlement also provides for limitations on commitments by board members. The Company will amend its Board Governance Guidelines such that the Audit Committee Chair will not serve on more than one other public company's Board, and any individual Board members will not serve as the chair of more than one committee or as a member of more than three committees. The Board Governance Guidelines will also be amended to require the Board's independent directors to meet in executive session (outside of the presence of any director serving as an officer of Navient) at each regularly scheduled Board meeting, with a minimum of four times per year. Moreover, the independent directors will have the authority to call for reporting from any business unit at the executive session, including from audit and compliance areas. Collectively, these components of the Settlement will help the Board to engage more fully in their oversight and risk monitoring activities going forward. They will also empower the independent directors to improve compliance monitoring without undue pressure

from Company insiders. In my opinion, these components of the Settlement should create significant shareholder value.

29.     The Settlement also contains a number of provisions to improve the Company's compliance with laws and regulations around loan collections and loan servicing operations. Navient will maintain at least one executive position at the Senior Vice-President level or higher whose responsibilities include overseeing compliance with state and federal laws relating to loan servicing operations and loan collections. Navient will also create an executive-level Loan Servicing and Collections Compliance Committee to be comprised of the executive listed in the prior sentence, the General Counsel or Principal Legal Officer, and the Chief Risk and Compliance Officer. This committee will report directly to Navient's Audit Committee and will provide additional oversight of internal controls relating to the Company's loan collections and loan servicing practices. The Loan Servicing and Collections Compliance Committee will provide reports directly to the Company's Audit Committee. These reports will include their oversight responsibilities relating to the Company's loan servicing and loan-related collections efforts and their oversight of internal controls relating to Navient's loan servicing and loan-related collections efforts. These aspects of the Settlement are directly related to the Company's prior alleged failures in these business practices, and I expect these components of the Settlement to improve the Company's compliance efforts going forward, which should lead to the creation of significant shareholder value.

30.     Finally, the Settlement provides that Navient will amend its Code of Business Conduct to improve compliance failure internal reporting. This language provides that any employee who becomes aware of a Company failure relating to state or federal consumer protection laws, federal securities laws, or SEC rules, must immediately report this information to

the Company through a legal compliance email address. Moreover, the Settlement requires Navient's Chief Risk Compliance Officer to meet with the Audit Committee at least once a year to discuss the Company's Whistleblower Policy. The Company must consider any amendments to the policy recommended by this officer or the Audit Committee. These aspects of the Settlement should help the Company improve its internal reporting processes and address the internal failures alleged in the Complaint.

31.     As I discuss further in the following section, I believe these improvements in board independence, risk oversight, internal controls, and monitoring of business practices will lead to greater Company compliance with applicable laws, regulations, and standards. The board of directors should be much more engaged in the regulatory environment surrounding the Company's business practices. I believe these improvements will benefit numerous borrowers, the Company's reputation, and ultimately Company shareholders.

## V.     Valuation

32.     Numerous academic studies have explored the relation between corporate governance and firm value. These types of studies can be used to approximate the expected valuation impacts from various categories of corporate governance improvements. Below I focus on two academic studies that examine the types of governance improvements considered in this Settlement. I believe these studies provide an appropriate setting in which to estimate the potential valuation impacts of these changes. The studies have been published in top-tier, peer-reviewed, academic finance journals: the *Journal of Financial Economics* ("JFE")*, and the *Journal of Corporate Finance* ("JCF"). These journals are widely considered by academic scholars (and myself) to be among the most well-respected, reliable, and highly cited publications within the finance discipline; moreover, the JFE is considered to be one of the top three peer-reviewed

12

academic finance publications. These studies continue to be viewed by academic scholars as foundational to this line of corporate governance research. The two studies support the conclusion that these governance changes will directly create value for the Company's shareholders.

33.     I begin by estimating the valuation impact of the first component of the Settlement: the addition of two independent directors to the Board. Numerous academic studies have documented the beneficial roles that independent directors play within firms. Board independence helps to ensure that critical decisions are made without the influence of conflicts of interest, self-dealing, and agency problems that commonly plague decision-making bodies. Prior research has also shown that independent directors can improve corporate transparency.[2] Independent directors also improve internal monitoring of management and company practices. These types of improvements directly relate to the allegations regarding inadequate risk oversight, monitoring, and compliance detailed in the Complaint.

34.     To evaluate the Settlement's addition of two independent directors, I rely on a study published in *The Journal of Financial Economics* ("JFE") titled "The Value of Independent Directors: Evidence from Sudden Deaths."[3] The authors of this study state that "The emphasis on the value of independence in both academic and practitioner work reflects the notion that independent directors are better at monitoring the management because they are not, or are less, subject to the classic agency problem" (page 551). They further state that they "use sudden death of independent directors as a natural experiment to analyze their contribution to firm value. Our

---

[2] See Armstrong, Christopher S., John E. Core, and Wayne R. Guay, 2014, Do Independent Directors Cause Improvements in Firm Transparency, *Journal of Financial Economics* 113, 383-403.
[3] Nguyen, Bang Dang and Kasper Meisner Nielsen, 2010, The Value of Independent Directors: Evidence from Sudden Deaths, *Journal of Financial Economics* 98, 550-567.

underlying hypothesis is that the stock price should decline following the sudden death if an independent director properly monitors or provides managers with pertinent advice" (page 551).

35.     The authors conclude that their study "provides direct empirical evidence for the contribution of independent directors to shareholder value" (page 551). The average magnitude of this value effect ranges from 0.85% to 5.01% of the company's market capitalization in their models.[4]

36.     As a conservative estimate of the Settlement's value relating to the two new independent directors, I focus on the low-end of this average valuation range, or 0.85%. I multiply this by two in order to account for the addition of two new independent directors, and then I multiply this by Navient's market capitalization of $3.22 billion.[5] This results in a valuation estimate of $55 million. In other words, I would expect this portion of the Settlement to contribute at least $55 million in value to Navient and the Company's shareholders.

37.     I calculate a separate and more comprehensive approximation of the Settlement's value using a study published in *The Journal of Corporate Finance* ("JCF").[6] This study measures the evolution of firm value after corporate governance improvements were imposed upon poorly-governed firms. Some of these governance practices include: "boards must consist of a majority of independent directors," "non-management directors must have executive sessions without management," "audit committee must consist of only independent directors and at least three

---

[4] *See id*. at Table 4, page 557 and Table 7, page 561. I believe these are conservative valuation estimates. If investors anticipate that a deceased independent director will be replaced with another independent director with some probability, then the price reaction is attenuated.

[5] Closing stock price on November 15, 2018 of $12.16 multiplied by 265 million shares. outstanding. Source: Nasdaq.com.

[6] See Aggarwal, Reena, Jason D. Schloetzer, and Rohan Williamson, 2016, Do Corporate Governance Mandates Impact Long-Term Firm Value and Governance Culture?, *Journal of Corporate Finance*, Article in Press.

members," "firms must adopt and disclose corporate governance guidelines," and "regular assessment of Board performance" (page 4). These governance improvements are exactly the types of changes articulated in the Settlement and are aimed at remedying the Company problems alleged in the Complaint. I thus view this study as capturing not only the value of independent directors but also the value of other aspects of the Settlement. The study's authors document changes in firm value annually from one to five years after these governance improvements.[7] Overall, they find an average increase in firm value of 4.3%.[8]

38.     I thus use 4.3% as an estimate of the expected valuation impact of the Settlement. I multiply 4.3% by Navient's $3.22 billion market capitalization to obtain a valuation estimate of $139 million. I would expect the Settlement to increase Navient's shareholder value by up to $139 million over the next several years. I believe this figure includes both the value of independent directors and the value of other board oversight and monitoring improvements obtained in the Settlement. Thus, I do not separately add the $55 million value to this amount, but rather it is my opinion that the Settlement will create aggregate shareholder value of up to $139 million. I believe this is a robust estimate given the empirical design and strong reputation of the studies, their direct relevance to the alleged conduct in the Complaint, and the corporate governance improvements obtained in the Settlement.

## VI.    Conclusion

39.     My opinion is that the Settlement provides significant benefits to Navient and its shareholders. These commitments by the Company are directly targeted to the lack of board engagement and monitoring oversight alleged in the Complaint. Improved internal controls and

---

[7] See Table 4 on page 9.
[8] See Table 3, Column 8 on page 8.

monitoring of loan servicing and collections will improve the firm's regulatory compliance significantly. Moreover, prior academic research has consistently documented the beneficial effects of independent directors and proper board functioning. The Settlement provides for significantly improved internal controls and greater board involvement and oversight into the Company's business practices.

40.     Based upon the academic literature relating to these types of corporate governance improvements, I estimate that the value of the Company's equity will increase by up to $139 million within several years of the Settlement's approval. The Settlement thus strengthens Navient's corporate governance structure and significantly enhances shareholder value.

Dated: November 20, 2018

Matthew D. Cain

16

# EXHIBIT A

# Matthew D. Cain, Ph.D.

November 2018

E-mail: mdcain@outlook.com

Mobile: 574-485-8065

U.S. Citizen

mcain@law.harvard.edu

Cambridge, MA  02138

Research on SSRN

## Education

Ph.D., Finance, August 2007

B.S., Finance, May 2001

Purdue University, West Lafayette, IN

Grove City College, Grove City, PA

## Professional and Academic Experience

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-Present

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Working Papers**

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), Revise and Resubmit at *Journal of Financial and Quantitative Analysis*

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon)

**Presentations**

Berkeley Center for Law and Business, 2018
Cornerstone Research, 2018
U.C. Berkeley School of Law, 2018
Cornell University, 2016; 2015
Oxera, London, 2016
Institute for Law and Economics, University of Pennsylvania, 2015
U.C. Berkeley M&A Roundtable, New York, 2015
American Bar Association, Business Law, Private Equity M&A Subcommittee meeting, 2015
Virginia Commonwealth University, 2015
American Finance Association, annual meeting, 2015
Argentum Centre for Private Equity Symposium, Bergen, Norway, 2014
U.S. Securities and Exchange Commission, 2014
American Law and Economics Association, University of Chicago, 2014
The Brattle Group, 2013
U.S. Securities and Exchange Commission, 2013
Institute for Law and Economics, University of Pennsylvania, 2013
All Indiana Conference, 2013; 2010; 2009
American Law and Economics Association, Stanford Law School, 2012
George Washington University Law School, 2012
American Finance Association, annual meeting, 2012
Ohio State, 2011
Ohio University, 2011
Conference on Empirical Legal Studies, Yale Law School, 2010
Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden, 2010
Purdue Alumni Conference, 2010

American Finance Association, annual meeting, 2008
Indiana University, 2008
Penn State, 2008
University of Arizona, 2008
University of Colorado, 2008
University of Florida, 2008
University of North Carolina at Chapel Hill, 2008
University of Notre Dame, 2008
University of Oregon, 2008
University of Pittsburgh, 2008
Virginia Tech, 2008
Financial Management Association, annual meeting, 2007
University of Georgia, 2007
University of Kentucky, 2007
Western Finance Association, annual meeting, 2006


**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*


**Teaching Experience**

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert and Summary Witness Experience**

- **Declaration** – *Tharp v. Acacia Communications, Inc.*, No. 17-cv-11504 (D. Mass.), 2018.

- **Report, Deposition** – *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-SCJ (N.D. Ga., filed July 7, 2016). Assess information leakage and estimate trading profits in equities and options around three merger announcements in relation to insider trading allegations, 2017.

- **Report** – *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc., filed Oct. 4, 2016). Identify mutual fund diversification violations and investment advisor cherry-picking of trading allocations. 2016-2017.

- **Testimony, Report, Declaration** – *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa., filed Jan. 21, 2015). Quantify trading profits in equities and options of over 150 companies in relation to insider trading allegations, 2015-2016.

- **Declaration** – *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex., filed Mar. 3, 2015). Calculate ill-gotten gains and disgorgement in relation to unregistered stock sales, 2015.

# EXHIBIT E

# DRAFT
# Meeting Our Commitment:
# A Report on How Navient Manages Risks



NAVIENT®

## Our Commitment

Navient is committed to actively managing risk for all of our stakeholders, including our customers, clients, employees, and shareholders. We take this responsibility seriously as our success depends on the goodwill, support and success of our stakeholders. We are also committed to regularly reviewing our approaches and updating them to reflect changes, feedback and best practices. This report outlines our comprehensive approach.

## Board of Directors' Role in Risk Oversight

Our Board of Directors has the ultimate responsibility for risk oversight for Navient's Enterprise Risk Management ("ERM") philosophy and framework. In carrying out this critical responsibility, the Board has designated the Audit Committee as having primary responsibility to assist the Board in the development, maintenance and governance of the company's ERM policy, standards and program. Other standing committees of the Board are charged with overseeing specific enterprise risks, as described below. The Board and its standing committees are responsible for ensuring we adhere to established risk tolerances and parameters that form a cornerstone of the company's ERM framework.

The Board has delegated day-to-day responsibility for risk oversight to our Chief Executive Officer and senior management team, who in turn have established the following management committees to implement this directive:  Enterprise Risk and Compliance Committee, Credit and Loan Loss Committee, Asset and Liability Committee, and Incentive Compensation Plan Committee. These internal management committees, described in more detail below, provide regular reports to the Board and its standing committees—either directly or through one or more senior executives. The overall risk governance structure is illustrated below:



## Enterprise Risk and Compliance Committee

The Enterprise Risk and Compliance Committee is critical to Navient's ERM framework. This management-led committee is responsible for identifying, measuring, mitigating, monitoring and reporting on all risks associated with the business operations of Navient Corporation and its subsidiaries (together, "Navient"). The Enterprise Risk and Compliance Committee provides a high-level forum for our executive management to review, discuss and direct action on enterprise risk issues. The committee is responsible for management oversight of the ERM framework and the processes for monitoring and measuring Navient's risk profile against our established Risk Appetite Framework (described below).

Our Enterprise Risk and Compliance Committee also oversees, reviews and approves Navient's compliance management program, which identifies, measures, mitigates, monitors and reports on compliance, consumer complaint processing, information security, asset protection, legal and government relations risks associated with Navient's business operations. The committee has responsibility for oversight of our compliance with laws, regulations and internal policies and programs, including:

- Consumer protections associated with debt collection and education loan management;
- Privacy of customer information;
- Navient's Code of Business Conduct
- Bank Secrecy Act, Office of Foreign Assets Control, and anti-money laundering requirements;
- Information security;
- Asset protection;
- Consumer complaint processing; and
- Vendor Management.

The Enterprise Risk and Compliance Committee is led by our Chief Risk and Compliance Officer and meets at least quarterly, preceding each regularly scheduled meeting of the Board, or more frequently as necessary. The Chief Risk and Compliance Officer, who reports to our CEO, provides regular reports to the Audit Committee and escalates to that committee any significant departures from risk tolerances and parameters established under the Risk Appetite Framework. These reports also include a review of corrective actions if there are any breaches of risk limits or thresholds in the company's Risk Appetite Framework.

## Enterprise Risk Management Policy

The Enterprise Risk Management Policy defines the overall ERM framework for Navient. This policy describes how Navient monitors, controls, and tracks material risks to which the company is exposed in the normal course of business. The policy also describes individual and functional responsibilities by Navient's ERM framework. The ERM Policy is reviewed and approved on an annual basis by our Enterprise Risk and Compliance Committee and the Audit Committee.

## Risk Appetite Framework

Navient employs a Risk Appetite Framework to identify the most significant risks that could impact our business and provides the process for evaluating and quantifying those risks. The Risk Appetite Framework defines the type and degree of risk Navient is able and willing to assume, given its business objectives, contractual and other legal requirements, and obligations to stakeholders. As noted below, our Risk Appetite Framework segments enterprise risk across nine enterprise risk domains.

The Risk Appetite Framework specifies risk limits and risk thresholds for given risk domains. Risk limits set the outermost boundary of acceptable risk levels, while risk thresholds are warning below the risk limits which trigger additional monitoring, reporting or mitigation steps. Our internal ERM team, led by our Chief Risk and Compliance Officer, is responsible for monitoring and reporting on all risk limits and risk thresholds. Breaches of risk thresholds or risk limits, as well as proposed

corrective actions, are reported by management to the Enterprise Risk and Compliance Committee. The Chief Risk and Compliance Officer in turn reports information on limit breaches to the Audit Committee at least quarterly.

## Enterprise Risk Domains

Our Risk Appetite Framework segments Navient's enterprise risks across nine enterprise risk domains: (1) Credit; (2) Market; (3) Funding and Liquidity; (4) Compliance; (5) Legal; (6) Operational; (7) Reputational and Political; (8) Governance; and (9) Strategy. These risk domains are disclosed in our Form 10-K and proxy statements filed with the SEC.

The Board has assigned oversight responsibility for each risk domain to one or more of its standing committees. These risk oversight responsibilities are spelled out in each committee's charter, which can be found at https://www.navient.com/about/investors/corp_governance/board_charters/.

Each of the enterprise risk domains is described below, along with the standing committee(s) responsible for risk oversight.

| Enterprise Risk Domain | Board Committee | Risk Description |
|---|---|---|
| Credit | Finance and Operations Committee | Risk resulting from an obligor's failure to meet the terms of any contract with the company or otherwise fail to perform as agreed. |
| Market | Finance and Operations Committee | Risk resulting from changes in market conditions, such as interest rates, spreads, commodity prices or volatilities. |
| Funding and Liquidity | Finance and Operations Committee | Risk arising from the company's inability to meet its obligations when they come due without incurring unacceptable losses. |
| Compliance | Audit Committee / Finance and Operations Committee | Risk arising from violations of, or non-conformance with, laws, rules, regulations, prescribed practices, internal policies, and procedures, or ethical standards. |
| Legal | Audit Committee / Finance and Operations Committee | Risk manifested by claims made through the legal system, including litigation brought against the company. Legal risk may arise from a product, a transaction, a business relationship, property (real, personal, or intellectual), employee conduct, or a change in law or regulation. |
| Operational | Finance and Operations Committee / Compensation and Personnel Committee | Risk resulting from inadequate or failed internal processes, personnel and systems, inadequate product design and testing, or from external events. |
| Reputational and Political | Nominations and Governance Committee | Risk from stakeholder perceptions regarding actual or alleged violations law, our internal code of conduct or other employee misconduct. |
| Governance | Nominations and Governance Committee | Risk of not establishing and maintaining a control environment that aligns with stakeholder and regulatory expectations, including tone at the top and board performance. |
| Strategic | Executive Committee | Risk from adverse business decisions or improper implementation of business strategies. |

## Credit and Loan Loss Committee

The Credit and Loan Loss Committee is an internal management committee established to consider all matters relating to credit risk and loan loss management for Navient. It serves as the management-level forum for reviewing and approving

credit and credit risk policy, credit products, pricing, and all aspects of managing and approving credit risk and the loan loss allowance at Navient. Our Chief Risk and Compliance Officer serves as the committee chairperson, who also serves as a liaison to the Enterprise Risk and Compliance Committee. The Credit and Loan Loss Committee meets at least quarterly prior to the filing of our SEC periodic filings.

## Asset and Liability Committee

The Asset and Liability Committee is an internal management committee led by our Chief Financial Officer. The committee manages the assets, liabilities and the investments of Navient consistent with the guidance, goals and risk tolerance of the Enterprise Risk and Compliance Committee and the Board's Finance and Operations Committee. Our Chief Financial Officer reports on committee matters both to the Enterprise Risk and Compliance Committee and the Finance and Operations Committee. The Asset and Liability Committee meets at least quarterly.

## Cybersecurity Risk

The Board, through the Finance and Operations Committee, also oversees Navient's cybersecurity risk management. The Finance and Operations Committee receives regular briefings from the company's Chief Information Officer and its Chief Information Security Officer on our information security program. These briefings include recent developments in cybersecurity prevention, detection, response and recovery, as well as updates on breaches and exploitations, both successful and unsuccessful, at other companies.

## Incentive Compensation Risk

Navient maintains an internal Incentive Compensation Plan Committee to monitor incentive compensation plans, as well as the plan governance structure put in place to mitigate risks associated with the plans. The Committee has responsibility for ensuring that our incentive compensation practices properly incent our employees, do not improperly incent risk or non-compliance and reflect industry best practices. The Incentive Compensation Plan Committee conducts an annual risk review and assessment of the various incentive compensation plans covering our employees—including plans that cover our senior executives—to ensure that our employees are not incented to take inappropriate risks, which could impact our financial position and controls, reputation and operations. Our Chief Risk and Compliance Officer, Chief Legal Officer, Chief Audit Officer and Chief Human Resources Officer serve on the committee, along with senior business leaders.

Incentive awards made to our senior executives are subject to clawback in the event of a material misstatement of the company's financial results and other qualifying events. We enhanced our clawback policy twice in the last two years. In 2017, following the Compensation and Personnel Committee's extensive review and consideration of the previous clawback policy, we updated the clawback policy to give the Board discretion to recoup incentive compensation both in the event of a financial restatement and in the case of executive misconduct involving a material violation of a company policy or commission of fraud or other misconduct involving the company. In March 2018, following engagement with its shareholders, the Board further enhanced the clawback policy to add a clawback trigger in the event of misconduct committed by persons under a senior executive's supervision.

## Our Operational Commitment

Our Enterprise Risk Management Program goes hand in hand with our daily operations and compliance routines, including:

- All employees participate in annual training in areas such as anti-discrimination, fair lending, and other consumer protection laws to ensure team members' compliance with laws, regulations, and policies.

- Education on our code of conduct for all new employees and regular refresher courses for existing employees

- Whistleblower Hotline to report any code of conduct violations

- Complaint tracking and analysis

- Legal and compliance expert review of marketing materials

- Regular quality assurance testing and call listening

- Consumer research to identify actionable insights to enhance our offerings

We also share learnings and make recommendations to our clients when we identify insights or opportunities that we believe would enhance their program. Further, we engage with policymakers to share practical recommendations on potential policy changes that we believe would benefit consumers.